# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | |
|---|---|
| IN RE: ) | Case No. 20 B 81699 |
| ) | |
| Mauricio A. Luna and ) | Judge Thomas M. Lynch |
| Marisol Luna, ) | |
| ) | Chapter 7 |
| Debtors. ) | |
| ) | Trustee Joseph D. Olsen |

---

| | |
|---|---|
| Rodrigo Martinez Torres, Dario ) | |
| Aguilera Rendon, Luis Alfredo ) | |
| Gamboa Marrero, Melquiades ) | |
| Barron Sandoval, Omar Alonso ) | |
| Esquivel Beltran, Brian Flores ) | |
| Gonzalez, Gerardo Martinez ) | |
| Hernandez, Angel Valentin Estrella ) | Adversary Proceeding No. |
| Diaz, Gerardo Santillan Hernandez, ) | |
| Arturo Jasso Villalpando, Gerardo ) | |
| Garcia Roldan, Manuel de Jesus ) | JURY DEMANDED |
| Sandoval Medina, Jose Luis Torres ) | |
| Salinas, Rogelio Olivares Rodarte, ) | |
| Martin Castañeda Aranda, Samuel ) | |
| Hidrogo Ruiz, J Remedios Mares ) | |
| Cordova, Guillermo Guevara Mora, ) | |
| Jose Eliseo Hernandez Aranda, ) | |
| Francisco Palos Soto, Edgar Castillo ) | |
| Torres, Manuel Mora Garcia, Marco ) | |
| Cuevas Leal, and Felipe Flores ) | |
| Garcia, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| Mauricio Luna, ML Farm Systems ) | |
| Inc., Alpha Agricultural Builders ) | |
| Inc., Spartans Agricultural Builders ) | |
| Inc., ) | |
| ) | |
| Defendants. ) | |

**ADVERSARY COMPLAINT BY WAGE CREDITORS FOR A FINDING OF
NON-DISCHARGEABILITY, DENIAL OF DISCHARGE, AND OTHER RELIEF**

### INTRODUCTORY STATEMENT

1.     A group of migrant workers (the "Workers") bring this case seeking relief for racketeering, human trafficking, forced labor, violation of the Fair Labor Standards Act and other wrongful conduct; and seek a finding of non-dischargeability of debts incurred as a result of that unlawful conduct. The debtor, Mauricio Luna ("Luna"), did business under various business names, including ML Farm Systems Inc. ("ML Farm"), which later became Alpha Agricultural Builders Inc. ("Alpha"), and Spartans Agricultural Builders, Inc. ("Spartans"). As set forth below, Luna repeatedly created and shifted assets to purportedly new business entities solely to avoid the consequences of his criminal and other unlawful treatment of the Workers.

2.     Luna recruited the Workers to work under H-2A temporary agricultural worker visas and transported them from their homes in Mexico to the United States to construct buildings for hog and poultry production throughout the country. Luna induced the Workers to work for him by promising them well-paid, lawful work, and the Workers relied on those promises, incurring significant debts to come to the U.S., only to be exploited, abused, and coerced to work without pay.

3.     Instead of providing the wages Luna falsely promised Workers, he and his agents repeatedly lied to and deceived them, and in some cases threatened the Workers with deportation, compelling the Workers to work at sites across the country for hundreds of hours without pay and under appalling conditions. The Workers frequently lacked sufficient food, water, and proper housing.

4.     When the Workers complained, Luna and his agents continued to make false promises to the Workers regarding their pay, and threatened them if they complained or refused to continue working without pay.

5.     Luna induced the Workers to come to the U.S. to work based on false promises, coercion, intimidation, and threats, and caused the Workers to continue working without pay and in fear of harm, which constituted human trafficking and forced labor.

6.     The Workers seek all available remedies under RICO, 18 U.S.C. § 1961, *et seq.,* the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1589 *et seq.*, and the Illinois Trafficking Victims Protection Act, as well as damages for breach of contract, fraudulent misrepresentation, and unjust enrichment.

### **JURISDICTION**

7.     The Workers bring this adversary Complaint pursuant to Rule 7001(1) against each of the Defendants, and against Luna under Rule 7001(4) of the Federal Rules of Bankruptcy Procedure, as it constitutes an objection to Luna's discharge and the dischargeability of the Worker's claims.

8.     This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2). Thus, this Court has jurisdiction over this proceeding pursuant to both 28 U.S.C. §§ 157 and 1334.

9.     Because the Workers seek a jury trial, the Workers do not consent to entry of final orders or judgment by the Bankruptcy Court on non-core matters.

10.     Venue in this proceeding is proper in this District pursuant to 28 U.S.C. § 1409(a).

11.     On January 11, 2021, the Workers filed a motion to extend the time within which to file their objections to discharge or dischargeability under § 523 and § 727 of the Bankruptcy Code, and this Court granted the motion on January 27, 2021, extending the deadline to make those objections to March 22, 2021. (Luna Dkt. #55, 64.)

12.     On March 16, 2021, the Workers and United States Trustee filed another motion to extend time under § 523 and § 727 of the Bankruptcy Code, and this Court granted the motion, extending the deadline to make objections to discharge or dischargeability to June 1, 2021. (Luna Dkt. #79, 80, 85.)

13.     On May 26, 2021, the Workers and the United States Trustee filed a third motion under § 523 and § 727 of the Bankruptcy Code, and this Court granted the motion, extending the deadline to July 14, 2021 (Luna Dkt. #119 - 129.)

14.     On June 30, 2021, the Workers filed a motion for Relief from the Automatic Stay under 11 U.S.C. § 362(d)(1) in the Alpha case. The Court granted the motion on June 30, 2021, allowing Wage Creditors to pursue their rights and remedies in an adversary proceeding in connection with Luna's bankruptcy case (Luna Dkt. #470).

15.     On July 6, 2021, the Workers filed a fourth motion to extend time under § 523 and § 727 of the Bankruptcy Code, and this Court granted the motion, extending the deadline to September 30, 2021 (Luna Dkt. #135, 137).

16.     The Workers timely filed this adversary complaint before September 30, 2021.

## PARTIES
### WORKERS - PLAINTIFFS

17.     At various times between 2012 and 2020, each of the Workers provided services for ML Farm in the United States under the H-2A Visa Program, and Luna owes wages and related compensation to each that ML Farm failed to pay.

18.     Rodrigo Martinez Torres is a Mexican citizen from the state of Durango, Mexico. He provided services to ML Farm during various periods from 2013 to 2019, including from August 2013 to December 2013, from July 2014 to November 2014, from October 2018 to March 2019, and in September 2019.

19.     Dario Aguilera Rendon is a Mexican citizen from the state of Zacatecas, Mexico. He provided services to ML Farm from 2016 to 2019, including from June 2016 to December 2016, from May 2017 to approximately March 2018, from August 2018 to approximately March 2019, and from June 2019 to August 2019.

20.     Luis Alfredo Gamboa Marrero is a Mexican citizen from the state of Durango, Mexico. He provided services to ML Farm during various periods from 2012 to 2019. Each year from 2012 through 2016, he provided services to ML Farm from approximately June until the end of the year. He also provided services to ML Farm from September 2019 to October 2019, at which point he had an accident at work, and could no longer work.

21.     Melquiades Barron Sandoval is a Mexican citizen from the state of Zacatecas, Mexico. He provided services to ML Farm in August 2019.

5

22.     Omar Alonso Esquivel Beltran is a Mexican citizen from the state of Durango, Mexico. He provided services to ML Farm from November 2018 through February 2019 and from September 2019 to October 2019.

23.     Brian Flores Gonzalez is a Mexican citizen from the state of Durango, Mexico. He provided services to ML Farm from November 2018 through February 2019 and from July 2019 through September 2019.

24.     Gerardo Martinez Hernandez is a Mexican citizen from the state of Tamaulipas, Mexico. He provided services to ML Farm from July 2017 to March 2018, from approximately July 2018 to March 2019, and from July 2019 to September 2019.

25.     Angel Valentin Estrella Diaz is a Mexican citizen from the state of Zacatecas, Mexico. He provided services to ML Farm during various periods from 2013 to 2019, including from August 2013 to January 2014, from June 2014 to January 2015, from June 2015 to approximately November 2015, from September 2016 through February 2017, from June 2017 through February 2018, and from October 2018 through February 2019.

26.     Gerardo Santillan Hernandez is a Mexican citizen from the state of Durango, Mexico. He provided services to ML Farm from July 2019 to August 2019.

27.     Arturo Jasso Villalpando is a Mexican citizen from the state of Zacatecas, Mexico. He provided services to ML Farm during various periods from 2016 to 2020, including from June 2016 through February 2017, from May 2017 through February 2018, from July 2018 through February 2019, from September 2019 to October 2019, and from March 2020 to April 2020.

28.     Gerardo Garcia Roldan is a Mexican citizen from the state of Zacatecas, Mexico. He provided services to ML Farm from January 2019 to February 2019.

29.     Manuel de Jesus Sandoval Medina is a Mexican citizen from the state of Zacatecas, Mexico. He provided services to ML Farm during various periods from 2016 to 2019, including from October 2016 to February 2017, from May 2017 through February 2018, from August 2018 to February 2019, and from May 2019 to October 2019.

30.     Jose Luis Torres Salinas is a Mexican citizen from the state of Tlaxcala, Mexico. He provided services to ML Farm during various periods from around 2014 to 2019, including from approximately the beginning of each summer until December each year between about 2014 and 2018, and from August 2019 to approximately September 2019.

31.     Rogelio Olivares Rodarte is a Mexican citizen from the state of Zacatecas, Mexico. He provided services to ML Farm from July 2017 to August 2017.

32.     Martin Castañeda Aranda is a Mexican citizen from the state of Zacatecas, Mexico. He provided services to ML Farm during three or four different periods between 2015 and 2018. Most recently, he provided services to ML Farm from September 2017 to March 2018.

33.     Samuel Hidrogo Ruiz is a Mexican citizen from the state of Zacatecas, Mexico. He provided services to ML Farm from June 2016 to December 2016, from June or July 2017 to March 2018, and from October 2018 to March 2018.

34.    J. Remedios Mares Cordova is a Mexican citizen from the state of Zacatecas, Mexico. He provided services to ML Farm during various periods from 2015 to 2019, including from July 2015 to February 2016, from July 2016 to February 2017, from July 2017 to February 2018, from July 2018 to February 2019, and from September 2019 to December 2019.

35.    Guillermo Guevara Mora is a Mexican citizen from the state of Veracruz, Mexico. He provided services to ML Farm from December 2018 through February 2019.

36.    Jose Eliseo Hernandez Aranda is a Mexican citizen from the state of Zacatecas, Mexico. He provided services to ML Farm during various periods from 2016 to 2019, including from August 2016 to February 2017, from July 2017 to February 2018, from May 2018 to February 2019, and from July 2019 to December 2019.

37.    Francisco Manuel Palos Soto is a Mexican citizen from the state of Durango, Mexico. He provided services to ML Farm from November 2018 through February 2019.

38.    Edgar Castillo Torres is a Mexican citizen from the state of Tlaxcala, Mexico. He provided services to ML Farm during various periods from 2014 to 2019, including from September 2014 to February 2015, from May 2015 to February 2016, from May 2016 to December 2016, from May 2017 to February 2018, from June 2018 to February 2019, and from October 2019 to December 2019.

39.   Manuel Mora Garcia is a Mexican citizen from the state of Veracruz, Mexico. He provided services to ML Farm from December 2018 through February 2019.

40.   Marcos Cuevas Leal is a Mexican citizen from the state of Veracruz, Mexico. He provided services to ML Farm from October 2018 to March 2019.

41.   Felipe Flores Garcia is a Mexican citizen from the state of Durango, Mexico. He provided services to ML Farm from December 2018 through February 2019.

### DEFENDANTS

42.   Luna owned ML Farm, served as its sole officer (President and CEO), and maintained ML Farm's books and records for at least two years before ML Farm filed its bankruptcy case in this District. Luna controlled and directed ML Farm's business operations. ML Farm's status as a purportedly separate business entity from Luna is a fiction and fraud and must be disregarded.

43.   ML Farm incorporated in Iowa on February 20, 2009, with its principal place of business in Illinois. ML Farm has been "insolvent" for purposes of 11 U.S.C. § 101(32) since at least January 1, 2019. ML Farm ceased all or nearly all of its field operations in or around March of 2020. ML Farm filed a voluntary chapter 7 bankruptcy petition in this Court on October 23, 2020, case number 20-81768 ("ML Case"). The ML Case was closed on February 9, 2021.

44.   Alpha was first incorporated in Texas on June 17, 2019, and registered to conduct business in the States of Iowa and Illinois on April 28, 2020 and May 4,

2020, respectively. Alpha was subsequently domesticated as an Illinois corporation on July 8, 2020. Luna's son-in-law, Luis Garcia, is, and at all times has been, its purported sole officer. Alpha's office is located at 111 5th Avenue, Rochelle, Illinois 61068. On information and belief, Luna has controlled and directed Alpha's business operations since its inception and Alpha's status as a purportedly separate business entity from Luna is a fiction and fraud and must be disregarded.

45.     Spartans is an Illinois Corporation incorporated on September 3, 2020, with its registered agent located at 226 N. West Avenue, Suite 205, Elmhurst, Illinois 60126. Lucia Ramirez, a former employee of ML Farm and Alpha, is, and at all times has been, its purported sole officer. On information and belief, Luna has controlled and directed Spartans' business operations since its inception, and Spartans' status as a purportedly separate business entity from Luna is a fiction and fraud and must be disregarded.

### THE WORKERS CHALLENGE LUNA'S ENTITLEMENT TO DISCHARGE THE WORKER'S CLAIMS AND GENERALLY TO RECEIVE A BANKRUPTCY DISCHARGE

46.     The Workers bring this adversary proceeding under § 523(a) of the Bankruptcy Code, as the Workers seek this Court's determination that the debts Luna owes them are non-dischargeable because they constitute debts for services obtained by false pretenses, false representation, or actual fraud within the meaning of Bankruptcy Code (§ 523(a)(2)(A)) and because the debts represent willful and malicious injury to the Workers (§ 523(a)(6)).

47.     In the alternative, Luna is not entitled to a bankruptcy discharge because, with intent to hinder, delay, or defraud the Workers, Luna has "transferred,

10

removed, destroyed, mutilated, or concealed his property" within one year before filing, and "concealed, destroyed, mutilated, falsified, or failed to keep or preserve" the appropriate records and other documents from which his financial condition and business transactions might be ascertained, within the meaning of 11 U.S.C. § 727(a)(2) and (3).

48.     Luna conducted his business under various entity names, including ML Farm, Alpha, and Spartans as his alter egos. The purportedly separate corporate statuses of ML Farm, Alpha, and Spartans constitute a fiction and sham. Based on the facts set forth below, this Court can and must "pierce the corporate veil" and disregard the purportedly separate nature of these entities.

## LEGAL BACKGROUND
### OVERVIEW OF THE H-2A PROGRAM

49.     The H-2A temporary agricultural program ("H-2A Program") allows U.S. employers or their agents to bring Workers from outside the United States ("H-2A Workers") to work in temporary jobs in agriculture when insufficient domestic workers are available.

50.     In order to import Workers to the U.S., an agricultural employer must submit an application to the U.S. Department of Labor ("USDOL"), which includes a "job order" in compliance with the requirements of 20 C.F.R. § 653.501(d)(3).

51.     Once USDOL approves a job order, the employer must seek a special H-2A visa with U.S. Citizenship and Immigration Services ("USCIS"). When USCIS issues an H-2A visa, the visa restricts the worker to work only for the employer and for no other business.

52.    If the employer successfully completes the application process, USDOL issues a temporary labor certification, permitting the importation of H-2A Workers.

53.    As a condition of receiving a temporary labor certification, USDOL requires agricultural employers to pay the highest of the "Adverse Effect Wage Rate", the prevailing hourly wage, or the federal or state minimum wage. 20 C.F.R. § 655.120.

54.    H-2A employers are required to pay wages free and clear, without deduction of items that are primarily for the benefit of the employer, and without reducing an employee's wages by shifting costs to the employee. *Id.* § 655.122(p).

55.    H-2A workers must earn, on average, at least the hourly wage specified by the regulations per pay period. *Id.* § 655.122(l)(2)(i).

56.    H-2A employers may not charge recruitment fees to workers applying for H-2A jobs. *Id.* § 655.135(j).

57.    H-2A employers must reimburse workers for any costs expended prior to arrival at the jobsite that are primarily for the benefit of the employer, including travel expenses, such as subsistence costs, motels, transportation, and visa fees. *Id.* § 655.122(h).

58.    H-2A employers must provide workers with free housing that complies with health and safety regulations. *Id.* § 655.122(d)(1).

59.    Employers are also prohibited from requiring workers to pay for any activity related to obtaining labor certification. *Id.* § 655.135(j).

60.     Employers must also provide written work contracts to workers by the time the workers appear for work. *Id.* § 655.122(q).

61.     If the employer fails to provide such a written contract, the required terms of the job order and the certified application control as the work contract. *Id.*

62.     H-2ALCs, who supply workers (as opposed to fixed-site agricultural employers), are subject to additional requirements.

63.     When an H-2ALC, rather than a fixed-site employer, seeks H-2A visas, it must provide the name and location of each fixed-site agricultural business to which the contractor expects to provide workers; a letter of support from any fixed-site agricultural employer promising to employ the H-2A labor contractor for the period of the job order; the expected beginning and ending dates; and a description of the crops and activities to be performed at the sites. *Id.* § 655.132(b)(1).

64.     The H-2ALCs must also provide the USDOL with "copies of the fully-executed work contracts with each fixed-site agricultural business" listed on the itinerary. *Id.* § 655.132(b)(4).

65.     Employers filing an H-2A application, including H-2ALCs, must certify that the H-2A application is accurate.

66.     Employers filing an H-2A application, including H-2ALCs, must also certify that conditions of employment will comply with federal, state, and local employment-related laws and regulations, and that the employer will provide workers' compensation insurance at no charge to the worker.

13

67.    The H-2ALC must also sign a statement acknowledging that knowingly providing false information is a felony under 18 U.S.C. § 1001.

## FACTS

### FACTS ESTABLISHING LUNA'S INDEPENDENT STATUS AS AN "EMPLOYER" UNDER FLSA

68.    Luna, operating as ML Farm, recruited the Workers from their home communities in Mexico to work under H-2A temporary agricultural visas.

69.    The Workers are from rural, impoverished areas of Mexico where there are few opportunities for paid employment, and no opportunities that pay wages comparable to those promised under the H-2A program. The Workers traveled to the United States at considerable personal expense, with the goal of earning enough to support their families back home.

70.    Luna founded ML Farm in 2009 and has, at all pertinent times, maintained total operational control of the company.

71.    Luna filed job orders with the USDOL to bring hundreds of H-2A workers from Mexico over a number of years to the United States to work for ML Farm.

72.    Luna exercised day-to-day control of operations of the company, including payroll, schedules, sales, and transportation.

73.    Luna was directly involved in the payment of ML Farm employees and H-2A workers through Delta Financial Services ("Delta"), a payroll company based in Elmhurst, Illinois.

74.     Luna often supervised crews of H-2A workers on their out-of-state jobsites and otherwise managed ML Farm supervisors and crew leaders.

75.      Accordingly, Luna is individually liable as an employer under FLSA, 29 U.S.C. § 203(d), for Defendants' wage law violations.

### GENERAL FACTS

76.     Between 2012 and 2020, ML Farm had annual revenues in excess of $500,000 and conducted interstate commerce by transporting H-2A Workers from Illinois to locations all over the United States.

77.     USDOL and other public records show that between January 2018 and the present, Luna, operating as ML Farm, Alpha, and Spartans, recruited hundreds of H-2A Workers to work in the United States.

78.     At all relevant times, Luna employed the Workers and all similarly situated persons at ML Farm, Alpha, and Spartans to work as temporary agricultural laborers to build large animal enclosures under H-2A guest worker visas.

79.     During his Rule 2004 deposition, Luna admitted that he regularly sent the Workers to, and required them to work at locations other than those he identified on job orders he had filed with the USDOL.

80.     Commonly, the Workers worked for a few weeks at the jobsite indicated in the USDOL job order, but were then moved to multiple other jobsites, often at a great distance, and not specified in the job order.

81.    For example, the Workers worked in the following states that were not included in their job orders: Ohio, New York, Wisconsin, North Dakota, South Dakota, Nebraska, Utah, Pennsylvania, Iowa, and Colorado.

82.    Luna gave the Workers no contract or job order to indicate where they were moving or would be working, and often the Workers did not even know the location where Luna was sending them.

83.    The Workers entered into employment contracts with Luna, the "minimum . . . provisions" of which are established by the H-2A regulations. *See, e.g.*, 20 C.F.R. §§ 122(q), 122(14).

84.    Luna ultimately required the Workers to work many hours a week beyond the number of hours stated in the contracts and at a rate below the Adverse Effect Wage Rate.

85.    During his Rule 2004 deposition, Raul Coria, ML Farm's former comptroller, admitted that the Workers worked 10-11 hours a day, beyond the 40 hours Luna reported in the USDOL job orders.

86.    As ML Farm's sole officer and the person who oversaw ML Farm's operations, Luna knew or acted in reckless disregard for the truth that the Workers performed services beyond the hours reported in ML Farm's USDOL job orders.

87.    In or around 2017, Luna knew that ML Farm was losing substantial sums due to his mismanagement of the business and would not have net revenue available to pay the Workers.

88.     Despite knowing he would not be able to pay Workers, Luna continued to file job orders, and obtained the Workers' labor by knowingly and intentionally making a series of false statements to USDOL as part of his job applications for participation in the H-2A program.

89.     Luna's false statements to USDOL included stating that Workers would work only 40 hours a week and be provided adequate food and housing.

90.     Luna also obtained the Workers' labor by knowingly and intentionally making a series of false statements, either directly or through his agents, to Workers, during recruitment of the Workers in their home country.

91.     Luna or his authorized agents made these false statements to Workers knowing that the Workers would rely on the statements and used these statements to induce the Workers to work for him.

92.     Luna did not intend to fulfill the conditions he laid out in his H-2A applications or the promises he made to the Workers during their recruitment.

93.     The Workers reasonably relied on Luna's false statements to the Workers and to USDOL regarding the terms and conditions of their employment.

94.     The Workers believed that the wages, the reimbursement for travel costs, and the free housing Luna offered would enable them to recoup their inbound travel expenses, pay off the recruitment debt he induced them to incur, and have a fair amount of money to bring home to their families at the end of the contract.

95.     In reliance on Luna's false statements, the Workers accepted his employment offer and left Mexico to work for him.

96.     As a result of Luna's false promises, the Workers suffered damages.

97.     Once the Workers arrived to work in the United States, Luna failed to pay the total promised wages or comply with the terms and conditions of the Workers' contracts.

98.     Luna knowingly and intentionally made a series of threats and engaged in action to coerce and pressure the Workers to continue to work for ML Farm.

99.     The Workers suffered pecuniary damages and emotional distress, including stress, humiliation, and anxiety because of Luna's willful and malicious actions.

### FACTS ESTABLISHING THAT LUNA, ML FARM, ALPHA, AND SPARTANS ARE ONE AND THE SAME

100.    Courts can "pierce the corporate veil" between purportedly separate entities where (1) there such unity of interest in the ownership and operation of the entities that separate corporations do not exist, and (2) where adherence to the fiction of separate corporate status would sanction a fraud or promote injustice.

101.    Courts determine whether this test is met by examining a number of factors, including, inter alia, an absence of corporate records, a failure to observe corporate formalities, commingling of funds, diversion of assets from one entity to the other to the detriment of creditors, and failure to maintain arm's length relationships among the purportedly separate entities.

102.    If one corporation is merely a dummy or sham for another corporation, the distinct corporate entities will be disregarded and the purportedly separate corporations will be treated as one.

18

103.   Luna, in the operation of his various businesses, including but not limited to ML Farm, Alpha, and Spartans, conducted these businesses as his alter egos, seeking to shield himself from personal liability, while at the same time using funds of these businesses for fraudulent, unjust, and unfair purposes.

104.   Luna caused Alpha to be created as an alter ego of ML Farm, seeking to shield himself and ML Farm from liability incurred due to Luna's mismanagement and fraud, and as a sham vehicle for further fraudulent, unjust, and unfair purposes.

105.   When it began to appear that creditors, including the Workers, recognized Alpha to be a sham and would seek to hold it liable for ML Farm's debts, Luna caused Spartans to be created as an additional sham vehicle for Luna's fraudulent, unjust, and unfair purposes.

106.   Luna conducted this scheme to avoid paying creditors, including the Workers.

*Facts establishing Luna and ML Farm as alter egos*

107.   At the meeting of creditors on December 15, 2020 in the ML Farm Bankruptcy, Luna testified that he personally guaranteed many of the debts of ML Farm.

108.   In 2018, ML Farm had gross revenues of $4,822,403.

109.   In 2019, ML Farm had gross revenues of $3,559,881.

110.   In 2020, ML Farm had gross revenues of $1,884,848.

111.   In June 2019, Luna and ML Farm provided Iowa Falls State Bank, one of Luna's creditors, with a balance sheet dated December 31, 2018 (the "2018 Balance

Sheet"), which stated ML Farm owned machinery, equipment, furniture, and vehicles worth over $4,600,000.00.

112.   Luna, with knowledge of his liability to the Workers and other Creditors, diverted ML Farm's revenues for various personal expenses, such as gym memberships, restaurant purchases, grocery purchases, home improvement expenses, cash withdrawals, checks to himself, car washes, amusement park tickets, payment of personal debts, iTunes and Apple charges, pharmacy purchases, a Sirius Radio subscription, casino expenses, recreation expenses, purchases from "Liquor Land," and purchases from Amazon.

*Facts establishing Luna, ML Farm, and Alpha as alter egos*

113.   In furtherance of a scheme to defraud the Workers and other creditors, Luna directed Raul Coria, ML Farm's comptroller, to cause Alpha to be incorporated in Texas on June 17, 2019. Alpha was subsequently domesticated as an Illinois corporation on July 8, 2020.

114.   Specifically, on June 4, 2020, under Luna's direction, Coria emailed Richard Randick, an attorney and CPA based in Illinois, and stated, "Per Mauricio [Luna]'s instructions, he needs your help to create a new company. This is the information. (He won't be the owner)."

115.   In subsequent emails to Randick, Coria copied Luna and no one else, such as Alpha's purported owner, Luis Garcia.

116.   On June 13, 2020, Randick emailed Luna and stated, "Mauricio, I mailed today the formation documents for the new corporation that is formed under the laws of Texas and sent them to the Secretary of State of Texas . . . ."

117.   Alpha has a business model identical to that of ML Farm, that is, the construction of animal enclosures using H-2A labor.

118.   Luna caused Alpha's formation for the purpose of unlawfully transferring Luna and ML Farm's assets to Alpha in a fraudulent bid to avoid paying debts owed by Luna and ML Farm to Workers, among other creditors.

119.   Although Luna's son-in-law Luis Garcia is Alpha's purported owner and sole officer, Luna maintains functional control over Alpha.

120.   Luis Garcia had no prior experience operating a business of any kind and continued to maintain a full-time job with Tyson Foods while purportedly operating Alpha.

121.   Luna's daughter, Melissa Garcia, worked for ML Farm in an administrative capacity and currently works for Alpha in the same capacity.

122.   Luna directed Luis and Melissa Garcia in the material aspects of Alpha's business. Upon information and belief, without Luna, Alpha would not be able to operate.

123.   While being examined under oath in connection with his bankruptcy, Luna falsely denied involvement with Alpha, including but not limited to, claiming that (1) he and his wife, Marisol, did not live with Luis and Melissa Garcia, (2) he did not know whether his daughter Melissa Garcia worked at Alpha, (3) he had never

visited Alpha's office, and (4) he served only as an occasional consultant to Alpha. Luna later revised this testimony to admit that he and his wife lived with Luis and Melissa Garcia, that he knew his daughter worked for Alpha, that he frequented Alpha's office, and that he performed "sales" and helped with hiring for Alpha. Luna's falsehoods reveal both that Alpha is an alter ego of Luna and ML Farms, and that Luna deliberately intended to defraud creditors by using the Alpha name, hiding his conduct because he knew it was wrongful.

124.    Before ML Farm filed its Chapter 7 bankruptcy case, Luna caused ML Farm to transfer substantially all of its assets to Alpha for virtually no consideration.

125.    Between November 2019 and January 2020, Alpha contracted with ML Farm to act as a subcontractor for its jobs. These jobs paid over $300,000. Luna intended this scheme to allow Alpha to take over the going concern value of ML Farm's business without liability for ML Farm's debts.

126.    Luna allowed and facilitated Alpha's taking over ML Farm's business, including its customer relationships, without requiring Alpha to pay ML Farm for the transfer of the going concern value of ML Farm's business.

127.    Luna directed ML Farm's customers to contract directly with Alpha rather than ML Farm.

128.    Luna then caused Alpha to enter into a "subcontractor" agreement with ML Farm whereby ML Farm provided all materials, labor, tools, and know-how for a job for one of ML Farm's customers, but diverted the majority of the proceeds to Alpha, even though Alpha provided no value to ML Farm.

22

129.   Luna thereby diverted a substantial portion of ML Farm's revenue and profits to Alpha.

130.   ML Farm did not receive reasonably equivalent value in return for the transfer of these assets to Alpha.

131.   In or about February 2020, when a representative of Iowa Falls State Bank confronted Luna, he conceded that he had established Alpha as a "zombie" company so that he could shed ML Farm of its debt, its tax issues, and its issues with the USDOL.

132.   Upon information and belief, the issues with the USDOL included the Workers' claims.

133.   Soon after Alpha's inception, Luna transferred ML Farm's H-2A Workers, contacts, book of sales, and vendors to Alpha for no consideration.

134.   In or around August 2019, Worker Samuel Hidrogo Ruiz sent Luna a message asking to be paid. Luna told Mr. Hidrogo that he did not have any money, and that he should contact Alpha if he wanted to get paid.

135.   From October 2019 to January 2020, Luna transferred ML Farm's material assets, including vehicles and equipment, to Alpha and ceased ML Farm's business operations so that it had no funds with which to compensate the Workers and other creditors. Upon information and belief, Alpha paid less than fair market value for these items.

136.   During this time, Melissa Garcia worked at ML Farm in the Accounts Payable department. She was concurrently working at Alpha.

137.    Upon information and belief, Luna and Melissa Garcia coordinated the transfer of vehicles and other assets between ML Farm and Alpha.

138.    In July 2020, after Luna had already shut down ML Farm's business operations, ML Farm applied to the United States Government for a PPP loan of approximately $760,000, ostensibly to pay their employees.

139.    During his Rule 2004 examination on May 21, 2021, Luna testified that ML Farm used approximately $105,000 of the proceeds from the PPP loan to pay back wages, including outstanding wages from past seasons, to certain H-2A Workers.

140.    Luna also stated in writing that he intended to pay the USDOL for a judgement with proceeds with the PPP loan, but that the USDOL would not accept his settlement offer.

141.    At least a portion of the PPP loan proceeds were used by Luna for purposes other than those permitted by the PPP loan agreement.

142.    Upon information and belief, Luna personally received tens of thousands or more dollars from the PPP loan proceeds.

143.    On multiple occations, Luna transferred all or a portion of the PPP loan proceeds for the purpose of hindering, delaying, or defrauding creditors.

144.    After ML Farm stopped business operations, many ML Farm employees, including Melissa Garcia, Lucia Ramirez, Raul Coria, Raul Rios, Jerome (JP) Vyborny, Lucero Fustuq, Carla Capasso, Valente Barragan, and Andy Romero, began working for Alpha.

24

145.   Despite having falsely characterized himself as a consultant, Luna continued to have hiring and firing power, sign payroll, negotiate salaries, and pursue sales leads for Alpha in 2019 and 2020.

146.   Luna admitted that he participated in hiring negotiations for Kim O'Rorke, Alpha's Chief Financial Officer, in or around March 2020.

147.   During her Rule 2004 examination, Melissa Garcia testified that the Garcias' household income was less than $70,000 year, and they were unable to save more than a few hundred dollars a month.

148.   In 2019, Luis Garcia loaned approximately $185,000 to Alpha from his personal accounts. During her Rule 2004 examination, Melissa Garcia testified that she did not know about the loan, and did not know where her husband got the money to make the loan.

149.   During his Rule 2004 examination, Luna testified that he loaned approximately $60,000 to his son-in-law to start Alpha. He further stated that he had not been paid back for that loan.

150.   Before September 2020, Alpha, while operating as a debtor in possession, conducted a profitable business.

151.   According to Alpha's statement of financial affairs, Alpha generated just $265,098.98 of gross revenue during its first fiscal year of existence but generated gross revenue of $2,394,811.85—an increase of over nine hundred percent—during its next eight months of operation immediately preceding the Bankruptcy Petition Date (Alph. Dkt. 1 at 35).

152.    Although Alpha experienced six-figure net operating losses during two of the first seven reported months of Alpha's bankruptcy case (Alph. Dkt. 59 at 2; Alph. Dkt. 113 at 2), those losses were always preceded by a month of even larger net profit and a subsequent month of additional net profit (Alph. Dkt. 49 at 2; Alph. Dkt. 79 at 2; Alph. Dkt. 94 at 2; Alph. Dkt. 194 at 2).

*Facts establishing Luna, ML Farm, Alpha, and Spartans as alter egos*

153.    Because the United States Trustee, the Workers, and Iowa Falls State Bank indicated to Luna and Alpha that they considered Alpha a sham subject to alter ego or successor liability for ML Farm's debts, Alpha began subcontracting its business to yet another entity that Luna caused to be created, Spartans, for the purpose of defrauding Luna's creditors.

154.    Spartans used the same staff and administrative support as both Alpha and ML Farm.

155.    Delta worked as both ML Farm and Alpha's accountant and payroll company. Spartans used Delta's Elmhurst address as its principal office in its Articles of Incorporation and, on information and belief, Delta provides accounting and payroll processing services to Spartans as well.

156.    During her Rule 2004 examination, Melissa Garcia falsely testified that Lucia Ramirez ceased to work for Alpha around the time of Spartans' formation at the end of 2020.

157.    Confronted with documents showing, for example, that Ramirez continued to send e-mails on behalf of Alpha from her Alpha e-mail address until at

least April 26, 2021, Melissa Garcia subsequently admitted that Ramirez continued to work for Alpha at least seven months after Spartans' formation.

158.   Melissa Garcia was responsible for overseeing Ramirez's work when Ramirez was working for both Alpha and Spartans.

159.   Ramirez had access to her Alpha e-mail account through at least April 26, 2021 and use it to conduct business for Spartans.

160.   Instead of permanently leaving Alpha, Ramirez continued to access Alpha's payroll, e-mail, and other records through at least April 26, 2021.

161.   Luis and Melissa Garcia paid Ramirez a $1,500 year-end bonus at the end of 2020.

162.   When Melissa Garcia claimed that Ramirez had stopped working for Alpha in 2020, she knew that statement was false. That deliberate false statement regarding Ramirez's employment indicates that Melissa Garcia deliberately conspired with Luna to assist him in his scheme to defraud creditors and knew the conduct was wrongful.

163.   Prior to subcontracting with Spartans, Luna, Melissa Garcia, and Luis Garcia had never seen any of the work that Spartans had performed, did not know whether Spartans had any other customers, did not ask how long Spartans had been in business, did not request any references from Spartans, and did not require a bond from Spartans.

164.   On information and belief, in December 2020, during a meeting at Alpha, a representative of Alpha told H-2A Workers that they were going to be sent

back to Mexico, but that they could return the following season, and indicated that, in the meantime, Alpha would be changing its name to Spartans.

165.    Luna then caused Spartans to enter into a "subcontractor" agreement with Alpha, diverting Alpha's income to Spartans, even though Spartans provided no value to Alpha.

166.    After Spartans' incorporation, Luna, through Alpha, funneled what now purported to be Alpha's business and money, having a value of in excess of $900,000, to Spartans, as part of his fraudulent scheme to avoid paying the Workers and other creditors.

167.    Alpha began paying Spartans for work Spartans allegedly completed around September 21, 2020 (Alph. Dkt. 49 at 15), 18 days after Spartans' formation.

168.    Alpha did not receive reasonably equivalent value in return for the transfer of these assets to Spartans.

169.    Instead of paying for its subcontracted work according to the purported terms of its subcontracts—or on a percentage-of-production-completed basis—Alpha paid Spartans at a loss, on an actual-time-input basis.

170.    By way of example, Alpha contracted with an outside corporation to complete a job order for $32 an hour. Alpha then subcontracted with Spartans for the same job, paying $40 an hour, thereby diverting the more than the entirety of Alpha's revenue and profit to Spartans.

171.    For another job, Alpha contracted with Summit Livestock to complete a job order for $40 an hour. Alpha then subcontracted with Spartans for the same

job, paying $40 an hour, thereby diverting the entirety of Alpha's revenue and profit to Spartans.

172.    After making these transfers to Spartans, Alpha effectively ceased to operate.

## INDIVIDUAL FACTS

LUIS ALFREDO GAMBOA MARRERO

173.    Mr. Gamboa worked for ML Farm in 2012, 2013, 2015, 2015, 2016, and 2019.

174.    Each year, he paid for his transportation and lodging to obtain his visa at the border, and to travel to Rockford, Illinois to start work. Mr. Gamboa spent approximately US $400 for his travel each time he came to the United States This included motel and food expenses in Mexico to obtain his visa at the border, and food expenses.

175.    During the trip from Mexico, the company driver travelled with 20-30 Workers in a van that should carry no more than 12 people. The van was cramped, and many travelled without seatbelts for the two-day trip.

176.    Upon arrival in Rockford, Mr. Gamboa tendered his receipts for these travel expenses to ML Farm. The company reimbursed only a portion of his travel expenses. In 2019, Mr. Gamboa had receipts as proof of his US $400 expenditures in these initial travel expenses, but the company only reimbursed him approximately $50 each year he provided services to ML Farm, including in 2019.

177.   Each year, Mr. Gamboa arrived in Illinois and waited days, or even a week, to begin work. ML Farm did not pay him for the days he waited to be assigned work.

178.   ML Farm gave Mr. Gamboa a contract for work only once he arrived in the United States. The contract usually listed work in only one state, but ML Farm transported Mr. Gamboa to numerous states to work. The contract stated that he would work 40 hours per week. Instead, Mr. Gamboa always worked 10 hours per day, six to seven days a week. Regularly, Mr. Gamboa's work hours were 6:00 a.m. to 6:00 p.m., or 7:00 a.m. to 7:00 p.m. Sometimes, Mr. Gamboa worked later than 7:00 p.m.

179.   Once, while working in Minnesota, Mr. Gamboa became ill because he worked in the rain until 9:00 or 10:00 p.m. He did not go to work the next day. When Luna's agent realized that Mr. Gamboa did not come to work, he told Mr. Gamboa he was not going to pay for the motel room if Mr. Gamboa did not keep working and threatened to send Mr. Gamboa back to the motel in Illinois. Mr. Gamboa then became anxious about taking any time off due to illness, because he knew he would either not be paid or be returned to Rockford with no assigned work and no pay.

180.   During his time working for ML Farm, Mr. Gamboa worked in Pennsylvania, Iowa, Nebraska, Arkansas, Minnesota, and Missouri. ML Farm transported him from job to job, which often took many hours. Neither Luna nor ML Farm paid him for the travel time between jobs.

181.   ML Farm falsely told Mr. Gamboa it would provide housing and food during the contract period. Instead, the company deducted the cost of food from his check for the last three seasons he provided services to ML Farm: 2015, 2016, and 2019. In later years, ML Farm paid Mr. Gamboa with a debit card and provided him no pay stub that detailed the deductions from his pay.

182.   ML Farm housed Mr. Gamboa and other Workers in motels, usually located about an hour from the worksite. The motel rooms housed at least three to four Workers per room, with only two beds, requiring the Workers to share a bed with someone or sleep on the floor. The motels were often infested with mice and bedbugs. Sometimes during the summer, the air conditioning in the motels did not work.

183.   Mr. Gamboa and other Workers often had to pool their money and pay for gas for the van to travel to and from the worksite.

184.   ML Farm deducted approximately $12 per day for food, but the provision of food was inconsistent. ML Farm often gave Mr. Gamboa two meals at the same time. By the time Mr. Gamboa tried to eat his second meal, it was spoiled. On two or three occasions, Mr. Gamboa became ill from eating spoiled food.

185.   Mr. Gamboa sometimes went without dinner because it was spoiled, or because the Workers returned so late from work that they could not find any place that was still open where they could get a hot meal. Because of this, Mr. Gamboa often had to buy food at a gas station, which was insufficient.

186.   When he worked during the summer months, ML Farm did not provide adequate water, so Mr. Gamboa purchased his own water to stay hydrated.

187.   On October 17, 2019, a worker accidentally pulled the trigger on a nail gun, piercing Mr. Gamboa's left index finger. ML Farm did not cover all of Mr. Gamboa's expenses for his injury, and he believes he still has an outstanding bill with the hospital. ML Farm told Mr. Gamboa the company did not enroll him in workers' compensation.

188.   ML Farm staff verbally abused Mr. Gamboa and other Workers, forcing them to work harder and finish jobs as quickly as possible. ML Farm staff regularly told Mr. Gamboa and other Workers they were "good for nothing" and that "they didn't come to the U.S. to be lazy, but to work hard" or words to that effect.

189.   Luna also forced Mr. Gamboa and other Workers to work in dangerous conditions, ordering Workers not to use safety equipment. ML Farm staff ordered Workers to take off safety harnesses because they believed it slowed down the work, or made the Workers work on pitched roofs during cold weather when it was very slippery. At a worksite in Montana, a worker fell off the roof and was evacuated from the worksite by a helicopter. He could not walk for eight months. Mr. Gamboa remained anxious and scared about having to work in unsafe conditions.

190.   Neither ML Farm nor Luna timely paid Mr. Gamboa. When he asked ML Farm staff when he would be paid, he was told they would pay him "tomorrow."

191.   When Workers were sick, or complained about not being paid, ML Farm staff told them that if they continued to complain or did not work due to illness, they would be sent back to the motel in Rockford, which meant they would have no work

and would not be paid. Mr. Gamboa felt these statements coerced workers and compelled them to work when they were sick or injured.

192.   The 2019 work season was the worst Mr. Gamboa experienced. His supervisor regularly degraded Mr. Gamboa and the other Workers and pressured the Workers to work faster and faster. Mr. Gamboa heard supervisors from ML Farm threaten other Workers, and he feared he could be sent back to Mexico if he complained about work conditions or pay. His supervisor told Mr. Gamboa and the Workers that if they did not finish their work on time, he would both report them to immigration and cause them to be sent back to Mexico.

193.   Mr. Gamboa's finger remains injured, and he cannot use his left hand as productively as before.

RODRIGO MARTINEZ TORRES

194.   Mr. Martinez Torres worked for ML Farm for four seasons, from August to December 2013, July to November 2014, October to March 2018, and in September 2019.

195.   Before every season, Mr. Martinez Torres received a contract in Mexico that stated that ML Farm would reimburse all travel costs; that he would only be working in one state, that Mr. Martinez Torres would work 40 hours per week, and that ML Farm would provide housing and food.

196.   Each season, Mr. Martinez Torres incurred various travel-related expenses and fees in order to work for ML Farm, including travel from his home in

Durango to Nuevo Laredo or Monterrey, Mexico and lodging in these cities while waiting for the visa.

197. Before the 2013 and 2014 seasons, Mr. Martinez Torres deposited approximately $100-$200 per season into an account at Luna's agent's instruction. Luna's agent told him this deposit was for costs associated with obtaining Mr. Martinez Torres's visa.

198. In 2013, Mr. Martinez Torres spent approximately $50 for costs to travel from Durango to the United States Consulate to obtain his visa. He also paid approximately $100 to stay in a motel while waiting for his visa. In 2014, Mr. Martinez spent about the same amount for travel and motel costs to obtain his visa.

199. ML Farm reimbursed Mr. Martinez Torres approximately $200 – $300 for each season in the 2013 and 2014 seasons.

200. For the 2019 season, Mr. Martinez Torres also paid for required travel to Guadalajara, Mexico, to undergo a medical check, and take a course on worksite safety. He spent approximately $339 – $387 during this season for these costs.

201. Mr. Martinez Torres then paid for his travel to Monterrey, Mexico in order to obtain his visa. He spent approximately $90 for a bus ticket to Monterrey, and approximately $120 for three nights in a motel in Monterrey.

202. In order to pay for these expenses for the 2019 season, Mr. Martinez Torres took out a $1,000 loan.

203.   Mr. Martinez never received reimbursement for the majority of his above-described expenses. Additionally, neither Luna nor ML Farm reimbursed Mr. Martinez Torres for *any* of his travel expenses for the 2019 season.

204.   When Mr. Martinez Torres arrived in the United States, he was taken to Rockford, Illinois. He spent one to two days in Rockford waiting for an assignment. He was not paid for this time.

205.   Even though the contract stated that Mr. Martinez Torres would only be working in one state, over the course of all seasons worked, ML Farm transported Mr. Martinez Torres and other Workers from Rockford, Illinois to various farms in multiple states, including Indiana, Oklahoma, Iowa, Missouri, Illinois, Wisconsin, Minnesota, Nebraska, and Arkansas.

206.   Trips to worksites located in other states often occurred overnight. Mr. Martinez Torres and the Workers with him were either transported directly to the worksites to begin work immediately, or were able to rest at a motel for, at the most, a few hours before beginning work.

207.   During the 2013 season, Mr. Martinez Torres had to pay $15 to $20 a week for gas for the company truck that transported them to worksites. Neither Luna nor ML Farm reimbursed Mr. Martinez Torres for this expense.

208.   Even though the contract indicated that Mr. Martinez Torres would work 40 hours a week, he often worked 70 to 80 hours a week.

209.   For instance, during the 2019 season, Mr. Martinez Torres worked from 7:00 a.m. to 7:00 p.m. or 8:00 p.m., and sometimes, as late as 1:00 a.m.

35

210.    ML Farm failed provide Mr. Martinez Torres and other Workers with proper safety equipment. In 2014, Mr. Martinez Torres was working at a height of thirty feet without a harness or other protective gear. He fell from this height and fractured his pelvis. It took two years and extensive physical therapy for him to recover, and he could not work during this time.

211.    Mr. Martinez Torres and other Workers were often driven to worksites by another worker who did not have a driver's license. During the 2014 season, the crew was involved in a car crash at 4:00 a.m. in a company vehicle driven by an unlicensed worker.

212.    During each season, there was insufficient room in the motel rooms for all the Workers. For instance, in the 2019 season, Mr. Martinez Torres was assigned to a room with only two beds and four workers.

213.    During the 2014 and 2019 seasons, two of the motel rooms ML Farm provided for Mr. Martinez Torres were infested with bedbugs.

214.    Mr. Martinez Torres's contract stipulated that the Workers would receive three meals a day and water at the site.

215.    The food ML Farm provided was insufficient to feed Workers relative to the physical intensity and duration of the work every day. At times, Workers did not end their workdays until 1:00 a.m., and were forced to supplement the meals provided with purchases from gas stations or nearby stores. Mr. Martinez Torres frequently went hungry because supervisors would delay meal breaks and require the Workers to keep working.

216.    ML Farm failed to provide water at the jobsites, so Mr. Martinez Torres had to bring his own water to every jobsite.

217.    Luna or Luna's agents subjected Mr. Martinez Torres and other Workers to verbal abuse and humiliation. They called him a "son of a fucking bitch" or words to that effect and insulted the quality and speed of his work. These supervisors frequently made Workers cry.

218.    Luna or Luna's agents yelled at Mr. Martinez Torres at such close proximity that Mr. Martinez Torres feared they might try to hit him.

219.    Luna or Luna's agents discouraged Mr. Martinez Torres from using the bathroom during the workday, expressing frustration if he needed to take a break to relieve himself.

220.    ML Farm failed to pay Mr. Martinez Torres timely and full wages.

221.    Mr. Martinez Torres is missing pay for two weeks of the 2014 season, for one week of the 2018 season, and for four weeks of the 2019 season.

222.    During the 2014 season, Luna threatened Mr. Martinez Torres with blacklisting, telling him that if he complained about working conditions or left ML Farm's employment, he would not be invited to return for future work with ML Farm or be able to obtain work with other companies in the United States.

223.    During the 2014 and 2019 seasons, Luna made statements to Mr. Martinez Torres indicating that if he left his employment, Luna would report his departure to immigration authorities, and Mr. Martinez Torres would not be able to

obtain another H-2A visa again because the authorities would know that he did not complete his contract.

224.    In October 2019, Mr. Martinez Torres and two other Workers asked Luna for the weeks of unpaid wages owed them from that season. Luna told them to keep working and promised he would pay them eventually.

225.    Mr. Martinez Torres finally stopped believing Luna's promises and left ML Farm rather than continue to work without pay.

ANGEL VALENTIN ESTRELLA DIAZ

226.    Mr. Estrella worked for ML Farm for six seasons between 2013 and 2019, from August 2013 to January 2014, from June 2014 to January 2015, from June 2015 to approximately November 2015, from September 2016 through February 2017, from June 2017 through February 2018, and from October 2018 through February 2019.

227.    For each season that Mr. Estrella worked for ML Farm, he received a contract that stated that he would be reimbursed for all travel costs, that he would only be working in one state and would work 40 hours per week, and that housing and food would be provided.

228.    Each season, Mr. Estrella incurred approximately $175 in travel-related expenses and fees in order to work for ML Farm, including travel from his home in Zacatecas to Nuevo Laredo or Monterrey, Mexico, food and lodging in these cities while waiting for the visa, and food during the trip to Rockford, Illinois.

229.   ML Farm reimbursed Mr. Estrella approximately $140 for each season during the 2013, 2014, and 2015 seasons. Mr. Estrella was reimbursed $120 for each season during the 2016, 2017, and 2018 seasons.

230.   When Mr. Estrella arrived in the United States, he was taken to Rockford, Illinois. He usually spent one to three days in Rockford waiting for an assignment. ML Farm did not pay him for this time.

231.   Mr. Estrella received a contract at the beginning of each season that had a worksite address listed on it. However, every season that he worked for ML Farms, the address listed on his contract was either somewhere he never worked or just one of several places he worked. In his last season, for example, Mr. Estrella's contract said he would be working at one location in Huron, South Dakota. In reality, he was required to work in various cities and towns all over South Dakota.

232.   In previous seasons, Mr. Estrella was taken to several states to work, not just the one listed on his contract.

233.   Trips to worksites located in other states often occurred overnight. Mr. Estrella and the Workers with him were either transported directly to the worksites to begin work immediately, or were able to rest at a motel for, at the most, a few hours before beginning work.

234.   In September 2016 Mr. Estrella and other workers drove to New York overnight and arrived directly to the worksite in the morning without stopping at the hotel first. During Mr. Estrella's last season, he was driven 12 hours to South Dakota and only slept 2 to 3 hours in the hotel first before starting work.

235.    During his first season working for ML Farm, Mr. Estrella and the other workers on his team paid for the cost of gas while traveling and were not reimbursed.

236.    Even though the contract indicated that Mr. Estrella would be working 40 hours a week, he usually worked at least 60 hours a week, if not more.

237.    During the 2017 season, Mr. Estrella worked at a site in Michigan. Based on a labor complaint, the USDOL came to the site to interview Workers from August 28, 2017 to September 4, 2017 and again from September 7, 2017 to September 12, 2017. They interviewed the Workers one by one and asked questions about the accommodations and food, among other things. During this time, Luna or Luna's agents did not permit the Workers to work, and neither Luna nor ML Farm paid the Workers any wages for the time that they were required to interview with the USDOL.

238.    During each season, there was insufficient room in the motel rooms for all the Workers. Except for the 2018 season, during each season Mr. Estrella worked for ML Farm, three or four Workers were assigned to a room with only two beds.

239.    The motels where Mr. Estrella stayed while working for ML Farm were located between thirty minutes to an hour from the jobsites. ML Farm did not pay Mr. Estrella for the time he was required to spend on travel to and from the jobsites each day.

240.    Some of the motels where Mr. Estrella stayed while working for ML Farm were dirty and infested with insects.

241.   In the last two seasons worked, ML Farm provided Mr. Estrella only two meals a day, despite his contract stating that he would be given three meals a day.

242.   Workers, including Mr. Estrella, were forced to supplement the meals ML Farm provided with food purchased with their own money.

243.   During the 2018 season, because ML Farm failed to pay the Workers, Mr. Estrella lent his own money to other Workers who did not have enough money to buy food.

244.   ML Farm failed to provide water at the jobsites or with meals, so Mr. Estrella purchased and brought his own water to every jobsite.

245.   ML Farm failed to pay Mr. Estrella timely and full wages.

246.   ML Farm provided Mr. Estrella with an "IOU" acknowledging that he was owed $2,686.70 in unpaid wages, but he is owed more than that.

247.   Mr. Estrella is still missing five full weeks of wages for the 2018 season, totaling $3,095.90.

248.   During the 2018 season, Mr. Estrella witnessed Luna or Luna's agents subjecting other workers to verbal humiliation by yelling, cursing at, and insulting them in front of their co-workers.

249.   Mr. Estrella heard from other Workers that he would be denied an opportunity to work for ML Farm in future seasons if he stopped working prior to the close of the season.

250.   After returning to Mexico at the end of the 2018 season, Mr. Estrella repeatedly called ML Farm's offices to ask for his unpaid wages, but his calls went unanswered, and he was never paid his earned wages.

JOSE LUIS TORRES SALINAS

251.   Mr. Torres worked for ML Farm for five seasons, from summer 2014 or 2015 to December of that year, summer 2016 to December 2016, summer 2017 to December 2017, summer 2018 to December 2018, and summer 2019.

252.   Mr. Torres did not receive a copy of his contract to work for ML Farm until he arrived in Illinois at the beginning of the season. The contracts were in English, and ML Farm supervisors reviewed the terms with Mr. Torres. The contracts stated Mr. Torres would only be working in one state and he would work 40 hours per week.

253.   Mr. Torres's contract also stipulated that the ML Farm would provide three meals a day.

254.   Each season, Mr. Torres incurred various travel-related expenses and fees to work for ML Farm, including travel from his home in Tlaxcala to the United States consulate in Monterrey, Matamoros, or Nuevo Laredo, Mexico, and lodging while waiting for the visa.

255.   Mr. Torres spent approximately $137 each season to travel to the United States Consulate and pay for lodging while waiting for his visa.

256.   He spent approximately $100 on food each season when traveling to the United States to work for ML Farm.

42

257.    Mr. Torres was reimbursed $120 for the seasons worked prior to the 2019 season. In 2019, neither Luna nor ML Farm reimbursed Mr. Torres for these costs.

258.    When Mr. Torres arrived in the United States, he was taken to Rockford, Illinois. In the seasons he worked prior to the 2019 season, Mr. Torres typically spent two days in Rockford before being transported to a jobsite. He was not paid for this time.

259.    Over the course of all seasons worked, ML Farm transported Mr. Torres and other Workers from Rockford, Illinois to various farms in Indiana, Iowa, Illinois, Wisconsin, South Dakota, Michigan, and Ohio.

260.    Even though the contract indicated that Mr. Torres would be working 40 hours a week, he typically worked 66 hours per week.

261.    Mr. Torres generally worked from 7:00 a.m. to 7:00 p.m., Monday through Saturday.

262.    In 2019, Mr. Torres and other Workers were taken from Rockford to Iowa for a separate job. The Workers were required to work through the night for 12 hours in order to remove thousands of pig carcasses after the animals died in a fire. ML Farm did not provide the Workers with food or water during the 12-hour job that required heavy physical labor and drove the Workers straight back to Rockford in the morning. Luna or Luna's agents did not allow the Workers to stop anywhere for food or drink on the return trip because they were covered in pig filth and dirt.

263.   During each season, there was insufficient room in the motel rooms for all the Workers. During each of the five seasons Mr. Torres worked for ML Farm, at least three Workers were assigned to a room with only two beds.

264.   Some of the motels that Mr. Torres stayed in prior to the 2019 season were infested with bedbugs and rats.

265.   During the 2019 season, ML Farm provided Workers with their lunch for the next day the night before. Sometimes, the food would spoil overnight, and Workers were compelled to buy replacement food with their own money.

266.   The food ML Farm provided was insufficient to feed Workers relative to the physical intensity and duration of the workday. ML Farm only provided the Workers with lunch and dinner, and the Workers were forced to supplement the meals with purchases from gas stations or nearby stores.

267.   Neither Luna nor ML Farm paid Mr. Torres timely and full wages.

268.   Mr. Torres is still owed wages for three-and-a-half weeks in the 2018 season.

269.   Six weeks into the 2019 season, Mr. Torres left ML Farm's employment because he had not received any wages.

MARTIN CASTAÑEDA ARANDA

270.   Mr. Castañeda worked for ML Farm during three or four different periods between 2015 and 2018. Most recently, he worked for ML Farm from September 2017 to March 2018.

271.   Before every season he worked for ML Farm, Mr. Castañeda received a contract in Mexico that stated that he would be working in one state and he would work 40 hours per week.

272.   Mr. Castañeda's contract with ML Farm also stipulated that ML Farm would provide three meals a day.

273.   Each season, Mr. Castañeda incurred various travel-related expenses and fees to work for ML Farm, including travel from his home in Fresnillo to Nuevo Laredo, Mexico, and lodging in Nuevo Laredo while waiting for the visa.

274.   The first season he worked for ML Farm, Mr. Castañeda paid a fee of $100 to Luna or Luna's agent to obtain his visa.

275.   Each subsequent season, Mr. Castañeda was required to pay a recruitment fee of $50 – $90 to Luna's agent, recruiter Manuel Esparza. The exact recruitment fee varied from year to year.

276.   Mr. Castañeda took out a loan to pay for these travel-related expenses.

277.   When Mr. Castañeda arrived in the United States, he was taken to Rockford, Illinois. Mr. Castañeda sometimes spent weeks in Rockford waiting for an assignment. ML Farm did not pay him for this time.

278.   Over the course of all seasons worked, ML Farm transported Mr. Castañeda and other Workers from Rockford, Illinois to various farms in Nebraska, South Dakota, Indiana, Wisconsin Minnesota, and Illinois.

279.  Trips to worksites located in other states often occurred overnight. ML Farm transported Mr. Castañeda and the Workers directly to the worksites to begin work.

280.  Even though the contract indicated that Mr. Castañeda would be working 40 hours a week, he typically worked 60 to 84 hours per week.

281.  Mr. Castañeda often worked from 7:00 a.m. to 7:00 p.m., Monday through Saturday, and sometimes on Sunday.

282.  ML Farm failed to provide Mr. Castañeda and other Workers with proper safety equipment. ML Farm supervisors pressured Workers to work without safety equipment, like harnesses, so they could work more quickly.

283.  In November 2017, Mr. Castañeda fell while on the job and suffered a shoulder injury. Mr. Castañeda continued working that day despite the pain, but he could not work the next day due to his injury.

284.  Mr. Castañeda had to wait more than a day for his supervisor to take him to a hospital after he fell at work. Luna or Luna's agent then falsely claimed that Mr. Castañeda's injuries were not work-related and told him that ML Farm would not cover his hospital bills for that reason. Mr. Castañeda declined the recommended medical treatment because he could not afford the $3,000 cost.

285.  After several days at the motel, Mr. Castañeda returned to work, without medical care and despite his ongoing shoulder pain, because he did not want to be sent Rockford and taken off the job.

286. Mr. Castañeda paid for his own physical therapy in Mexico to treat his shoulder injury. It took him two years and approximately $1,500 in physical therapy fees to regain 90% mobility in his arm.

287. During each season, there was insufficient room in the motel rooms for Mr. Castaneda and the other Workers. Mr. Castaneda was usually assigned with two or three other workers to a room with two beds, and he had to either share a bed or sleep on the floor.

288. Mr. Castañeda's contract stipulated that he would receive three meals and water at the site.

289. The food ML Farm provided was insufficient to feed Mr. Castañeda and other Workers relative to the physical intensity and duration of the workday. Mr. Castañeda was forced to supplement the meals ML Farm provided with purchases from gas stations or nearby stores.

290. ML Farm provided lunch for the next day at night, and because Mr. Castañeda had no refrigerator, the lunch often spoiled before he could eat it. Mr. Castañeda also suffered from frequent stomach pain because the food provided was not fresh.

291. Mr. Castañeda was forced to ask ML Farm for an "advance" on the late wages owed to him so that he could buy food. In September 2016, Mr. Castañeda asked ML Farm for a loan for food expenses. Several weeks later, ML Farm gave him $200 to buy food that ML Farm was contractually obligated to provide in the first place. ML Farm later deducted the $200 advance from Mr. Castañeda's check.

292.   ML Farm did not allow Mr. Castañeda or the Workers to take time off. Additionally, Mr. Castañeda and the other Workers worked longer than the eight hours per day promised on their contracts.

293.   When the Workers had to end a workday early because of injury or illness, they had to sit in the company van without air conditioning or heat and wait for other Workers to finish before they could return to the motel. Workers continued working despite being unwell because the extreme temperatures in the van during summers and winters were intolerable.

294.   Luna or Luna's agents discouraged Mr. Castañeda and the other Workers from using the bathroom during the workday, expressing frustration if they needed to take a break to relieve themselves.

295.   On some of his jobs, there were no bathrooms, and Mr. Castañeda felt belittled and dehumanized.

296.   ML Farm failed to pay Mr. Castañeda full and timely wages.

297.   During each season, ML Farm paid Mr. Castañeda less than he had earned. From 2015-2016, ML Farm gave Mr. Castañeda an "IOU," stating he was owed him $1,856.00, but in actuality, ML Farm owed Mr. Castañeda more than that. Luna or Luna's agents falsely promised that ML Farm would pay his unpaid wages in installments, but never did.

298.   In subsequent seasons, ML Farm failed to provide Mr. Castañeda an IOU for unpaid wages. Luna admitted he owed Mr. Castañeda wages and promised

to pay him during the next pay period. However, during the next pay period, Mr. Castañeda was paid for only part of his work.

299.   At the start of each season, ML Farm still owed Mr. Castañeda wages from the previous season.

300.   The second season he worked for ML Farm, Luna or Luna's agent told Mr. Castañeda that if he or other Workers left before the end of the season, they would not be paid the wages owed to them.

301.   In 2017, Mr. Castañeda called ML Farm's office in Rockford and complained about the nonpayment. Luna or Luna's agent at the office told Mr. Castañeda that if he left the company because of the non-payment of wages, the departure would be on "bad terms" because he did not work through the end of his contract.

302.   Mr. Castañeda believed ML Farm would not pay him for the previous season of owed wages unless he returned to work.

303.   In 2018, Luna or Luna's agent pressured Mr. Castañeda to extend his H-2A visa so he could remain in the United States, working for ML Farm, despite Mr. Castañeda stating that he did not want to extend his visa.

304.   Luna or Luna's agent told Mr. Castañeda's that if he did not consent to the extension, ML Farm would not offer him work the following season, and the he would falsify Mr. Castañeda's signature on the extension. Mr. Castañeda felt he had no choice but to sign the extension.

305.    During the 2017season, the Workers heard that USDOL inspectors would arrive at their jobsite to interview them. Luna or Luna's agent warned the Workers not to complain. Mr. Castañeda's was instructed to tell inspectors that they were being treated fairly and did not have complaints about the work conditions. Luna or Luna's agents threatened the Workers with blacklisting if they did not comply.

306.    The day the USDOL inspectors were set to arrive, Luna or Luna's agents transported the Workers to a different farm.

307.    Mr. Castañeda subsequently contacted USDOL while he was working at a jobsite in South Dakota. In 2018, Mr. Castañeda filed a formal USDOL complaint for nonpayment of wages against Luna and ML Farm.

308.    On information and belief, Luna learned about Mr. Castañeda's USDOL complaint.

309.    Since filing his USDOL complaint, Mr. Castañeda has been unable to find work as an H-2A worker.

310.    On information and belief, because of the small industry and his connections, Luna blacklisted Mr. Castañeda for filing the USDOL complaint, and prevented him from finding work elsewhere.

J. REMEDIOS MARES CORDOVA

311.    Mr. Mares worked for ML Farm for five seasons, from July 2015 to February 2016, July 2016 to February 2017, July 2017 to February 2018, July 2018 to February 2019, and September 2019 to December 2019.

312.    Before every season during which Mr. Mares worked for ML Farm, Mr. Mares received a contract in Mexico that stated that he would be reimbursed for all travel costs, that he would only be working in one state, that he would work 40 hours per week, and that ML Farm would provide housing and food.

313.    Each season, Mr. Mares incurred various travel-related expenses and fees in order to work for ML Farm, including travel from his home in Zacatecas to Nuevo Laredo and lodging while waiting for the visa.

314.    ML Farm required Mr. Mares to pay a recruitment fee of $50 to $75 each season to Luna's agent, recruiter Manuel Esparza. The exact recruitment fee varied year to year.

315.    Each year, Mr. Mares paid approximately $50 for costs to travel from Zacatecas to the United States Consulate to obtain his visa. In 2015, Mr. Mares spent approximately $250 to stay in a motel while waiting for his visa. In each of the 2016, 2017, 2018, and 2019 seasons, Mr. Mares spent approximately $100 for motel costs, and approximately $20 for food costs during the trip to Rockford, Illinois.

316.    ML Farm reimbursed Mr. Mares $200 for the 2015 and 2016 seasons, $150 for the 2017 and 2018 seasons, and $100 for the 2019 season.

317.    The reimbursement amounts were insufficient to repay Mr. Mares the money he spent to get to Illinois for work.

318.    Mr. Mares also paid approximately $250 for his own travel back to Mexico for the 2016, 2017, 2018, and 2019 seasons.

319.   When Mr. Mares arrived in the United States, he was taken to Rockford, Illinois. In 2017, he spent approximately three or four days waiting for an assignment. ML Farm did not pay him for this time.

320.   Even though the contract stated that Mr. Mares would only be working in one state, over the course of all seasons worked, ML Farm transported Mr. Mares and other Workers from Rockford, Illinois to various farms in multiple states, including South Dakota, Nebraska, and Ohio.

321.   Trips to worksites located in other states often occurred overnight. ML Farm transported Mr. Mares and the Workers directly to the worksites to begin work.

322.   Even though the contract indicated that Mr. Mares would be working 40 hours a week, he usually worked approximately 72 to 90 hours per week. Typical working hours were from 7:00 a.m. to 8:00 p.m. or 9:00 p.m., Monday through Sunday. Workers were sometimes given Sundays off, but not always.

323.   During the 2017, 2018, and 2019 seasons, Mr. Mares was the driver for one of the company vans. He occasionally paid for gas out-of-pocket when ML Farm did not provide him with gas cards to pay for fuel. ML Farm did not reimburse Mr. Mares for any of the money he had to spend on gas.

324.   ML Farm failed to provide Mr. Mares and other Workers with proper safety equipment. Mr. Mares witnessed many jobsite accidents. ML Farm did not take Workers medical providers to seek proper care when they were injured.

325.   In the seasons prior to the 2019 season, several of the motel rooms Mr. Mares stayed in were infested with cockroaches or bedbugs. The rooms where he

stayed in Rockford were dirty, and the motel did not always did not provide toilet paper or towels.

326.    During each season, there was insufficient room in the motel rooms for all the Workers. For instance, while staying at the Rockford motel at the beginning of the 2017 season, three Workers were assigned to a room, and Mr. Mares had to share a bed with another Worker. When staying at a motel in South Dakota, three Workers were also assigned to a room with only two beds, and one Worker shared a bed with other Workers, or slept on the floor.

327.    Mr. Mares' contract stipulated that the Workers would receive three meals and water at the site.

328.    The food ML Farm provided was insufficient to feed the Workers relative to the physical intensity and duration of the workday. Workers were forced to supplement the meals with purchases from gas stations or nearby stores. Mr. Mares frequently went hungry because Luna or Luna's agents delayed meal breaks and required the Workers to keep working.

329.    At times ML Farm provided two meals in the morning, and because Mr. Mares could not store the meals in a refrigerator, the meals spoiled before he could eat them.

330.    ML Farm failed to provide water at the jobsites or with meals, so Mr. Mares brought his own water to every jobsite.

331.    The portable toilets provided at jobsites were often dirty, with no toilet paper.

332.   Neither Luna nor ML Farm paid Mr. Mares timely and full wages.

333.   Mr. Mares is owed four weeks of pay for the 2018 season, and two weeks for the 2019 season.

334.   Luna pressured Mr. Mares and other Workers into returning for future seasons by claiming he would only pay them for the past season's wages if they returned to work the next season.

335.   ML Farm deducted money from the Workers' pay at the end of a season after checking the company's inventory of tools. After the end of every season, Luna docked Mr. Mares' pay, claiming tools were missing, even though Mr. Mares did not take any tools.

336.   Mr. Mares heard Luna threatening the Workers with blacklisting if they complained about unpaid or late wages, telling them that if they did not continue working, he would ensure they were not able to obtain future visas to work with companies in the United States.

ARTURO JASSO VILLALPANDO

337.   Mr. Jasso worked for ML Farm for four seasons, from June 2016 through February 2017, May 2017 through February 2018, July 2018 through February 2019, September 2019 to October 2019, and March 2020 to April 2020.

338.   The last season Mr. Jasso provided services to ML Farm began in September 2019 and ended in April 2020, but Mr. Jasso was unable to work from mid-October 2019 until March 2020 due to an injury he suffered on the job.

339.   Before every season Mr. Jasso worked for ML Farm, he received a contract that stated that he would be reimbursed for all travel costs, that he would only be working in one state, that he would work 40 hours per week, and that he would be provided housing and food.

340.   In each of the four seasons, Mr. Jasso incurred approximately $250 per year in travel-related expenses and fees in order to work for ML Farm, including travel from his home in Zacatecas to Nuevo Laredo or Matamoros, Mexico, food and lodging in these cities while waiting for the visa, and food during the trip to Rockford, Illinois.

341.   Before the 2016 season, Mr. Jasso paid a recruiter fee of approximately $100 to Luna's agent.

342.   ML Farm reimbursed Mr. Jasso approximately $90 for these costs each season during the 2016, 2017, and 2018 seasons. ML Farm did not reimburse Mr. Jasso for any of his travel expenses for the 2019 season.

343.   When Mr. Jasso arrived in the United States, he was taken to Rockford, Illinois. He usually spent one to two days in Rockford waiting for an assignment, but during the 2016, he spent four days waiting for work. ML Farm did not pay him for this time.

344.   Even though the contract stated that Mr. Jasso would only be working in one state, over the course of all seasons worked, ML Farm transported Mr. Jasso and other Workers from Rockford, Illinois to four or five different states per season. These states included Michigan, Ohio, South Dakota, and Wisconsin.

345.   Trips to worksites located in other states often occurred overnight. ML Farm transported Mr. Jasso and the Workers directly to the worksites to begin work immediately, and they were able to rest at a motel for, at the most, a few hours before beginning work.

346.   ML Farm often transported the Workers to the jobsites in vehicles with insufficient seatbelts for each person.

347.   Even though the contract indicated that Mr. Jasso would be working 40 hours a week, he often worked 70 to 80 hours a week, if not more.

348.   Mr. Jasso and other Workers were forced to work outside in extreme weather, including in freezing temperatures.

349.   ML Farm failed provide Mr. Jasso and other Workers with proper safety equipment for the cold and the type of work they were doing. On October 15, 2019, Mr. Jasso was working at a height of approximately twenty feet without a harness or other protective gear. He fell from this height and fractured his right foot in three places. Mr. Jasso's foot required orthopedic surgery on October 28, 2019, and Mr. Jasso remained unable to return to work until March 2020.

350.   Luna or Luna's agents denied Mr. Jasso necessary medical attention after his injury and subsequent surgery by refusing to provide transportation to scheduled doctor's appointments.

351.   Mr. Jasso felt compelled to return to work in March 2020 because he stopped receiving workers' compensation and needed the money.

352.   During each season, there was insufficient room in the motel rooms for all the Workers. During each of the four seasons Mr. Jasso worked for ML Farm, three or four Workers were assigned to a room with only two beds.

353.   The motels where Mr. Jasso stayed while working at the last three jobsites were located between 30 minutes to an hour from the jobsites. ML Farm did not pay Mr. Jasso for the time he was required to spend on travel to and from the jobsites each day.

354.   Mr. Jasso's contract stipulated that the Workers would receive three meals a day and water at the jobsite.

355.   Generally, Mr. Jasso and other Workers only received two meals a day, and, on some days, received no meals.

356.   During the 2017 season, ML Farm provided Workers with their lunch for the next day the night before; if the motel rooms lacked refrigerators, the food spoiled overnight, and Workers were compelled to buy replacement food with their own money.

357.   The food ML Farm provided was insufficient to feed Workers relative to the physical intensity and duration of the work every day. Mr. Jasso was forced to supplement the meals with food purchased with his own money. During the 2019 season, because ML Farm failed to timely pay Mr. Jasso's wages, Mr. Jasso had to borrow money from a coworker to eat.

358.   ML Farm failed to provide water at the jobsites or with meals, so Mr. Jasso was forced to purchase and bring his own water to every jobsite. On many

occasions, when it was very hot, Mr. Jasso ran out of water during the work day, causing him to feel sick.

359.   Neither Luna nor ML Farm paid Mr. Jasso timely and full wages.

360.   Mr. Jasso is still owed three full weeks of wages: $2,584.82 for the 2018 season, and four partial weeks of wages: $1,562.72 for the 2019 season.

361.   Mr. Jasso heard from other Workers that Luna threatened blacklisting in future seasons if they complained about working conditions, housing, or food, or if they stopped working for ML Farm prior to the close of the season.

362.   On information and belief, the Workers believed that Luna would take action based upon statements Luna or Luna's agents made to Workers in the past.

363.   Upon information and belief, Luna intended the Workers to share these threats with each other to create an environment of fear and compliance.

364.   Mr. Jasso felt compelled to keep working despite not being paid because he understood ML Farm would not hire him for future seasons if he left before the end of his contract due to nonpayment of wages, and he would not receive unpaid wages if he did not return to work.

SAMUEL HIDROGO RUIZ

365.   Mr. Hidrogo worked for ML Farm for three seasons, from June 2016 to December 2016, June or July 2017 to March 2018, and October 2018 to March 2018.

366.   Before every season Mr. Hidrogo worked for ML Farm, he received a contract that stated that it would reimburse all travel costs, that he would only be working in one state, that he would work 40 hours per week, and that he would be provided housing and food.

367.    Each season, Mr. Hidrogo incurred various travel-related expenses and fees in order to work for Luna, including travel from his home in of Zacatecas, Mexico to Monterrey, Mexico, and lodging in Monterrey while waiting for the visa.

368.    For example, before starting the 2016 season, Mr. Hidrogo paid a recruitment fee of approximately $1,500 to Luna's agent and recruiter, Manuel Esparza.

369.    He also paid approximately $250, for motel accommodations while waiting for his visa to be processed that year, and another $20 for food on the journey the trip.

370.    Mr. Hidrogo paid approximately $75, for motel accommodation while his visas were pending for the 2017 and 2018 seasons, and about $20 for food on the journey to ML Farm's office in Illinois each of those years.

371.    During each season in which Mr. Hidrogo worked for ML Farm, he was reimbursed only $100 for travel costs and expenses.

372.    The above reimbursement amounts were insufficient to repay Mr. Hidrogo for the money he expended.

373.    When Mr. Hidrogo arrived in the United States, he was taken to Rockford, Illinois where he spent time waiting to be assigned to a job.

374.    For example, in 2016, Mr. Hidrogo spent 10 to 12 days in Rockford waiting for an assignment. ML Farm did not pay him for this time.

375.    Even though the contract stated that Mr. Hidrogo would only be working in one state, over the course of all seasons worked, ML Farm transported Mr. Hidrogo

and other Workers from Rockford, Illinois to various farms in multiple states, including Illinois, Ohio, North Dakota, South Dakota, Utah, and Colorado.

376.   Workers' pay, including that of Mr. Hidrogo, fluctuated depending on which state they were in. ML Farm failed to pay the Workers what was promised in their contracts.

377.   At the meeting in Rockford held every year when the Workers arrived, Luna threatened to "send Workers back to Mexico" and prevent further work opportunities in the United States if the Workers did not complete their jobs satisfactorily. Luna told the Workers, including Mr. Hidrogo, that if they missed a day of work, they would be sent back to Mexico.

378.   On their trips to the jobsites, ML Farm transported Mr. Hidrogo and the Workers either directly to the worksites to begin work immediately, and they were able to rest at a motel for, at the most, a few hours before beginning work.

379.   For example, during the 2016 season, Mr. Hidrogo traveled for twelve hours to a jobsite in Ohio, and then went straight to work without an opportunity to rest.

380.   Even though the contract indicated that Mr. Hidrogo would be working 40 hours a week, he often worked 70 to 80 hours a week.

381.   For instance, Mr. Hidrogo regularly worked from 7 a.m. to 8 p.m. or 9 p.m. He was only given a 30-minute break each day. Mr. Hidrogo worked for 15 days straight, and then received one day off.

382.   Mr. Hidrogo and other Workers were forced to work outside in extreme weather, including freezing temperatures and blizzard-like conditions.

383.   ML Farm failed provide Mr. Hidrogo and other Workers with proper safety equipment for the cold and type of work. Each season, ML Farm provided Mr. Hidrogo only a safety vest and helmet, and Luna or Luna's agents told him that he would be charged for replacements if the equipment needed to be replaced.

384.   ML Farm often transported Mr. Hidrogo and other Workers to the jobsites in vehicles with insufficient seatbelts for each person.

385.   In 2016, the Mr. Hidrogo and other Workers were in ML Farm's company van going to a jobsite. The van slid on ice and flipped over. Not everyone in the van had a seatbelt.

386.   Mr. Hidrogo and other Workers did not work that day because of the cold conditions.

387.   When Luna or Luna's agent learned they were not working, he told them that he did not care about the unsafe conditions and threatened to return them to Mexico if they refused to work.

388.   Mr. Hidrogo had to buy his own tools every season, which cost about $100. ML Farm did not reimburse these costs.

389.   The motels Mr. Hidrogo stayed in while working for ML Farm were often dirty and infested with bedbugs. Motel rooms were not regularly cleaned.

390.   Mr. Hidrogo's contract stipulated that ML Farm would provide the Workers with three meals a day and water at jobsites.

391.   The food provided was insufficient to feed Workers relative to the physical intensity and duration of the work every day. The food ML Farm provided to Mr. Hidrogo and other Workers was often spoiled, and Mr. Hidrogo could not safely eat it. Workers pooled their money to buy their own food and shared it amongst themselves.

392.   ML Farm did not provide water at the jobsites, and bathrooms were often unsanitary. There was nowhere the Workers could wash their hands.

393.   Mr. Hidrogo estimates he spent about $6 to $7 per week on water.

394.   When Mr. Hidrogo and other Workers complained about the lack of pay, long hours, or exposure to the weather while working, Luna or Luna's agents would tell them to "then go to Mexico." Mr. Hidrogo understood these comments to mean that Luna would call Immigration and Customs Enforcement to revoke their immigration status if they continued to complain.

395.   Luna or Luna's agents repeatedly told Mr. Hidrogo that they could not do anything about the Workers' complaints, and they could either choose to work or leave.

396.   At the end of the 2016 season, Luna or Luna's agent told Mr. Hidrogo and other Workers that they needed to extend their visas and work another four days. Some of the Workers objected to this extension because they had already made plans to return to their home countries. Luna or Luna's agent told Mr. Hidrogo and the Workers that they would not be hired for future seasons if they did not comply and agree to extend their visas and work the extra days.

397.    Luna routinely threatened to prevent Mr. Hidrogo and other Workers from obtaining H-2A visas in the future if their work was not satisfactory.

398.    Every season, Mr. Hidrogo saw dozens of Workers leave early. He understood that many of them fled due to the appalling working conditions.

DARIO AGUILERA RENDON

399.    Mr. Aguilera worked for ML Farm for four seasons, from June 2016 to December 2016, May 2017 to March 2018, August 2018 to March 2019, and June 2019 to August 2019.

400.    Before every season Mr. Aguilera worked for ML Farm, he received a contract that stated that he would be reimbursed for all travel costs, that he would only be working in one state, that he would work 40 hours per week, and that housing and food would be provided.

401.    Each season, Mr. Aguilera incurred various travel-related expenses and fees in order to work for ML Farm, including travel from his home in Durango to Nuevo Laredo or Monterrey, Mexico and lodging in these cities while waiting for the visa.

402.    Each season he worked for ML Farm, Mr. Aguilera paid for transportation from his home in Zacatecas, Mexico, to the Mexico/U.S. border. He also paid approximately $100 − $150 out of pocket each season for transportation, lodging, and food costs up to the border. He also paid about $35 in food expenses between the border and ML Farm's offices in Illinois.

403. ML Farm reimbursed Mr. Aguilera approximately $100 for travel-related expenses for the 2016 season, approximately $100 for the 2017 season, approximately $80 for the 2018 season, and approximately $50 for the 2019 season. These reimbursement amounts were insufficient to repay Mr. Aguilera for the money he spent.

404. When Mr. Aguilera arrived in the United States, he was taken to Rockford, Illinois. He spent one to two days in Rockford waiting for an assignment. ML Farm did not pay him for this time.

405. Even though the contract stated that Mr. Aguilera would only be working in one state, over the course of all seasons worked, ML Farm transported Mr. Aguilera and other Workers from Rockford, Illinois to various farms in multiple states, including Pennsylvania, New York, Michigan, Ohio, Wisconsin, Nebraska, and Missouri.

406. ML Farm did not inform Mr. Aguilera before he arrived in the United States which states he would be working in. ML Farm told the Workers the locations of their next site once they had finished an assignment.

407. Mr. Aguilera was not paid consistently with what was set forth in their contracts.

408. Even though the contract indicated that Mr. Aguilera would be working 40 hours a week, he often worked 70 to 80 hours a week.

409. For instance, Mr. Aguilera worked from 7:00 a.m. to 7:00 p.m. or 8:00 p.m. Monday through Sunday.

410.    During each season, there was insufficient room in the motel rooms for all the Mr. Aguilera and the other Workers. For instance, in 2016, Mr. Aguilera and three other Workers were assigned to a room, and two of them had to sleep on cots. In 2018 and 2017, Mr. Aguilera and two other Workers were assigned to one room, and one of them had to sleep on a cot.

411.    Mr. Aguilera's contract stipulated that the Workers would receive three meals a day and water at the jobsite.

412.    The food ML Farm provided was insufficient in relation to the physical intensity and duration of the work every day. ML Farm frequently failed to provide food for several days on end. Even when food was provided, Mr. Aguilera was forced to spend his pay on food to supplement the meager portions provided to him.

413.    For example, in the 2019 season, ML Farm failed to provide food for more than one day per week, and Mr. Aguilera had to purchase his own food daily at a gas station.

414.    During periods when Mr. Aguilera and other Workers were not provided food, ML Farm often continued to make deductions for food from their pay.

415.    ML Farm often failed to provide water at the jobsites, so Mr. Aguilera had to bring his own water to every jobsite.

416.    ML Farm deducted money from Workers' pay at the end of a season after checking the company's inventory of tools. After the 2017 and 2018 seasons, ML Farm docked Mr. Aguilera's pay, claiming tools were missing, even though Mr. Aguilera did not take any tools.

417.   Mr. Aguilera witnessed Luna's agents make degrading comments to new or younger Workers to motivate them to work harder and faster.

418.   Luna or Luna's agents threatened to report the workers to Immigration and Customs Enforcement (ICE) when the Workers did not want to work on the weekends. During the 2017 season, Mr. Aguilera witnessed supervisors send two co-workers to ML Farm's offices in Rockford for refusing to work weekends. He understood Luna was sending these workers back to Mexico.

419.   Mr. Aguilera believed that if he failed to meet Luna's demands to work extra hours, Luna would send him to Mexico.

420.   Each season, ML Farm extended the Workers' visas beyond the term originally stated in their contracts. Some of the Workers objected to these extensions. During the 2017, 2018, and 2019 seasons, Mr. Aguilera witnessed Luna blacklisting workers to prevent future opportunities to work for ML Farm or other agricultural companies in the United States if the Workers refused to sign requests for their visa extensions and remain longer than originally agreed.

EDGAR CASTILLO TORRES

421.   Mr. Castillo worked for ML Farm for six seasons, from September 2014 to February 2015, May 2015 to February 2016, May 2016 to December 2016, May 2017 to February 2018, June 2018 to February 2019, and October 2019 to December 2019.

422.   Each season, Mr. Castillo received a contract in Rockford, Illinois that stated that ML Farm would reimburse all travel costs, that he would only be working

in one state, that he would work 40 hours per week, and that he would be provided housing and food.

423. Each season, Mr. Castillo incurred various travel-related expenses and fees, including travel from his home in Tlaxcala to Nuevo Laredo and Monterrey, Mexico and lodging in these cities while waiting for the visa.

424. In 2014, 2016, 2017, and 2018, Mr. Castillo spent approximately $75 per season for costs to travel from Tlaxcala to Nuevo Laredo, Mexico to obtain his visa from the United States Consulate. He also paid approximately $45 per season to stay in a motel while waiting for his visa.

425. In 2014, Mr. Castillo paid approximately $200 in visa-related fees.

426. In both 2015 and 2019, Mr. Castillo spent approximately $60 for costs to travel from Tlaxcala to Monterrey, Mexico to obtain his visa, and $75 to stay in a motel while waiting for his visa.

427. Each season, Mr. Castillo spent approximately $100 on food costs while traveling to the United States.

428. In 2015, ML Farm did not provide transportation from Mexico to the United States, and Mr. Castillo spent around $100 on bus tickets and taxi fare to travel from Monterrey, Mexico to Rockford, Illinois.

429. In 2019, Mr. Castillo paid for required travel from Tlaxcala to Guadalajara, Mexico to undergo a medical check and take a course on worksite safety. Mr. Castillo spent approximately $251 on these costs, including transportation, lodging, and a fee for the medical check.

430. ML Farm reimbursed Mr. Castillo approximately $150 for each of the six seasons he worked for ML Farm.

431. These reimbursement amounts were insufficient to repay Mr. Castillo for the money he spent.

432. Each year, when Mr. Castillo arrived in the United States, ML Farm took him to Rockford, Illinois. He spent one to two days in Rockford before leaving for his assignment. During this time, he worked preparing tools and loading a trailer with the equipment his crew used on their assignment. ML Farm did not pay him for this time.

433. Even though the contract stated that Mr. Castillo would only work in one state, over the course of all seasons worked, ML Farm transported Mr. Castillo and other Workers from Rockford, Illinois to various farms in multiple states, including Ohio, Pennsylvania, Minnesota, Wisconsin, Nebraska, and South Dakota.

434. Mr. Castillo was not paid consistently at the rate set forth in his contract.

435. Trips to worksites located in other states often occurred overnight. Mr. Castillo and the Workers with him were either transported directly to the worksites to begin work immediately, or were able to rest at a motel for, at the most, a few hours before beginning work.

436. During the 2015-2016 season, Mr. Castillo and other Workers arrived at a new worksite in the middle of the night. They rested in the van, rather than a motel

68

before beginning work because ML Farm did not provide a motel room until the following night.

437. Even though the contract indicated Mr. Castillo would work 40 hours a week, he often worked 70 hours a week.

438. Each season, Mr. Castillo usually worked from 7:00 a.m. to 7:00 p.m. Monday through Saturday, and from 8:00 a.m. to 1:00 p.m. or 2:00 p.m. every other Sunday.

439. In February 2015, the transportation from Rockford, Illinois back to Mexico (contracted by ML Farm) felt so unsafe that for each of the following seasons, Mr. Castillo paid for his own transportation back to Mexico.

440. In January 2018, Mr. Castillo and other Workers traveling with him were involved in a rollover car crash in a company vehicle while on their way to the worksite. Ambulances took Mr. Castillo and the Workers to the hospital, and the Workers' supervisor informed Luna of what happened. Luna threatened that if the Workers did not return to work, he would not pay the motel cost for that day.

441. During each season, there was insufficient room in the motel rooms for all the Workers. For most seasons, Mr. Castillo was assigned, along with two other Workers, to a motel room with only two beds. To avoid the third Worker having to sleep directly on the floor, the Workers purchased a mattress for around $20 and took turns sleeping on the mattress on the floor.

442. During one season, one of the motel rooms ML Farm provided for Mr. Castillo was infested with bedbugs.

443.    Mr. Castillo's contract stipulated that the Workers would receive three meals a day and water at the worksite.

444.    The food ML Farm provided was insufficient relative to the physical intensity and duration of the work every day. Mr. Castillo was forced to supplement the two meals provided with purchases from gas stations or nearby stores.

445.    ML Farm often provided Mr. Castillo both meals at the worksite, and because they were insufficient on their own, Mr. Castillo routinely finished both meals at lunchtime. Even if he saved his dinner meal for later, the food spoiled and become inedible. Either way, Mr. Castillo had to supplement his meals by purchasing his own dinner.

446.    Mr. Castillo and his roommates purchased basic cooking supplies, such as a frying pan, a small grill, and gas for the grill, for approximately $55, so that they could cook for themselves.

447.    During the 2014, 2015, 2016, 2017, and 2018 seasons, ML Farm failed to provide water at the jobsites. During the 2019 season, ML Farm occasionally provided some water, but even then it was insufficient and ran out before the end of the day. Each season, Mr. Castillo had to bring his own water to every jobsite.

448.    Luna or Luna's agents subjected the Workers to verbal humiliation and harassment. During the 2019 season, Luna's agents yelled at Mr. Castillo and the other Workers, pushing them to work harder and faster until they exhausted all their strength.

449.    Mr. Castillo and other workers were scolded when they stopped to rest.

70

450.    Luna punished Workers who wanted to take time off if they were ill or needed to rest. If a Worker wanted time off to recuperate, they were taken to the motel and then not allowed to work the next day, and were not paid, as punishment.

451.    Neither Luna nor ML Farm paid Mr. Castillo timely and full wages.

452.    Mr. Castillo is missing pay for five to six weeks of the 2018 season, and for three weeks of the 2019 season for a total of $6,229.05.

453.    Luna coerced Mr. Castillo and other Workers into returning for future seasons by claiming he would pay them for the past season's wages if they returned the next season.

454.    Mr. Castillo left ML Farm's employment rather than continue to work without pay.

MANUEL DE JESUS SANDOVAL MEDINA

455.    Mr. Sandoval worked for ML Farm for four seasons, from 2016 to 2019, October 2016 to February 2017, May 2017 through February 2018, August 2018 to February 2019, and May 2019 to October 2019.

456.    Before every season Mr. Sandoval worked for ML Farm, he received a contract that stated that he would be reimbursed for all travel costs, that he would only be working in one state, that he would work 40 hours per week, and that he would be provided housing and food.

457.    Each season, Mr. Sandoval incurred various travel-related expenses and fees in order to work for ML Farm, including travel from his home in Zacatecas to

Nuevo Laredo, Monterrey, and Matamoros, Mexico and lodging in those cities while waiting for the visa.

458.   Mr. Sandoval paid Luna's agent and recruiter, Manuel Esparza, a fee of $1,500 before beginning work for the 2016 season. Mr. Esparza told him ML Farm required this fee as "insurance" to make sure Mr. Sandoval would actually travel to the United States to work for ML Farm. Mr. Sandoval borrowed money from family and friends to pay the $1,500 recruitment fee.

459.   Mr. Sandoval also paid for transportation to ML Farm's Rockford office for the 2016 season. He and other Workers paid for their own bus tickets to Chicago, and then shared a taxi to Rockford. Mr. Sandoval paid approximately $300 for costs incurred traveling to Illinois, which included motel lodging while waiting for his visa and food.

460.   ML Farm reimbursed Mr. Sandoval $100 for travel-related expenses for the 2016 season, far less than the approximately $1,800 Mr. Sandoval spent. He did not earn any money during the 2016 season because the costs he paid to work were so high.

461.   Mr. Sandoval also paid approximately $300 for travel-related costs for the 2017 and, 2018, and 2019 seasons.

462.   Mr. Sandoval received a $100 reimbursement for travel costs for the 2017 season. ML Farm did not reimburse him for his expenditures for the 2018 and 2019 seasons.

463.   Before starting the 2019 season, ML Farm required Mr. Sandoval to travel to Guadalajara, Mexico for a medical examination to clear him for work. Mr. Sandoval paid approximately $50 out of pocket for transportation to Guadalajara, motel lodging, and the medical exam. ML Farm never reimbursed Mr. Sandoval for these costs.

464.   These reimbursement amounts were insufficient to repay Mr. Sandoval the money he spent to work for ML Farm.

465.   When Mr. Sandoval arrived in the United States, he was taken to Rockford, Illinois. He spent one to eight days in Rockford waiting for an assignment. He was not paid for this time.

466.   Even though the contract stated that Mr. Sandoval would only be working in one state, over the course of all seasons worked, ML Farm transported Mr. Sandoval and other Workers from Rockford, Illinois to various farms in multiple states, including Pennsylvania, Nebraska, Wisconsin, Iowa, and South Dakota.

467.   Mr. Sandoval and other Workers' pay fluctuated depending on which state they were in. They were not consistently paid the rate set forth in their contracts.

468.   Mr. Sandoval and the other Workers were either transported directly to the worksites to begin work immediately, or were able to rest at a motel for, at the most, a few hours before beginning work.

469.   Even though the contract indicated that Mr. Sandoval would be working 40 hours a week, he often worked 70 to 80 hours a week.

470.   ML Farm failed provide Mr. Sandoval and other Workers with proper safety equipment.

471.   During the 2016 season, Mr. Sandoval observed a worker refusing to do construction work on stilts without safety equipment. Luna's agent yelled that he had no choice, but the Worker continued to refuse. Luna's agent took the Worker away from the jobsite and Mr. Sandoval did not see him again.

472.   This incident made Mr. Sandoval believe that if he did not do exactly as Luna or Luna's agent instructed, even if he felt unsafe, he would be taken away from the jobsite and not given more work.

473.   In 2019, when Mr. Sandoval and other Workers arrived in Rockford, they were taken immediately to Iowa with no rest. Their driver was so tired that he was falling asleep at the wheel, so Mr. Sandoval was forced to drive.

474.   When Mr. Sandoval and the other Workers arrived at the Iowa jobsite, they worked through the night for 12 hours, removing thousands of pig carcasses after the animals had reportedly died in a fire. ML Farm did not provide the Workers with food or water and drove them straight back to Rockford in the morning. The Workers could not stop anywhere for food or drink on the return journey trip because they were covered in pig filth and dirt.

475.   The motels Mr. Sandoval stayed in while working for ML Farm were often dirty and infested with bedbugs. Motel rooms were not regularly cleaned.

476.   During the 2017 season, one of the motel rooms ML Farm provided for Mr. Sandoval was infested with bugs, to such an extent that the Workers were compelled to sleep in the van.

477.   During each season, there was insufficient room in the motel rooms for all the Workers. For instance, during the 2016 season, three Workers were assigned to a room with two beds, and Mr. Sandoval had to sleep on the floor on bedding he paid for himself.

478.   Luna or Luna's agents told Mr. Sandoval that if he or other workers were sick and could not work that day, the worker would have to pay for the motel room.

479.   Luna or Luna's agents told Mr. Sandoval that if he or other workers missed three days of work, they would be sent back to Mexico.

480.   Workers understood that to mean that if they missed more than three days of work, Luna would make them return to Mexico.

481.   Mr. Sandoval's contract stipulated that the Workers would receive three meals a day and water at the jobsite.

482.   The food ML Farm provided was insufficient to feed Workers relative to the physical intensity and duration of the work every day. Workers received lunch and dinner at the same time, either at night or in the morning.

483.   Workers often threw out one of these meals before they could it eat because they could not safely store them anywhere to prevent spoiling. Mr. Sandoval became sick several times because he ate food he did not realize had spoiled.

484.   Every season, there were several days when Mr. Sandoval and other Workers only received one meal.

485.   To supplement the insufficient food ML Farm provided, Mr. Sandoval bought food at Wal-Mart once a week.

486.   ML Farm often failed to provide water at the jobsites, so Mr. Sandoval brought his own water to every jobsite.

487.   During his first season worked, Mr. Sandoval was injured on the job when a nail went through his hand. Although he needed medical attention, he did not receive it.

488.   Luna or Luna's agents subjected Mr. Sandoval and other Workers to verbal humiliation and threats.

489.   Every season, Luna or Luna's agents told Mr. Sandoval and other Workers they would be thrown out of the motel if they did not finish their work on time.

490.   In 2018, after Workers complained about non-payment of their wages, Luna screamed profanities at Mr. Sandoval and others and told them that if they could not do the work, they should leave so that Luna could contract with other workers.

491.   Luna regularly threatened Mr. Sandoval and other Workers with blacklisting and adverse action by immigration authorities, telling them that if they did not satisfactorily complete their work, Luna would call ICE and tell the agency to

revoke their visas, in addition to preventing them from obtaining H-2A visas in the future.

492.   Luna made similar threats at each of the large company meetings held in Rockford at the beginning of the season.

493.   Mr. Sandoval believed these threats and felt compelled to continue working because of them.

JOSE ELISEO HERNANDEZ ARANDA

494.   Mr. Hernandez worked for ML Farm for four seasons, August 2016 to February 2017 July 2017 to February 2018, May 2018 to February 2019, and July to December 2019.

495.   Before every season Mr. Hernandez worked for ML Farm, he received a contract in Mexico that stated that he would be reimbursed for all travel costs, stated his wage for each season, and stated that he would be provided housing and food.

496.   Each season, Mr. Hernandez incurred various travel-related expenses and fees in order to work for ML Farm, including lodging, food, transportation, and other travel expenses.

497.   Every season, Mr. Hernandez spent approximately $400 per season for travel expenses to obtain his visa at a U.S. Consulate, including a bus ticket and three nights in a motel.

498.   Each season he worked for ML Farm, Mr. Hernandez paid for his own visa at the consulate, at a cost of approximately $190 every year.

499.   To pay for these expenses, Mr. Hernandez took out a $750 loan from the bank before each season.

500.   ML Farm reimbursed Mr. Hernandez $180 per season upon Mr. Hernandez's arrival to the ML Farm office.

501.   These reimbursement amounts were insufficient to repay Mr. Hernandez the money he spent.

502.   When Mr. Hernandez arrived in the United States, ML Farm brought him to Rockford, Illinois. He typically spent about four days in Rockford waiting for an assignment. He spent about fifteen days in Rockford before being transported to the jobsite in the 2017 season. ML Farm did not pay him for this time.

503.   Even though the contract stated that Mr. Hernandez would only be working in one state, over the course of all seasons worked, ML Farm transported Mr. Hernandez and other Workers from Rockford, Illinois to various farms in Wisconsin, Michigan, Iowa, Pennsylvania, South Dakota, Illinois, and other states.

504.   ML Farm transported Mr. Hernandez and the Workers with him either directly to the worksites to begin work immediately, or to rest at a motel for a few hours before beginning work.

505.   Even though the contract indicated that Mr. Hernandez would be working 40 hours a week, he often worked 70 to 80 hours a week.

506.   During his time working for ML Farm, Mr. Hernandez routinely worked six days a week. Sometimes he and other Workers worked 15 consecutive days without a day off.

507.    Twice while working for ML Farm, Mr. Hernandez was injured on the job. During the 2016 season, he cut his leg, and the wound became infected. He was hospitalized for two days and had to spend approximately fifteen days recuperating in the motel. During the 2018 season, a severe blister formed on one of Mr. Hernandez's fingers from the construction work he performed. The blister became infected and continued to grow larger. He ultimately had to have surgery, and his finger was set in a cast. During this time, Mr. Hernandez was unable to work.

508.    Mr. Hernandez was not paid for the time he spent recuperating from his job-related injuries and did not receive workers' compensation.

509.    During each season, there was insufficient room in the motel rooms for all the Workers. Mr. Hernandez shared a bed with another Worker.

510.    Mr. Hernandez's contract for the 2019 season stipulated that the Workers would receive three meals a day and water at the site.

511.    During the 2019 season, ML Farm provided two meals a day even though the contract stipulated that he would receive three meals a day.

512.    The food ML Farm provided was insufficient relative to the physical intensity and duration of the work every day. Mr. Hernandez often supplemented the meals with purchases from gas stations or nearby stores.

513.    ML Farm failed to provide water at the jobsites, so Mr. Hernandez brought his own water to every jobsite.

514.    Neither Luna nor ML Farm paid Mr. Hernandez timely and full wages.

515.    Mr. Hernandez is missing pay for three weeks of work in the 2018 season.

516.    During the 2018 season, Luna pressured Mr. Hernandez and the other Workers into returning for the next season by claiming he would pay them for the past season's wages if they returned to work the next season.

517.    Mr. Hernandez returned the next season, in July 2019. Neither Luna nor ML Farm paid Mr. Hernandez the wages owed from the previous season.

518.    ML Farm failed to pay Mr. Hernandez for another three weeks of work in the 2019 season. Luna promised Mr. Hernandez he would deposit the owed wages on a bank card, but Mr. Hernandez never received this deposit.

519.    During the 2019 season, Mr. Hernandez's supervisor and Luna's agent, Miguel Avila, threatened to withhold pay and to prevent future work opportunities for the Workers if they continued to complain.

520.    Mr. Avila also threatened to report Mr. Hernandez Aranda and other Workers to ICE.

521.    Mr. Avila insulted and cursed at Mr. Hernandez and other Workers. He yelled at Workers while they were working on roofs and other heights, which added to Mr. Hernandez's fear and intimidation.

GERARDO MARTINEZ HERNANDEZ

522.    Mr. Martinez Hernandez worked for ML Farm for three seasons, from July 2017 to March 2018, July 2018 to March 2019, and July 2019 to September 2019.

523.    Before every season Mr. Martinez Hernandez worked for ML Farm, he received a contract that stated that he would be reimbursed for all travel costs, that he would only be working in one state, that he would work 40 hours per week, and that housing and food would be provided.

524.    Each season, Mr. Martinez Hernandez incurred various travel-related expenses and fees in order to work for ML Farm, including travel from his home in Tamaulipas to get his visa, and lodging while waiting for the visa.

525.    In 2017, Mr. Martinez Hernandez paid roughly $220 to travel from his home in Tamaulipas to Nuevo Laredo, a motel in Nuevo Laredo to get his visa, and food expenses.

526.    During the 2017 season, Mr. Martinez Hernandez paid $1,300 for the visa at the United States Consulate. He received a $100 reimbursement from ML Farm for this expense.

527.    In 2018, Mr. Martinez Hernandez paid roughly $290 for travel expenses from his home in Tamaulipas to Matamoros, a motel in Matamoros to get his visa, and food expenses. When he arrived in Rockford that year, the company reimbursed him $100, which did not cover all of his expenses.

528.    In 2019, Mr. Martinez Hernandez was required to go to Guadalajara and get a medical exam before receiving his visa in Monterrey. The travel to Guadalajara,

the medical exam, two nights in a motel in Guadalajara, travel to Monterrey, and two nights in a motel in Monterrey costs him a total of $315. ML Farm provided no reimbursement at all upon Mr. Martinez Hernandez's arrival in Rockford that year.

529.   When Mr. Martinez Hernandez arrived in the United States, he was taken to Rockford, Illinois. Depending on the season, he spent from one day to two weeks in Rockford waiting for an assignment. He was not paid for this time.

530.   Even though the contract stated that Mr. Martinez Hernandez would only be working in one state, over the course of all seasons worked, ML Farm transported Mr. Martinez Hernandez and other Workers from Rockford, Illinois to various farms in multiple states, including Illinois, Indiana, Arkansas, Wisconsin, Ohio, and South Dakota.

531.   Even though the contract indicated that Mr. Martinez Hernandez would be working 40 hours a week, he often worked 70 to 80 hours a week.

532.   Generally, Mr. Martinez Hernandez began work at 7 a.m. and finished work at 7 p.m. He worked six days a week and had Sundays off.

533.   Mr. Martinez Hernandez's contract stipulated that he would receive three meals a day and water at the site.

534.   The food ML Farm provided was insufficient to feed Workers relative to the physical intensity and duration of the work every day. Generally, Workers only received two meals a day, however, some days they would receive one meal or no meals at all.

535.    ML Farm usually gave Mr. Martinez Hernandez and the other Worker both meals at once. On several occasions, Mr. Martinez Hernandez's food spoiled, and he had to throw it away.

536.    During the last season, Mr. Martinez Hernandez and two other Workers left their jobsite and traveled to Rockford, Illinois to complain to Luna about their unpaid wages.

537.    When they arrived in Rockford, they told Luna that they were leaving the job because they were not getting paid.

538.    Luna told them that they were abandoning their worksites and the contract and would not be hired again in the future.

539.    Mr. Martinez Hernandez and the other Workers protested that they were only contemplating leaving the job because Luna had failed to pay them in full.

540.    Luna replied that they were "starting a problem" and told them they would no longer be hired in the future.

541.    Luna's agent, Alex LNU, a supervisor at ML Farm, told the Workers that they would make it difficult for the Workers to get a visa in the future.

Rogelio Olivares Rodarte

542.    Mr. Olivares worked for ML Farm for one season, from mid-July 2017 to mid-August 2017.

543.    Before Mr. Olivares began working for ML Farm, he received a contract in Mexico that stated that he would be reimbursed for all travel costs, he would only

be working in one state, he would work 40 hours per week, and that housing and food would be provided.

544.    Mr. Olivares incurred various travel-related expenses and fees in order to work for ML Farm, including travel from his home in Fresnillo to Nuevo Laredo, Mexico and lodging in Nuevo Laredo while waiting for the visa. He also paid for his own food while traveling to ML Farm's office in Rockford, Illinois. These expenses totaled approximately $349.

545.    Luna's recruiter and agent, Manuel Esparza, charged Mr. Olivares $1,500 to obtain his visa for his 2017 season.

546.    Mr. Olivares obtained a loan from his father and mother-in-law to pay this fee.

547.    ML Farm reimbursed Mr. Olivares only $125 of these costs.

548.    This reimbursement amount was insufficient to repay Mr. Olivares for the money he spent.

549.    When Mr. Olivares arrived in the United States, he was taken to Rockford, Illinois. He spent approximately ten days in Rockford waiting for an assignment. He was not paid for this time.

550.    During these days spent in Rockford, ML Farm supervisors told Mr. Olivares not to go too far from the motel because he was "on call."

551.    When Mr. Olivares arrived in Rockford, he attended a meeting at the ML Farm offices. Luna and other ML Farm permanent employees were present.

552.   A member of the human resources staff, Mirsa Benavides, told Workers that if they took any action against the company, they would be fired, and they would not earn any money, or words to that effect.

553.   Mr. Olivares and the other Workers did not have access to a car while waiting in Rockford, and therefore had to walk on the side of a highway to purchase their food at a nearby store.

554.   When he was finally transported to a worksite in Pennsylvania, the trip occurred overnight. Mr. Olivares began work immediately upon arrival to Pennsylvania.

555.   Even though the contract indicated that Mr. Olivares would be working 40 hours a week, during the first eleven days he worked for ML Farm, he worked more than one hundred hours.

556.   For instance, Mr. Olivares worked from 7:00 a.m. to 7:00 p.m. for the majority of the days he worked on the jobsite.

557.   During each season, there was insufficient room in the motel rooms for all the Workers. During the 2017 season, Mr. Olivares shared a two-bed hotel room with three Workers, and two Workers had to share a bed.

558.   Mr. Olivares's contract stipulated that the Workers would receive three meals a day and water at the jobsite.

559.   The food ML Farm provided was insufficient to feed Workers relative to the physical intensity and duration of the work every day. Workers were forced to supplement the meals with purchases from gas stations or nearby stores.

560.   Mr. Olivares received only two meals a day: dinner and lunch. ML Farm provided lunch for the next day the evening before, when that day's dinner was also given to Workers. Because ML Farm did not provide Mr. Olivares with a refrigerator, lunch spoiled overnight and was unsafe to eat the following day.

561.   Over the course of the 2017 season, Mr. Olivares had to borrow approximately $90 from co-workers to buy food to survive.

562.   Mr. Olivares estimates he lost approximately 35 pounds during his time working for ML Farm.

563.   ML Farm failed to provide water at the jobsites, so Mr. Olivares had to bring his own water to every jobsite. Mr. Olivares suffered from headaches and dizziness because he was dehydrated while working construction in the summer heat.

564.   Luna's agent pressured Mr. Olivares to work harder and faster. He told Mr. Olivares and other Workers that if they could not sustain an intense pace of work, they would be sent back to the motel in Rockford.

565.   Mr. Olivares understood this to mean that Luna would suspend these Workers from work until the Workers gave up and decided to go back to Mexico. This belief compelled Mr. Olivares to continue working for ML Farm.

566.   Luna's agents also subjected Workers to verbal humiliation. Mr. Olivares witnessed Luna's agents calling other Workers useless and stupid, and telling them it would be better if they went back to Mexico.

567.   Luna's agents often spoke in English to prevent Mr. Olivares and the Workers from understanding their conversations.

86

568.    The bathrooms at the worksite in Pennsylvania were so unsanitary that Mr. Olivares had to wait until he returned to the motel to go to the bathroom or relieve himself outdoors.

569.    Neither Luna nor ML Farm paid Mr. Olivares timely wages.

570.    Mr. Olivares left ML Farm's employment before his contract ended because he could not continue to work without pay.

571.    Luna's agent, ML Farm comptroller Raul Coria, pressured Mr. Olivares to keep working by falsely claiming that if he continued to work, he would eventually receive the wages owed to him.

572.    Coria threatened Mr. Olivares that he would call ICE to let them know if Mr. Olivares left ML Farm's employment. This caused Mr. Olivares to fear that he would be deported, but Mr. Olivares nevertheless ultimately decided to leave because he could not sustain himself or his family without income.

573.    Mr. Olivares worked a total of 11 days, but ML Farm gave Mr. Olivares a check for approximately three days of work on the day he left ML Farm's employment. Mr. Olivares was not paid the remainder of what he was owed until several months later.

MARCOS CUEVAS LEAL

574.    Mr. Cuevas worked for ML Farm for one season, from October 2018 to March 2019.

575.   Mr. Cuevas received a contract that stated that ML Farm would reimburse all travel costs, that he would work in one state, he would work 40 hours per week, and that housing and food would be provided.

576.   Prior to traveling to the United States to work for ML Farm, Mr. Cuevas paid Luna's agent $90, for what he understood to be visa- or passport-related expenses.

577.   Additionally, Mr. Cuevas paid the equivalent of approximately $290 in other travel-related expenses in order to work for ML Farm, including on travel from his home in Veracruz to Matamoros, food and lodging while waiting in Matamoros for his visa, and $140 on food during the trip from Matamoros to Rockford, Illinois.

578.   ML Farm reimbursed Mr. Cuevas for only $140 of these costs.

579.   When Mr. Cuevas arrived in the United States, he was taken to Rockford, Illinois. In a meeting at ML Farm's office, Luna's agent provided further details about the job, handed out tools, and warned Mr. Cuevas and others in attendance that if they did not work, they would have to pay for their own lodging at the motel.

580.   The next day, Mr. Cuevas was transported to a jobsite in South Dakota; this trip took approximately 16 hours, and Mr. Cuevas was not paid for this time.

581.   Mr. Cuevas worked at four different jobsites in South Dakota.

582.   The van used to transport Mr. Cuevas and the other Workers to the jobsites did not have capacity for all the Workers; consequently, there were not enough seatbelts for all passengers.

583.   Even though the contract indicated that Mr. Cuevas would be working 40 hours a week, he usually worked over 70 hours a week, from around 6:00 a.m. to 7:00 p.m.

584.   ML Farm provided Mr. Cuevas with a single 15-minute break for lunch each workday.

585.   Mr. Cuevas generally worked six days a week, but he was occasionally required to work on Sundays.

586.   Workers were only allowed to miss work if they were extremely ill to and required a visit to the hospital; otherwise, they were expected to work.

587.   Luna or Luna's agent constantly told Mr. Cuevas and others that they had to work faster.

588.   On several days, the temperatures were dangerously cold, but Luna or Luna's agent required Mr. Cuevas and the other Workers to continue working.

589.   All the motel rooms in which Mr. Cuevas stayed while working for ML Farm were insufficient, requiring three Workers to share rooms with only two beds.

590.   Mr. Cuevas' contract stipulated that the Workers would receive three meals a day and water at the worksite.

591.   Mr. Cuevas was only provided two meals a day.

592.   The quality of the meals provided was so poor sometimes that Mr. Cuevas purchased his own food from Wal-Mart instead.

593.   ML Farm did not provide water at the worksites; Mr. Cuevas had to purchase and bring his own water.

594.    Neither Luna nor ML Farm paid Mr. Cuevas timely and full wages.

595.    Luna and ML Farm owe Mr. Cuevas for five full weeks of work.

596.    ML Farm provided Mr. Cuevas with an IOU acknowledging that he is owed $2,684.54 in unpaid wages, but he is owed more than that amount.

597.    Luna promised to pay Mr. Cuevas once he returned to Mexico, but he did not.

598.    Mr. Cuevas incurred additional expenses totaling approximately $170 on his return trip from Rockford, Illinois to his home in Veracruz.

599.    Mr. Cuevas was not reimbursed for the above-described return trip expenses.

600.    After returning to Mexico at the conclusion of the season, Mr. Cuevas repeatedly called Luna to ask when he would be paid, but Luna stopped returning his calls.

OMAR ALONSO ESQUIVEL BELTRAN

601.    Mr. Esquivel worked for ML Farm for two seasons, from November 2018 through February 2019 and from September 2019 to October 2019.

602.    Before each season Mr. Esquivel worked for ML Farm, he received a contract that stated that he would be reimbursed for all travel costs, he would only be working in one state, that he would work 40 hours per week, and that housing and food would be provided.

603.    Each season, Mr. Esquivel incurred various travel-related expenses and fees in order to work for ML Farm, including travel from his home in Durango to Monterrey, Mexico and lodging in that city while waiting for the visa.

604.    In 2018, Mr. Esquivel spent approximately $350 for travel, lodging, and food while obtaining his visa and traveling to ML Farm's offices in Rockford, Illinois. In 2019, Mr. Esquivel spent about the same amount.

605.    In 2018, ML Farm reimbursed Mr. Esquivel only $150 for the expenses. In 2019, ML Farm only reimbursed him $50.

606.    These reimbursement amounts were insufficient to repay Mr. Esquivel for the money he spent to work for ML Farm.

607.    When Mr. Esquivel arrived in the United States, he was taken to Rockford, Illinois. He spent one to two days in Rockford waiting for an assignment. He was not paid for this time.

608.    Even though the contract stated that Mr. Esquivel would only be working in one state, each season when he arrived in Rockford, Mr. Esquivel learned he would not be working in the state named in his contract. Over the course of the 2018 and 2019 seasons, ML Farm transported Mr. Esquivel and other Workers from Rockford, Illinois to various farms in Indiana, Illinois, and Arkansas.

609.    Trips to worksites located in other states often occurred overnight. Mr. Esquivel and the Workers with him were either transported directly to the worksites to begin work immediately, or were able to rest at a motel for a few hours before beginning work.

610.    For example, in 2019, ML Farm transported Mr. Esquivel and other Workers from Rockford, Illinois to Arkansas overnight. The drive took approximately 11 hours, but Mr. Esquivel and the other Workers were taken straight to the worksite and required to begin work immediately. Mr. Esquivel and the other Workers asked the driver if they could go to the motel to rest for a few hours before beginning work, but the driver said no.

611.    The Arkansas motel where Mr. Esquivel lived during the 2019 season was located over an hour away from the worksite. ML Farm did not pay Mr. Esquivel for the time he was required to spend on travel to and from the worksites each day.

612.    On several occasions, Mr. Esquivel's supervisor asked him to drive the company vehicle even though Mr. Esquivel did not possess a U.S. driver's license.

613.    Even though the contract indicated that Mr. Esquivel would be working 40 hours a week, he often worked 70 to 80 hours a week, 6 to 7 days per week.

614.    During the 2019 season, Mr. Esquivel sometimes worked from 7:00 a.m. to 10:00 p.m. or even midnight.

615.    When Mr. Esquivel and other Workers complained to Luna's agents about the long hours or other problems with working conditions, they were told "this is what we are paying you for."

616.    In response to complaints from Mr. Esquivel and other Workers, Luna's agents told them, "[W]e brought you here from Mexico to work. If you don't want to work, we'll send you back to Mexico," or words to that effect. Mr. Esquivel understood those words to be a threat of deportation.

617.   Luna's agents also warned Mr. Esquivel and others that ML Farm would not hire them back for future seasons if they refused to keep working.

618.   Mr. Esquivel and other Workers were forced to work outside in extreme weather, including in freezing temperatures.

619.   Mr. Esquivel's contract stipulated that the Workers would receive three meals a day and water at the site.

620.   The food ML Farm provided was insufficient to feed the Workers relative to the physical intensity and duration of the work every day. The food was always the same, and Mr. Esquivel often had to purchase extra food for himself because he was still hungry after eating the food.

621.   Mr. Esquivel received, at most, two meals a day from ML Farm, and sometimes just one.

622.   ML Farm failed to provide water at the jobsites, so Mr. Esquivel had to purchase his own water before work and bring it to every jobsite.

623.   In Mr. Esquivel's experience, if a Worker was too sick to work, ML Farm did not pay that Worker for any days missed due to illness.

624.   Neither Luna nor ML Farm paid Mr. Esquivel timely and full wages.

625.   ML Farm consistently undercounted Mr. Esquivel's weekly hours by 1 to 4 hours during the 2018 season.

626.   Mr. Esquivel is missing a total of at least seven and a half weeks' worth of wages from the 2018 season. The last four checks Mr. Esquivel received from ML Farm in 2018 bounced, and he received no payment at all for the last three and a half

weeks of the season. When Mr. Esquivel complained directly to Luna about the bad checks and nonpayment, Luna told Mr. Esquivel to go back to Mexico and promised he would pay him soon. Mr. Esquivel was never paid.

627.   ML Farm did not timely pay Mr. Esquivel for the three weeks Mr. Esquivel worked during the 2019 season. During this time, Mr. Esquivel had to borrow money from family to pay for necessities like food and water.

628.   After three weeks without pay, Mr. Esquivel visited Luna at the Rockford office to demand his wages. Luna told Mr. Esquivel he did not have the money to pay him the missed wages from the 2018 season but said he would pay the 2019 wages in installments. When Mr. Esquivel expressed skepticism that ML Farm would ever pay his wages, Luna became angry and warned Mr. Esquivel that if Mr. Esquivel did not continue working, he would "make a report." Mr. Esquivel understood this to mean Luna would report him to ICE.

629.   Mr. Esquivel quit after the above-described conversation with Luna. ML Farm eventually paid Mr. Esquivel the wages owed from the 2019 season, but Mr. Esquivel is still owed the seven-and-a-half weeks' worth of wages from the 2018 season.

630.   Luna or Luna's agents subjected Mr. Esquivel and other Workers to verbal humiliation. Supervisors constantly threatened to send Workers "back to Mexico," called them "worthless," and cursed at and insulted them in front of other Workers.

631.   Mr. Esquivel believes these threats and verbal abuse were intended to pressure him and other Workers to continue working despite poor conditions and nonpayment of wages. Specifically, until he quit in 2019, Mr. Esquivel felt compelled to keep working to avoid serious financial harm; he believed that if he refused to keep working, he would never be paid his missing wages and would not be hired back for future seasons, leaving him unable to financially support himself and his family.

632.   Mr. Esquivel finally quit because he realized ML Farm would not pay him even if he did continue to work.

BRIAN FLORES GONZALEZ

633.   Mr. Flores Gonzalez worked for ML Farm for two seasons, from November 2018 to February 2019, and from July to September 2019.

634.   Each season, Mr. Flores Gonzalez incurred various travel-related expenses and fees in order to work for ML Farm, including travel from his home in Durango to Nuevo Laredo or Monterrey, Mexico and lodging in these cities while waiting for the visa.

635.   Before the 2018 season, Mr. Flores Gonzalez paid for transportation to Matamoros, Mexico to obtain his visa, a motel in Matamoros, transportation to Texas, and food for the journey to Illinois.

636.   In order to pay for these expenses for the 2018 season, Mr. Flores Gonzalez took out a loan of $485 loan from a bank to pay these costs.

637.   ML Farm did not reimburse Mr. Flores Gonzalez for any of his travel expenses for the 2018 season.

638.  Mr. Flores Gonzalez also paid these travel-related costs transportation for the 2019 season.

639.  He took out an $804 loan from a bank to pay these fees.

640.  ML Farm reimbursed Mr. Flores Gonzalez approximately $58 for his travel expenses for the 2019 season.

641.  These reimbursement amounts were insufficient to repay Mr. Flores Gonzalez the money he spent.

642.  When Mr. Flores Gonzalez arrived in the United States, he was taken to Rockford, Illinois. He waited approximately four days in Rockford before being transported to the first worksite at the beginning of the 2018 season. He and other Workers watched training videos while they waited. He was not paid for this time.

643.  Mr. Flores Gonzalez waited one day in Rockford for a job assignment in the 2019 season. He was not paid for this time.

644.  Even though the contract stated that Mr. Flores Gonzalez would only be working in one state, over the course of all seasons worked, ML Farm transported Mr. Flores Gonzalez and other Workers from Rockford, Illinois to various farms in multiple states, including Nebraska, South Dakota, Minnesota, and Ohio.

645.  Trips to worksites located in other states often occurred overnight. Mr. Flores Gonzalez and the Workers with him were transported directly to the worksites to begin work immediately.

646.  Even though the contract indicated that Mr. Flores Gonzalez would be working 40 hours a week, he often worked approximately 70 to 80 hours a week.

647.    During both seasons Mr. Flores Gonzalez worked for ML Farm, he worked from about 6:00 a.m. to 7:00 or 8:00 p.m. He only occasionally had a day off on Sunday.

648.    ML Farm failed to provide Mr. Flores Gonzalez and other Workers with proper safety equipment. Luna or Luna's agent ignored Workers' complaints about the lack of safety equipment.

649.    Job accidents were common because of lacking or faulty safety equipment. The cables, harnesses, and helmets ML Farm provided were often broken and did not function properly. Mr. Flores Gonzalez witnessed several Workers suffering on-site accidents and understood they returned to Mexico after Luna or Luna's agent sent them back to the motel in Rockford.

650.    If Mr. Flores Gonzalez was taking too long to put on his safety harness, Luna or Luna's agent told him to work without it.

651.    Mr. Flores Gonzalez was not given proper training on how to work on drywall stilts and fell three times during the 2018 season. Mr. Flores Gonzalez told Luna's agent he did not want to work on drywall stilts anymore, and Luna's agent responded that he did not have a choice if he wanted to continue working.

652.    Mr. Flores Gonzalez had to carry equipment distances of 300 to 600 feet, although his contract specified that the maximum distance over which he would have to carry equipment was 75 yards, or 225 feet. He told his supervisors that this was hurting his back, but Luna or Luna's agents refused to accommodate his injury. Luna

or Luna's agents told other Workers to work through painful conditions such as hernias.

653.   Mr. Flores Gonzalez worked in extreme cold, snow, sleet, and rain during the 2018 season. He suffered symptoms of what he believed to be frostbite on his hands and ears while he was working. He asked Luna's agent, Alejandro, to allow him to seek medical attention, but was told the frostbite would heal on its own.

654.   During each season, there was insufficient room in the motel rooms for all the Workers. For instance, in the 2018 season, four Workers were assigned to a room, and Mr. Flores Gonzalez and other Workers either had to share beds, or two Workers slept on the floor. In the 2019 season, three or four Workers were assigned to one room, and Mr. Flores Gonzales or one or two Workers either had to share a bed with other Workers, or sleep on the floor.

655.   Mr. Flores Gonzalez's contract stipulated that the Workers would receive three meals a day and water at the site.

656.   ML Farm provided only two small meals a day. Mr. Flores Gonzalez often felt weak and woke up in the night with hunger pangs. Workers were not allowed to eat the breakfast provided at the motels. On some days, ML Farm provided only one meal to Workers.

657.   The food provided was insufficient to feed Workers relative to the physical intensity and duration of the work every day. Workers were forced to supplement the meals with purchases from gas stations or stores. Workers' motels were often not located near stores to buy food. Mr. Flores Gonzalez spent his wages

or what money remained from his bank loan to buy extra food when they were able to visit a store. Mr. Flores Gonzalez was forced to ask co-workers for food or money to buy food.

658. Workers were often allowed only a few minutes to eat lunch.

659. ML Farm failed to provide water at the jobsites, so Mr. Flores Gonzalez had to bring his own water to every jobsite.

660. During the 2018 season, which took place over the winter, Workers could not bring their own water to the worksite because it froze. During the 2019 season, which took place over the summer months, Mr. Flores Gonzalez and other Workers were only allowed to drink water during their lunch break. Mr. Flores Gonzalez felt he was in danger of fainting from the combination of physical labor and lack of water.

661. Luna or Luna's agent discouraged Mr. Flores Gonzalez and other workers from using the bathroom during the workday. They expressed frustration and rushed workers if they needed to take a break to relieve themselves outside of the lunch break.

662. At one jobsite in Ohio during the 2019 season, ML Farm provided no bathrooms at all.

663. ML Farm failed to pay Mr. Flores Gonzalez timely and full wages.

664. Mr. Flores Gonzalez is missing pay for five or six weeks of work for the 2018 season, and one or two weeks of work in the 2019 season.

665.    Luna pressured Mr. Flores Gonzalez to return for the 2019 season by telling him that ML Farm would pay him the past season's wages only if he returned the next season. Mr. Flores Gonzalez has still not received these wages.

666.    During the 2018 season, Mr. Flores Gonzalez complained to Alejandro about the lack of safety equipment, lack of food, and unpaid wages.

667.    Neither Luna nor Alejandro responded to Mr. Flores Gonzalez's complaints.

668.    While on the jobsite, one of Luna's agents threatened the Workers, claiming they were not working hard enough. He stated that they would be deported, and that Luna would "burn" any opportunity for them come back to the United States.

669.    Mr. Flores Gonzalez told the other Workers that he did not want to keep working because he had no money and there was not enough food.

670.    The other Workers responded that Luna could have him deported, report him to the police, and take his visa.

671.    Upon information and belief, these Workers conveyed this message and believed that Luna would take these actions based upon statements Luna and his agents had made in the past.

672.    Upon information and belief, Luna intended the Workers to share such statements with each other to create an environment of fear and compliance.

673.    Mr. Flores Gonzalez heard similar threats of deportation on the jobsite.

674.    For this reason, he took the threats seriously, feared retaliation, and made no more complaints.

FELIPE FLORES GARCIA

675.   Mr. Flores Garcia worked for ML Farm for one season, from December 2018 through February 2019.

676.   Before he began work, Mr. Flores Garcia received a contract that stated that he would be reimbursed for all travel costs, that he would only be working in one state, that he would work 40 hours per week, and that housing and food would be provided.

677.   Mr. Flores Garcia paid the equivalent of approximately $225 in travel-related expenses. These expenses included travel from Mr. Flores Garcia's home in Durango to Monterrey, lodging while waiting in Monterrey for his visa, and food both in Monterrey and during the trip from Monterrey to Rockford, Illinois.

678.   ML Farm reimbursed Mr. Flores Garcia only $200, which was insufficient to cover all his expenses.

679.   When Mr. Flores Garcia arrived in the United States, he was taken to Rockford, Illinois. He spent five days in Rockford waiting for an assignment. He was not paid for this time.

680.   Even though his contract stated that Mr. Flores Garcia would only be working in one state, ML Farm transported Mr. Flores Garcia and other Workers from Rockford, Illinois to farms in Wisconsin and Indiana.

681.   Trips to jobsites located in other states occurred during the day or in the evening. Mr. Flores Garcia and the Workers with him were transported directly from Rockford to their first jobsite in Wisconsin early in the morning; they left Rockford at

3:00 a.m., arrived at the jobsite at 7:00 a.m., and began work immediately, with no time to rest or drop their belongings off at the motel before beginning work.

682.    Even though the contract indicated that Mr. Flores Garcia would be working 40 hours a week, he typically worked from early in the morning until late at night. ML Farm often required Mr. Flores Garcia to work from 7:00 a.m. until 10:00 p.m. or even midnight. Occasionally, ML Farm required Mr. Flores Garcia and the other Workers to work up to 17 hours in a single day.

683.    No matter how long they worked, Mr. Flores Garcia and the other Workers only received a single break during the day.

684.    ML Farm required Mr. Flores Garcia and the other Workers to work seven days a week.

685.    The van used to transport Mr. Flores Garcia and the other Workers to the jobsites did not have capacity for all the Workers; consequently, there were never enough seatbelts for all passengers.

686.    One of the van doors did not close completely. Because it was winter, cold air and snow would enter the van through the gap.

687.    Each of the two motels where Mr. Flores Garcia stayed while working for ML Farm in Wisconsin and Indiana was located half an hour to an hour away from the jobsites. ML Farm did not pay Mr. Flores Garcia for the time he was required to spend on travel to and from the jobsites each day.

688.    The Wisconsin and Indiana motel rooms lacked sufficient room for all the Workers. Three Workers had to share a room with two beds.

689.   Mr. Flores Garcia's contract with ML Farm stipulated that the Workers would receive three meals a day and water at the site.

690.   The food was insufficient to feed Workers relative to the physical intensity and duration of the work every day. Workers were forced to supplement the meals with purchases from nearby stores or restaurants.

691.   At most, Mr. Flores Garcia only received two meals per day.

692.   ML Farm always deducted the full $85 dollars a week from Mr. Flores Garcia's paychecks despite not providing the required meals.

693.   At the jobsite in Indiana, Luna or Luna's agents subjected Mr. Flores Garcia and other Workers to verbal humiliation. Luna's agent yelled and cursed at the Workers and threatened to blacklist them if they did not work harder.

694.   Mr. Flores Garcia felt compelled to continue working for ML Farm despite not being paid because he believed that he would be blacklisted if he quit.

695.   Neither Luna nor ML Farm paid Mr. Flores Garcia timely and full wages.

696.   ML Farm provided Mr. Flores Garcia with an IOU acknowledging that Mr. Flores Garcia is owed $3,264.82 in unpaid wages but he is owed more than that.

697.   Mr. Flores Garcia is missing four and a half weeks' worth of wages, totaling $3,864.82, from the only season he worked for ML Farm.

698.   At the conclusion of Mr. Flores Garcia's season, in February 2019, Luna told Mr. Flores Garcia, "I have no money to pay you. If you want to sue me, sue me," or words to that effect.

GUILLERMO GUEVARA MORA

699.   Mr. Guevara worked for ML Farm for one season, from December 2018 through February 2019.

700.   Before he began work, Mr. Guevara received a contract that stated that ML Farm would reimburse all travel costs, that he would only be working in one state, that he would work only 40 hours per week, and that housing and food would be provided.

701.   Mr. Guevara paid the equivalent of approximately $297 in travel-related expenses in order to work for ML Farm. These expenses included travel from Mr. Guevara's home in Veracruz to Monterrey, lodging while waiting in Monterrey for his visa, and food both in Monterrey and during the trip from Monterrey to Rockford, Illinois.

702.   ML Farm reimbursed Mr. Guevara only $200, which was insufficient to cover all his expenses.

703.   When Mr. Guevara arrived in the United States, he was taken to Rockford, Illinois. He spent four days in Rockford waiting for an assignment. He was not paid for this time.

704.   Even though the contract stated that Mr. Guevara would only be working in one state, ML Farm transported Mr. Guevara and other Workers from Rockford, Illinois to farms in Wisconsin, Illinois, and Indiana.

705.   Trips to jobsites located in other states occurred early in the morning or in the evening. Mr. Guevara and the Workers with him were usually transported

directly to the jobsites to begin work immediately, with no time to rest or drop their belongings off at the motel before beginning work.

706. During the trip from the jobsite in Wisconsin to a new jobsite in Indiana, Mr. Guevara and the other Workers were required to stop at a small farm in Illinois to complete a small job. There was no job order submitted to USDOL or contract for this job.

707. Only four Workers were selected for this approximately 4-hour job; the rest of the Workers were required to wait in the van until the job was completed. Mr. Guevara and the other Workers not selected for the day job were not paid for their time they were required to spend waiting in the van.

708. Every week, Luna's agent selected three Workers from Mr. Guevara's team to clean an ML Farm van. The Workers were required to buy their own cleaning supplies. They were not reimbursed.

709. Even though his contract indicated that Mr. Guevara would be working 40 hours a week, he typically worked from early in the morning until late at night, far more than the 40 hours laid out in the contract. Because the job at the Wisconsin jobsite needed to be completed quickly, on several occasions, Mr. Guevara worked 14 to 16 hours in a single day. On one occasion, ML Farm required Mr. Guevara and his team to work from 6:00 a.m. until 2:30 a.m. the next morning.

710. Mr. Guevara worked such long hours at the Wisconsin jobsite that he regularly got only two to three hours of sleep per night.

711.   Mr. Guevara and other Workers were not provided proper safety equipment. Mr. Guevara was required to work on stilts without a harness, and ML Farm failed to provide Workers, including Mr. Guevara, with replacement safety goggles as needed.

712.   Luna's agent, Alex, endangered Mr. Guevara and other Workers on numerous occasions at the Indiana jobsite due to Alex's reckless operation of the forklift.

713.   The van used to transport Mr. Guevara and the other Workers to the jobsites did not always have capacity for all the Workers; consequently, there were not always enough seatbelts for all passengers.

714.   Each of the two motels where Mr. Guevara stayed while working for ML Farm in Wisconsin and Indiana was located half an hour to an hour away from the jobsites. ML Farm did not pay Mr. Guevara for the time he was required to spend on travel to and from the jobsites each day.

715.   The motel rooms lacked sufficient room for all the Workers. In Rockford, Illinois and in Indiana, three Workers had to share one room with two beds.

716.   In Wisconsin, Mr. Guevara and the other Workers slept three to a room, with only one bed.

717.   The Rockford, Illinois and Indiana motel rooms ML Farm provided for Mr. Guevara were infested with cockroaches and biting insects. Additionally, the Workers had to request that the Indiana motel turn on the hot water each time they needed hot water for a shower or other purpose.

106

718.   Mr. Guevara's contract stipulated that the Workers would receive three meals a day and water at the site.

719.   The food ML Farm provided was insufficient to feed Workers relative to the physical intensity and duration of the work every day. Workers were forced to supplement the meals with purchases from nearby stores or restaurants.

720.   Mr. Guevara only received two meals per day at most.

721.   For the entire month of January, ML Farm failed to provide meals on Mondays. ML Farm failed to provide meals to Mr. Guevara and the other Workers on several weekends. Because ML Farm also failed to pay Mr. Guevara's wages, Mr. Guevara resorted to borrowing money from other Workers to buy food for himself.

722.   ML Farm always deducted the full $85 dollars a week from Mr. Guevara's paychecks despite not providing the required meals.

723.   ML Farm regularly failed to provide water at the jobsites. Mr. Guevara and the other Workers therefore brought their own water, but the water often froze solid during the day. On one occasion, Mr. Guevara was so thirsty at work that he tried to eat snow and suck on an icicle.

724.   Luna or Luna's agents subjected Mr. Guevara and other Workers to verbal humiliation. They called Mr. Guevara and others lazy and cursed at them.

725.   Luna or Luna's agents further threatened Mr. Guevara with termination and refusal to hire him for future seasons.

726.   Neither Luna nor ML Farm paid Mr. Guevara timely and full wages.

727.   ML Farm provided Mr. Guevara with an IOU acknowledging that he is owed $3,280.70 in unpaid wages, but he is owed more than that.

728.   Mr. Guevara is missing five weeks' worth of wages, totaling $4,100.88, from the one season he worked for ML Farm.

729.   Mr. Guevara felt compelled to continue working for ML Farm despite not being paid because he believed he had to do so to have any chance of receiving his unpaid wages.

730.   Mr. Guevara incurred additional expenses on his return trip from Rockford, Illinois to his home in Veracruz. ML Farm failed to inform Mr. Guevara of the departure time for the provided bus transportation from Rockford, Illinois to Mexico, causing Mr. Guevara to miss the bus. Because Mr. Guevara's visa was about to expire, his family had to send him money to purchase a plane ticket home. This return plane ticket cost $197.

731.   Mr. Guevara was not reimbursed for the above-described return trip expenses.

MANUEL MORA GARCIA

732.   Mr. Mora worked for ML Farm for one season, from December 2018 through February 2019.

733.   Mr. Mora received a contract that stated that ML Farm would reimburse all travel costs, that he would work in one state, that he would work 40 hours per week, and that housing and food would be provided.

734.     When Mr. Mora arrived in the United States, he was taken to Rockford, Illinois. He spent three days in Rockford waiting for an assignment. He was not paid for this time.

735.     Even though the contract stated that Mr. Mora would work in Iowa, ML Farm transported Mr. Mora and other Workers to worksites in Wisconsin and Indiana.

736.     ML Farm transported Mr. Mora and other Workers from Rockford to Lancaster, Wisconsin in the early morning, beginning the drive at 4:00 a.m. Mr. Mora and other Workers were transported directly to the worksite and required to begin working immediately.

737.     Even though the contract indicated that Mr. Mora would be working 40 hours a week, he often worked 70 to 80 hours a week.

738.     Mr. Mora typically worked from 7:00 a.m. to 7:00 p.m., but occasionally had to work until as late as 11:00 p.m.

739.     The Illinois motel where Mr. Mora lived while assigned to an Indiana worksite was located 2 hours away from the worksite. ML Farm did not pay Mr. Mora for the four hours he was required to spend traveling to and from the worksite each day.

740. In both Wisconsin and Illinois, the motel rooms provided were insufficient, requiring Mr. Mora to share a room with only two beds with two other Workers.

741.    Mr. Mora's Wisconsin motel room included a kitchenette, but Mr. Mora and the other Workers were prohibited from cooking food in the room.

742.    Mr. Mora's contract stipulated that the Workers would receive three meals a day and water at the site.

743.    Mr. Mora was generally only provided two meals a day. On approximately six occasions, Mr. Mora received only one meal or no meals, and was required to buy his own food.

744.    ML Farm only sporadically provided water at the Wisconsin worksite and did not provide any water at the Indiana worksite.

745.    When Mr. Mora was working in Indiana, Luna's agent, Alex, denied water to Mr. Mora and other Workers, telling them it was too cold outside for them to be thirsty.

746.    Mr. Mora was required to work outside or in unheated spaces during the winter without proper outerwear, and ML Farm did not provide Mr. Mora with work gloves.

747.    Luna or Luna's agent required Mr. Mora and other Workers to use equipment in unsafe conditions or when they were not properly trained to use the equipment. When Workers would fall or nearly fall when using the equipment, Alex laughed at them and ridiculed them.

748.    Neither Luna nor ML Farm paid Mr. Mora timely and full wages.

749.    Mr. Mora received no payment for four to five weeks of work.

750.   Mr. Mora took the job with ML Farm in order to earn money to send to his family in Mexico.

751.   Due to ML Farm's failure to pay his wages, Mr. Mora was unable to support his family as expected. Shortly after Mr. Mora returned to Mexico, he had to borrow money from a relative to pay his wife's medical bills, when he should have been able to pay them himself out of the wages he earned.

752.   Mr. Mora and other Workers repeatedly complained to Luna's agent regarding their unpaid wages, but he falsely assured them that if they kept waiting, eventually they would be paid.

753.   In late February 2019, Mr. Mora returned to Rockford to demand his wages from Luna. Luna told Mr. Mora that he did not have the money to pay him now, but when Mr. Mora went home to Mexico, he would get paid.

754.   Luna told Mr. Mora that he could "sue him" if he wanted to, but Luna did not have the money to pay him.

GERARDO GARCIA ROLDAN

755.   Mr. Garcia worked for ML Farm for one season, from January 2019 to February 2019.

756.   Before he began work, Mr. Garcia received a contract that stated that he would be reimbursed for all travel costs, that he would only be working in one state, that he would work 40 hours per week, and that housing and food would be provided.

757.    Mr. Garcia paid the equivalent of approximately $118 in travel-related expenses in order to work for ML Farm, including on travel from his home in Zacatecas to Matamoros, on lodging while waiting in Matamoros for his visa, and on food in Matamoros and during the trip from Matamoros to Rockford, Illinois.

758.    ML Farm did not reimburse Mr. Garcia for any of these costs.

759.    When Mr. Garcia arrived in the United States, he was taken to Rockford, Illinois, where he signed the employment contract with ML Farm, was given tools, and was told that he would be working in South Dakota.

760.    ML Farm did not provide Mr. Garcia with any job training.

761.    Mr. Garcia spent two nights in Rockford before being transported to South Dakota.

762.    The drive from Rockford to South Dakota took approximately 20 hours, and Mr. Garcia was not paid for this time. ML Farm did not provide Mr. Garcia with food or money for food during the 20-hour trip. Mr. Garcia and the other Workers dropped their belongings off at the motel upon arrival before 5:30 a.m. and were then taken directly to the jobsite to begin work.

763.    Mr. Garcia worked at two different jobsites in South Dakota.

764.    The van used to transport Mr. Garcia and the other Workers to the jobsites did not have capacity for all the Workers; consequently, there were not enough seatbelts for all passengers.

765.    Mr. Garcia generally worked over 70 hours a week, from around 7:00 a.m. to 7:00 or 8:00 p.m., Monday through Saturday.

766.   Mr. Garcia and his crew were unable to work due to extreme cold or heavy snow on about 10 non-consecutive days during the season. ML Farm did not pay Mr. Garcia for these cancelled work days.

767.   Luna or Luna's agents required Mr. Garcia and other Workers to work in unsafe conditions and without proper safety equipment, such as harnesses.

768.   ML Farm failed to provide Mr. Garcia and other Workers with any cold-weather clothing and equipment, even though they were working outdoors in South Dakota in the middle of the winter.

769.   Each of the motel rooms in which Mr. Garcia stayed was insufficient, requiring him to share rooms with only two beds with three other Workers.

770.   One of the two motels where Mr. Garcia stayed was infested with insects, including cockroaches.

771.   Mr. Garcia's contract stipulated that ML Farm would provide Workers with meals and water at the worksite.

772.   Mr. Garcia was provided only one meal a day, almost always consisting of a hamburger and chips, with no fruits or vegetables.

773.   ML Farm deducted the full $85 a week from Mr. Garcia's paycheck for meals, even though he received only one meal a day.

774.   The quality of the meals provided was so poor that several of Mr. Garcia's co-Workers became ill.

775.   Mr. Garcia often had to borrow money from co-Workers in order to feed himself. Mr. Garcia was unable to repay his co-Workers until they returned home to Mexico because neither Luna nor ML Farm fully and timely paid Mr. Garcia's wages.

776.   ML Farm did not provide water at the worksites; Mr. Garcia had to purchase and bring his own water or ask to drink some of the other Workers' water.

777.   ML Farm owes Mr. Garcia for three full weeks of work.

778.   ML Farm provided Mr. Garcia with an IOU acknowledging that he is owed $2,031.48 in unpaid wages but he is owed more than that.

779.   Mr. Garcia felt compelled to keep working despite not being paid because he understood ML Farm would not hire him for future seasons if he left before the end of his contract due to nonpayment of wages.

780.   Mr. Garcia believed the loss of opportunities for future employment would cause him serious financial harm.

781.   Mr. Garcia incurred additional expenses totaling approximately $78 on his return trip from Rockford, Illinois to his home in Zacatecas, which ML Farm did not reimburse.

GERARDO SANTILLAN HERNANDEZ

782.   Mr. Santillan worked for ML Farm for one season, from mid-July 2019 to August 2019.

783.   Before he began work, Mr. Santillan received a contract that stated that he would be reimbursed for all travel costs, that he would only be working in one

state, that he would work 40 hours per week, and that housing and food would be provided.

784.   Luna or Luna's agent instructed Mr. Santillan to travel from his home in Durango to Guadalajara for a blood test required for employment with ML Farm.

785.   Mr. Santillan paid all expenses related to this blood test and travel to and from Guadalajara.

786.   Mr. Santillan incurred additional travel-related expenses and fees in order to work for ML Farm, including travel from his home in Durango to Monterrey and lodging in Monterrey while waiting for the visa.

787.   Luna or Luna's agent instructed Mr. Santillan to save transportation, lodging, and food receipts related to his trip to Monterrey because he would be reimbursed by ML Farm within a week of arriving in the United States.

788.   Mr. Santillan paid about $900 in travel-related expenses for the 2019 season.

789.   ML Farm did not reimburse Mr. Santillan for any of the above-described expenses.

790.   When Mr. Santillan arrived in the United States, he was taken to Rockford, Illinois. He spent two days in Rockford waiting for an assignment, during which time ML Farm asked Mr. Santillan and others to clean up the yard around the office. He was not paid for this time.

791.   Even though the contract stated that Mr. Santillan would only be working in Nebraska, over the course of all seasons worked, ML Farm transported

Mr. Santillan and other Workers from Rockford, Illinois first to a jobsite in or near Barry, Illinois and then to another jobsite in or near Waterloo, Iowa.

792.   ML Farm transported Mr. Santillan and other Workers from Rockford to Barry, Illinois in the early morning, beginning the drive at 3:00 a.m. Mr. Santillan and other Workers were transported directly to the worksite and required to begin working immediately.

793.   Mr. Santillan worked at the Barry, Illinois worksite for about three weeks before ML Farm transported him and other Workers to the new worksite in Iowa.

794.   The Iowa motel where Mr. Santillan lived while assigned to the Waterloo worksite was located one and a half to two hours away from the worksite. ML Farm did not pay Mr. Santillan for the three to four hours he was required to spend on travel to and from the worksite each day.

795.   On one occasion, the van transporting Mr. Santillan and other Workers to and from the worksite ran out of gas, and Mr. Santillan and the others had to pay for additional gas.

796.   Even though the contract indicated that Mr. Santillan would be working 40 hours a week, he often worked 75 to 80 hours a week.

797.   Mr. Santillan generally worked 6 days a week (Monday through Saturday), with Sundays off, but ML Farm sometimes also required Mr. Santillan to work on Sundays.

798.   On a typical workday, Mr. Santillan was required to leave the motel between 4:30 and 5:00 a.m. and he did not return home until 8:00 or 9:00 p.m.

799.   ML Farm failed provide Mr. Santillan and other Workers with adequate safety equipment.

800.   In both Illinois and Iowa, the motel rooms provided were insufficient, requiring Mr. Santillan to share a room with two beds with three other Workers.

801.   Mr. Santillan's Illinois motel room was infested with insects and bedbugs.

802.   Mr. Santillan complained to Luna's agent about the above-described housing issues, but he took no action to remedy the problems.

803.   Mr. Santillan's contract stipulated that the Workers would receive three meals a day and water at the worksite.

804.   On approximately ten different days, ML Farm provided Mr. Santillan with just one meal or failed to provide any food at all.

805.   When ML Farm did provide meals, they were often spoiled or insufficient to feed Workers relative to the physical intensity and duration of the work every day.

806.   Mr. Santillan became sick after eating spoiled food provided by ML Farm.

807.   Workers had to supplement the meals with purchases from gas stations or nearby stores. Mr. Santillan estimates that he spent approximately $150 of his own money per week on food while working for ML Farm in 2019.

808.   ML Farm failed to provide water at the jobsites, so Mr. Santillan purchased his own water to bring to the worksite. Mr. Santillan estimates that he spent between $10 and $15 weekly on water.

809.   There were no bathrooms, portable or otherwise, at either of Mr. Santillan's worksites.

810.   Luna or Luna's agent told Mr. Santillan and other Workers that they were required to stay in the motel when not working or doing laundry. Mr. Santillan understood that if he left the motel without permission—even to walk to a nearby store—he would be sent back to Mexico.

811.   ML Farm did not allow Workers to take time off if they were ill. Luna's agents told Mr. Santillan and other Workers that if they did not work for whatever reason, ML Farm would not pay them, and they would have to pay for cost of meals and lodging themselves.

812.   Neither Luna nor ML Farm paid Mr. Santillan timely and full wages. In fact, ML Farm paid Mr. Santillan only once, in the amount of $700.

813.   ML Farm's failure to pay Mr. Santillan's wages increased the severity of the above-described threats to require Workers to pay their own food and lodging, because Mr. Santillan and others had no money with which to pay those expenses.

814.   Luna or Luna's agent repeatedly told Mr. Santillan and other Workers that they would only be paid what they were owed if they kept working.

815.   Mr. Santillan believed these threats, and he felt compelled to keep working in order to receive his unpaid wages, to recoup his visa- and travel-related

expenses, and to ensure continued access to food and lodging. Mr. Santillan believed that if he were to be sent back to Mexico, he would never receive his unpaid wages and would be blacklisted from future H-2A employment.

816.    At times, Mr. Santillan did not have enough money to buy adequate food, let alone to send money back to his family in Mexico, which was the primary objective of his work in the United States.

817.    On Mr. Santillan's very first day in Rockford, Luna threatened Mr. Santillan and other Workers with blacklisting, telling them that if they did not "behave themselves" or failed to do a satisfactory job, they would not be invited to return, and Luna would ensure that they would not be able to obtain another H-2A visa to work for any other U.S. company.

818.    Luna or Luna's agents also threatened Mr. Santillan and other Workers with being sent back to Mexico if they stopped working or did not perform well.

819.    Mr. Santillan and other Workers repeatedly asked Luna's agent for their unpaid wages. He told the Workers that their pay was coming, but aside from the first one and only payment of $700, Mr. Santillan received none of the wages ML Farm owed him.

820.    After weeks without receiving a paycheck, Mr. Santillan and another Worker returned to the ML Farm's office in Rockford, Illinois to request their back wages. Luna told Mr. Santillan that if he returned to the worksite and continued working, Luna would pay him soon.

821.   Luna also told Mr. Santillan that if he stopped working for ML Farm, Mr. Santillan would have to sign documents affirming that ML Farm was no longer responsible for him.

822.   Despite his concerns about Luna's threats, Mr. Santillan did not believe ML Farm would ever pay him, so he left ML Farm's employment rather than continue to work without pay.

MELQUIADES BARRON SANDOVAL

823.   Mr. Barron was employed by ML Farm in August 2019.

824.   Before Mr. Barron worked for ML Farm, he received a contract in Mexico that stated that he would be reimbursed for all travel costs, that he would only be working in one state, that he would work 40 hours per week, and that housing and food would be provided.

825.   Mr. Barron incurred various travel-related expenses and fees in order to work for ML Farm, including travel from his home in Juan Aldama to Durango, Mexico.

826.   Mr. Barron deposited approximately $553 into an account at Luna's agent's instruction. Luna's agent told him this deposit was for costs associated with a required training in Guadalajara, and that ML Farm would reimburse the deposit.

827.   Mr. Barron also deposited approximately $402 into another account at Luna's agent's instruction. Luna's agent told him this deposit was for costs associated with obtaining his visa and travel to the United States, and that ML Farm would reimburse the deposit.

828.   Mr. Barron spent approximately $26 for costs to travel roundtrip from Juan Aldama to Durango, Mexico to undergo a medical check and training on worksite safety in Guadalajara, Mexico. Luna's agents provided the transportation between Durango and Guadalajara and lodging in Guadalajara.

829.   Mr. Barron also spent an unknown amount to cover his food costs when traveling to and attending the training.

830.   Mr. Barron spent approximately $13 for costs to travel from Juan Aldama to Durango, Mexico to obtain his visa from the United States consulate in Monterrey, Mexico. Luna's agents provided the transportation between Durango and Monterrey and lodging in Monterrey.

831.   Mr. Barron also spent approximately $100 to cover his food costs in Monterrey and while traveling to the United States.

832.   ML Farm did not reimburse Mr. Barron for any of these costs.

833.   When Mr. Barron arrived in the United States, he was taken to Rockford, Illinois. He spent two days in Rockford working for ML Farm before being transported to his assignment. The work Mr. Barron performed in Rockford included preparing and loading the construction tools, supplies, and equipment that the crew would use on their assignment. He was not paid for this time.

834.   Even though the contract stated that Mr. Barron would only work in one state, ML Farm assigned him and other Workers to various farms in multiple states, including Missouri and Pennsylvania.

835.   ML Farm transported Mr. Barron and other Workers from Rockford, Illinois to Missouri, where they would support the ongoing work of another crew of Workers already there.

836.   Mr. Barron learned that after one month of work ML Farm had not paid the other Workers.

837.   The motel rooms ML Farm provided lacked sufficient space for all the Workers. For instance, when Mr. Barron arrived in Missouri, he was forced to share a room with two beds with three other Workers.

838.   Mr. Barron's contract stipulated that the Workers would receive three meals a day and water at the work site. Mr. Barron received two meals a day.

839.   The food ML Farm provided was insufficient to feed Workers relative to the physical intensity and duration of the work every day. Mr. Barron and the Workers were compelled to supplement the meals with purchases from gas stations and nearby stores. Workers would frequently go hungry because Luna's agents delayed meal breaks and required the Workers to keep working.

840.   ML Farm failed to provide water at the jobsites, so Mr. Barron and other Workers had to purchase their own water.

841.   Mr. Barron heard from other Workers that Luna or Luna's agents subjected Workers to verbal humiliation and yelling.

842.   Mr. Barron left ML Farm's employment rather than continue to work without pay and subject to the mistreatment that he observed and learned about on arrival in Missouri.

843. ML Farm failed to pay Mr. Barron timely and full wages the two days in August 2019 that he prepared and packed construction tools and equipment in Rockford, Illinois.

844. Luna's agent made statements to Mr. Barron indicating that if Mr. Barron did not report back to ML Farm's employment within 72 hours, Luna would report his departure to immigration authorities, and Mr. Barron would face consequences because the authorities would know that he did not complete his contract.

FRANCISCO MANUEL PALOS SOTO

845. Mr. Palos worked for ML Farm for one season, from November 2018 through February 2019.

846. Before Mr. Palos began work for ML Farm, he received a contract in Mexico that stated that he would be reimbursed for all travel costs, that he would only be working in one state, that he would work 40 hours per week, and that housing and food would be provided. Mr. Palos signed the contract upon arrival at ML Farm's office in Rockford, Illinois.

847. Mr. Palos incurred various travel-related expenses and fees, including travel from his home in Durango to Matamoros and lodging in Matamoros while waiting for the visa.

848. Mr. Palos spent approximately $150.59 for travel to and food and lodging in Matamoros. He spent an additional $51.21 on transportation from Matamoros to

the United States/Mexico border and food during his trip to ML Farm's office in Rockford.

849.    ML Farm reimbursed Mr. Palos $130 upon his arrival in Rockford. This amount was insufficient to repay Mr. Palos for the expenses he incurred.

850.    When Mr. Palos arrived in the United States, he was taken to Rockford, Illinois. The same day Mr. Palos arrived, Mr. Palos and other Workers were taken to work at a farm in Illinois for the rest of the day.

851.    The next day, Mr. Palos signed the contract with ML Farm and was transported to a worksite in Nebraska.

852.    Even though the contract stated that Mr. Palos would be working in South Dakota, he ended up working on two different farms in Nebraska; one in Omaha and one in Lincoln.

853.    Though the contract further indicated that Mr. Palos would be working 40 hours a week, he usually worked more than 10 hours a day.

854.    Mr. Palos generally worked from around 7:00 a.m. to around 5:00 or 6:00 p.m., though he sometimes had to work as late as 8:00 p.m.

855.    The motels at which Mr. Palos stayed when he was working in Omaha and Lincoln were each about an hour away from the worksites.

856.    Both motel rooms provided were insufficient, requiring that Mr. Palos share room two beds with two other Workers.

857.    The tap water at each of the motels was undrinkable, requiring Mr. Palos to buy bottled water to drink.

858.   Mr. Palos' contract with ML Farm stipulated that the Workers would receive three meals a day and water at the worksite.

859.   ML Farm only provided Mr. Palos with two meals a day.

860.   Mr. Palos had to purchase his own breakfast every day because ML Farm failed to provide breakfast and the motels did not offer complimentary breakfast.

861.   The food provided was insufficient to feed Workers relative to the physical intensity and duration of the work every day. Workers, including Mr. Palos, were compelled to supplement the meals with additional food they purchased themselves.

862.   Mr. Palos occasionally had to ask other Workers to lend or give him money to purchase extra food, because Mr. Palos did not have enough money to pay for it himself.

863.   Neither Luna nor ML Farm paid Mr. Palos timely and full wages.

864.   When ML Farm did pay Mr. Palos, it was generally by check. On one occasion, Mr. Palos' wages were deposited on a debit card.

865.   ML Farm failed to pay Mr. Palos any wages at all for four weeks of work.

866.   About midway through Mr. Palos' contract, Luna traveled to Omaha and told Mr. Palos and other Workers that he did not have the money to pay them at that time. Mr. Palos took this to mean that he would receive his unpaid wages at the end of his contract.

867.    At the end of Mr. Palos' contract, instead of paying him, Luna provided Mr. Palos with a written IOU stating that ML Farm owed him $2,427.83 in unpaid wages.

## CLAIMS FOR RELIEF: THE DISCHARGE AND NON-DISCHARGEABILITY COUNTS

### COUNT 1:

#### NON-DISCHARGEABILITY OF DEBTS OWED TO THE WORKERS UNDER § 523(a)(2)(A) OF THE BANKRUPTCY CODE

868.    The Workers incorporate by reference all preceding paragraphs of this Complaint.

869.    Luna is an insider of ML Farm, Alpha, and Spartans.

870.    Section 523(a)(2)(A) provides, in relevant part, that a debt is not dischargeable when it is "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

871.    Luna made false statements of material fact as set forth above, including when he promised the Workers would receive wages, proper housing, food, and water, and enticed the Workers to leave their homes and travel to the United States to work for ML Farm.

872.    Luna knew that his statements were false, and he would not be providing the Workers with all their wages, and proper housing, food, and water.

873.    Luna made these statements to induce the Workers to leave their homes in Mexico, travel the United States, and work for him.

874.   The Workers justifiably relied on Luna's promises the Workers would receive wages, proper housing, food, and water when they worked for ML Farm.

875.   The Workers were severely damaged by Luna's false misrepresentation.

876.   Luna fraudulently induced the Workers to work without pay, through false pretenses and false representations regarding the terms and conditions of the work or, in the alternative, by implied misrepresentations or conduct intended to create or foster a false impression.

877.   Luna intended that the Workers rely on his false representations.

878.   All or part of the debts owed to the Workers are non-dischargeable as they are debts for money and services obtained by Luna's false representations or actual fraud, within the meaning of § 523(a)(2)(A) of the Bankruptcy Code.

WHEREFORE, pursuant to 11 U.S.C. § 523(a)(2)(A), the Workers, as defined above, pray that this Honorable Court determine that the debt and liability owed by Mauricio Luna to the Workers is nondischargeable, and that it enter judgment in the Workers' favor for all amounts due as a result of Mauricio Luna's liability to the Workers, award the Workers their costs, and grant such relief as this Honorable Court deems just.

## COUNT 2:

### NON-DISCHARGEABILITY OF DEBTS OWED TO THE WORKERS UNDER § 523(a)(6) OF THE BANKRUPTCY CODE

879.   The Workers incorporate by reference all preceding paragraphs of this Complaint.

880.   Section 523(a)(6) provides, in relevant part, that

[a] discharge under section 727 . . . of this title does not discharge an individual debtor from any debt— . . . for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

881.    Luna willfully made false statements of material fact when he promised the Workers would receive wages, proper housing, food, and water, when the Workers were enticed to leave their homes and travel to the United States to work for ML Farm.

882.    Luna made these statements in order to induce the Workers to leave their homes in Mexico, travel the United States, and work for him.

883.    The Workers justifiably relied on Luna's promises the Workers would receive wages, proper housing, food, and water when they worked for ML Farm.

884.    The Workers were severely damaged by Luna's false statements.

885.    Luna acted willfully in that both the action of making the knowingly false statements and the resulting injury were intended by him.

886.    Luna made his statements maliciously in that he made them in conscious disregard of his duty or without just cause or excuse.

887.    All or part of the debt owed to the Workers is non-dischargeable as the debt is for willful and malicious injury within the meaning of § 523(a)(6) of the Bankruptcy Code.

WHEREFORE, pursuant to 11 U.S.C. § 523(a)(6), the Workers, as defined above, pray that this Honorable Court enter judgment in their favor and determine that the debt and liability owed by Mauricio Luna to the Workers is nondischargeable, and that it enter judgment for all amounts due as a result of

Mauricio Luna's liability to the Workers, award the Workers their costs, and grant such relief as this Honorable Court deems just.

## COUNT 3:

### NON-DISCHARGEABILITY OF DEBTS OWED TO THE WORKERS UNDER § 523(a)(6) OF THE BANKRUPTCY CODE

888.   The Workers incorporate by reference all preceding paragraphs of this Complaint.

889.   Section 523(a)(6) provides, in relevant part, that

[a] discharge under section 727 . . . of this title does not discharge an individual debtor from any debt— . . . for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523(a)(6).

890.   Luna knew he had no legal justification when he caused ML Farm to embark on his scheme when he made his false statements.

891.   Luna either desired to inflict injury on the Workers or knew the Workers' injury was likely to result from his actions.

892.   Luna acted in conscious disregard of his duties, and without just cause or excuse.

893.   The purpose, and unavoidable result, of Luna's actions was ML Farm's complete and total demise.

894.   Luna's purpose was not to salvage ML Farm's legitimate business operations, but to move those business operations to Alpha, and then later, to Spartans, for the purpose of hindering, delaying and defrauding the Workers.

WHEREFORE, pursuant to 11 U.S.C. § 523(a)(6), the Workers, as defined above, pray that this Honorable Court enter judgment in their favor and determine that the debt and liability owed by Mauricio Luna to the Workers is nondischargeable, and that it enter judgment for all amounts due as a result of Mauricio Luna's liability to the Workers, award the Workers their costs, and grant such relief as this Honorable Court deems just.

## COUNT 4:

### DENIAL OF DISCHARGE OF DEBTS UNDER § 727(A)(5) OF THE BANKRUPTCY CODE

895.   The Workers incorporate by reference all preceding paragraphs of this Complaint.

896.   Section 727(a)(5) provides, in relevant part, that the court may deny a discharge where

> [T]he debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

11 U.S.C. § 727(a)(5).

897.   ML Farm filed for protection under the United States Bankruptcy Code on October 23, 2020 as Case No. 20-81768.

898.   Luna is an insider of ML Farm.

899.   Luna disclosed a debt of $398,694.40 owed by ML Farm to Southern Carlson, Inc. on its Schedule F filed in its bankruptcy case.

900.   At the meeting of creditors held pursuant to 11 U.S.C. § 341 in the ML Farm bankruptcy case, Luna testified that ML Farm incurred the above-described debt to Southern Carlson, Inc. for the purchase of tools.

901.    Luna failed to disclose the date ML Farm incurred its debt to Southern Carlson, Inc. on its bankruptcy schedules.

902.    Luna did not list tools as assets of ML Farm on its Schedule B filed in the ML Farm bankruptcy case and disclosed only a transfer of tools to Alpha for $75,000.

903.    Luna testified at the meeting of creditors held pursuant to 11 U.S.C. § 341 in the ML Farm's bankruptcy case that the tools ML Farm acquired with financing from Southern Carlson, Inc. were all lost in a series of thefts in 2019 and 2020, but could not provide any information regarding the alleged thefts or even the authorities with which ML filed a police report.

904.    In Paragraph 10 of its Statement of Financial Affairs, Luna did not disclose any losses to ML Farm from theft or other casualty within one year of the filing of ML Farm's petition initiating its bankruptcy case.

905.    In Paragraph 1 of ML Farm's Statement of Financial Affairs, Luna stated under the penalty of perjury that ML Farm generated $1,884,848.60 in gross revenue in 2020.

906.    Luna testified at the meeting of creditors held pursuant to 11 U.S.C. § 341 in ML Farm's bankruptcy case that ML Farm did not perform any jobs in 2020.

907.    Luna has failed to explain failed to explain in any satisfactory manner the loss or deficiency of his and ML Farm's assets.

WHEREFORE, pursuant to 11 U.S.C. § 727(a)(5), the Workers, as defined above, pray that this Honorable Court determine that the debt and liability owed by

Mauricio Luna in this case shall not be discharged and that discharge be denied to Mauricio Luna, award the Workers their costs, and grant such relief as this Honorable Court deems just.

## COUNT 5:

### DENIAL OF DISCHARGE OF DEBTS UNDER § 727(A)(7) OF THE BANKRUPTCY CODE

908.    The Workers incorporate by reference all preceding paragraphs of this Complaint.

909.    Section 727(a)(5) provides, in relevant part, that the court may deny a discharge where

> the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

11 U.S.C. § 727(a)(5).

910.    Section 727(a)(7) provides, in relevant part, that the court may deny a discharge where

> [T]he debtor has committed any act specified in . . . [§ 727(a)(5)] . . . , on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider.

11 U.S.C. § 727(a)(7).

911.    Luna failed to satisfactorily explain the loss or dissipation of the machinery, equipment, furniture, and vehicles Luna listed as assets of ML Farm on its Balance Sheet having a value of $4,600,000.00.

912.    Luna failed to satisfactorily explain the loss or dissipation of more than $4,400,000.00 of ML Farm's accounts receivable.

913. Luna failed to satisfactorily explain the complete loss or dissipation of tools financed by Southern Carlson, Inc.

914. Luna failed to satisfactorily explain the complete loss or dissipation of its gross receipts during 2020, in light of its lack of projects or meaningful payments to its creditors, including the Workers.

WHEREFORE, Pursuant to 11 U.S.C. § 727(a)(7), the Workers, as defined above, pray that this Honorable Court determine that the debt and liability owed by Mauricio Luna in this case shall not be discharged and that discharge be denied to Mauricio Luna, award the Workers their costs, and grant such relief as this Honorable Court deems just.

### COUNT 6:

### DENIAL OF DISCHARGE OF DEBTS UNDER § 727(A)(3) OF THE BANKRUPTCY CODE

915. The Workers incorporate by reference all preceding paragraphs of this Complaint.

916. Section 727(a)(7) provides, in relevant part, that the court may deny a discharge where

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(7).

917. Luna has not provided full documentation regarding the transfer of all of ML Farm's assets and going concern value to Alpha or Spartans with the exception

of a vague invoices created well after the fact when Iowa Falls State Bank, one of
Luna and ML Farm's creditors, discovered Luna's scheme.

918.   Luna has not provided full records regarding payments received from
Alpha or work performed for Alpha.

919.   Luna has not provided full records regarding the dissipation of the
assets described in this Complaint.

920.   Luna was unable to provide any information at the meeting of creditors
held under 11 U.S.C. § 341 in the ML Farm Bankruptcy regarding these matters.

921.   Luna has either concealed, destroyed, or failed to keep or preserve
financial records from which ML Farm's financial condition or business transactions
might be ascertained.

WHEREFORE, pursuant to 11 U.S.C. § 727(a)(3), the Workers, as defined
above, pray that this Honorable Court determine that the debt and liability owed by
Mauricio Luna in this case shall not be discharged and that discharge be denied to
Mauricio Luna, award the Workers their costs, and grant such relief as this
Honorable Court deems just.

### COUNT 7:

#### DENIAL OF DISCHARGE OF DEBTS UNDER § 727(A)(4) OF THE BANKRUPTCY CODE

922.   The Workers incorporate by reference all preceding paragraphs of this
Complaint.

923.   Section 727(a)(4) provides, in relevant part, that the court may deny a
discharge where

[T}he debtor knowingly and fraudulently, in or in connection with the case—

134

(A) made a false oath or account;

(B) presented or used a false claim;

(C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

11 U.S.C. § 727(a)(4).

924.   Luna signed the Petition, Schedules, and Statement of Financial Affairs filed in ML Farm's bankruptcy case under penalty of perjury.

925.   Luna made numerous false statements under oath in connection with the case, including but not limited to his address, his knowledge of his daughter's employment with Alpha, and his involvement with Alpha's business.

926.   To the extent Luna attempts to explain the loss or dissipation of ML Farm's assets of in a manner that renders the Petition, Schedules, Statement of Financial Affairs, or testimony in the ML Farm bankruptcy case inaccurate or incomplete, Luna knowingly and fraudulently made a false oath or account in or in connection with a case under Title 11 of the United States Code.

WHEREFORE, pursuant to 11 U.S.C. § 727(a)(4), the Workers, as defined above, pray that this Honorable Court determine that the debt and liability owed by Mauricio Luna in this case shall not be discharged and that discharge be denied to Mauricio Luna, award the Workers their costs, and grant such relief as this Honorable Court deems just.

## COUNT 8:

### DENIAL OF DISCHARGE OF DEBTS UNDER
### §§ 727(A)(2) & 727(A)(3) OF THE BANKRUPTCY CODE

927.   The Workers incorporate by reference all preceding paragraphs of this

Complaint.

928.   Section 727(a)(2) provides, in relevant part, that the court may deny a

discharge where

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of
> the estate charged with custody of property under this title, has transferred,
> removed, destroyed, mutilated, or concealed, or has permitted to be
> transferred, removed, destroyed, mutilated, or concealed—
>
> (A) property of the debtor, within one year before the date of the filing of the
> petition; or
>
> (B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2).

929.   Section 727(a)(3) provides, in relevant part, that the court may deny a

discharge where

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or
> preserve any recorded information, including books, documents, records, and
> papers, from which the debtor's financial condition or business transactions
> might be ascertained, unless such act or failure to act was justified under all
> of the circumstances of the case.

11 U.S.C. § 727(a)(3).

930.   Luna caused the Workers to suffer injury through lost wages and ML

Farm's failure to perform its contractual obligations.

931.   Luna is not entitled to discharge because, with intent to hinder, delay,

or defraud the Workers, he has "transferred, removed, destroyed, mutilated, or

concealed his property" within one year before filing, and "concealed, destroyed, mutilated, falsified, or failed to keep or preserve" the appropriate records and other documents from which his financial condition and business transactions might be ascertained, within the meaning of 11 U.S.C. §§ 727(a)(2) & 727(a)(3).

WHEREFORE, pursuant to 11 U.S.C. §§ 727(a)(2) & 727(a)(3), the Workers, as defined above, pray that this Honorable Court determine that the debt and liability owed by Mauricio Luna in this case shall not be discharged and that discharge be denied to Mauricio Luna, award the Workers their costs, and grant such relief as this Honorable Court deems just.

## CLAIMS FOR RELIEF: SUBSTANTIVE COUNTS

### COUNT 9:

#### RACKETEERING IN VIOLATION OF 18 U.S.C. § 1962(c)

##### The Enterprise

932. At all relevant times there existed an "enterprise" within the meaning of 18 U.S.C. § 1961(4), namely, an association in fact of entities and individuals, the activities of which affected interstate and foreign commerce, which enterprise was comprised by ML Farm, Alpha, Spartans, Mauricio Luna, Marisol Luna, Luis Garcia, Melissa Garcia and others. This enterprise is hereafter referred to as the Luna Trafficking Operation.

933. Defendants conducted and participated in the conduct of the Luna Trafficking Operation through a pattern of racketeering activity as that term is defined 18 U.S.C.§ 1961(5), including through forced labor in violation of 18 U.S.C. §

1589, trafficking with respect to forced labor in violation of 18 U.S.C. § 1590, Hobbs

Act extortion in violation of 18 U.S.C. § 1951, fraud in foreign labor contracting in

violation of 18 U.S.C. § 1351(a), mail fraud in violation of 18 U.S.C. § 1341, wire fraud

in violation of 18 U.S.C. § 1343, and concealment of assets in bankruptcy proceedings

in violation of 18 U.S.C. § 152.

<u>The Pattern of Racketeering Activity</u>

<u>Racketeering Acts Nos. 1 through 6: Forced Labor in Violation of 18 U.S.C. § 1589</u>

934.    During the periods specified below, Defendants knowingly obtained the

labor or services of the following Workers by means of the abuse or threatened abuse

of law or the legal process, in violation of 18 U.S.C. § 1589(a).

| Racketeering Act | Victim | Dates | Paragraphs |
|---|---|---|---|
| 1. Luna threatened Mr. Gamboa with immigration consequences if he complained or did not finish his work in time. | Luis Alfredo Gamboa Marrero | 2019 | 192 |
| 2. Luna threatened Mr. Martinez Torres, stating that if Mr. Martinez Torres left his employment, he would be reported to immigration authorities, and falsely claimed he would not be able to obtain another H-2A visa. | Rodrigo Martinez Torres | 2019 | 223 |
| 3. Luna threatened Mr. Rendon, stating that if Mr. Rendon did not work on the weekends, he would report him to Immigration. Luna also told Mr. Rendon that if Mr. Rendon did not agree to an extension of his work visa, he would not be hired for | Dario Aguilera Rendon | 2017 | 418 − 420 |

| | | | |
|---|---|---|---|
| future seasons, and threatened him by stating Luna would prevent Mr. Rendon from obtaining future H-12A visas in the future if he refused to sign requests for visa extensions. | | | |
| 4. Luna regularly threatened Mr. Sandoval and other Workers with blacklisting and adverse action by immigration authorities, telling them that if they did not satisfactorily complete their work, Luna would call ICE and tell the agency to revoke their visas, in addition to preventing them from obtaining H-2A visas in the future. | Manuel de Jesus Sandoval Medina | 2018 | 491, 492 |
| 5. After Mr. Barron left Luna's employment because he was not being paid, Luna's agent made statements to Mr. Barron indicating that if Mr. Barron did not report back to ML Farm's employment within 72 hours, Luna would report his departure to immigration authorities, and Mr. Barron would face consequences because the authorities would know that he did not complete his contract. | Melquiades Barron Sandoval | 2019 | 844 |

935. Racketeering Act 6. During the period 2017 to 2020, Defendants knowing benefited financially from participation in a venture which engaged in the providing or obtaining of labor or services by means described in 18 U.S.C. § 1589(a), knowing or in reckless disregard of the fact that the venture has engaged in the

providing or obtaining of labor or services by such means, in violation of 18 U.S.C. § 1589(b).

### Racketeering Acts Nos. 7 through 13: Trafficking with Respect to Forced Labor

936.   Racketeering Acts 7-12. From 2017 to 2020, Defendants knowingly recruited, harbored, transported, provided and obtained by various means, each of the persons identified in the table following paragraph 941 above, for labor or services in violation of Chapter 77 of the Title 18 of the United States Code, in violation of 18 U.S.C. § 1590(a).

937.   Racketeering Act 13. From 2017 to 2020, Defendants obstructed and attempted to obstruct, and interfered with and prevented enforcement of 18 U.S.C. § 1590 by the United States Department of Labor, in violation of 18 U.S.C. § 1590(b).

### Racketeering Acts No. 13 through 24: Hobbs Act Extortion in Violation of 18 U.S.C. § 1951

938.   During the periods specified below, Luna obstructed, delayed and interfered with commerce by means of extortion and attempted extortion by the wrongful use of threats and fear of economic harm and deportation against each of the following Workers as described in the table set forth below, in violation of 18 U.S.C. § 1951.

| Racketeering Act No. | Plaintiff | Date | Paragraphs |
|---|---|---|---|
| 13. Luna pressured Mr. Mares and other Workers into returning for future seasons by claiming he would only pay them for the past season's wages if they returned to work the next season. Additionally, Mr. Mares heard | J. Remedios Mares Cordova | 2018-2019 | 334, 336 |

| | | | |
|---|---|---|---|
| Luna threatening the Workers with blacklisting if they complained about unpaid or late wages, telling them that if they did not continue working, he would ensure they were not able to obtain future visas to work with companies in the United States. | | | |
| 14. During the 2017 season, Workers heard that USDOL inspectors would arrive at their jobsite to interview them. Luna or Luna's agent warned the Workers not to complain. Mr. Castañeda's was instructed to tell inspectors that they were being treated fairly and did not have complaints about the work conditions. Luna or Luna's agents threatened the Workers with blacklisting if they did not comply. | Martin Castañeda Aranda | 2017 | 305 |
| 15. During the 2018 season, Luna or Luna's agent pressured Mr. Castañeda to extend his H-2A visa so he could remain in the United States, working for ML Farm, despite Mr. Castañeda stating that he did not want to extend his visa. Luna or Luna's agent told Mr. Castañeda's that if he did not consent to the extension, ML Farm would not offer him work the following season, and the he would falsify Mr. Castañeda's signature on the extension. Mr. Castañeda felt he had no choice but to sign the extension. | Martin Castañeda Aranda | 2018 | 303 |
| 16. At the meeting in Rockford held every year when the Workers arrived, Luna threatened to "send Workers | Samuel Hidrogo Ruiz | 2016, 2017, 2018 | 377 |

| | | | |
|---|---|---|---|
| back to Mexico" and prevent further work opportunities in the United States if the Workers did not complete their jobs satisfactorily. Luna told the Workers, including Mr. Hidrogo, that if they missed a day of work, they would be sent back to Mexico. When Mr. Hidrogo and other Workers complained about the lack of pay, long hours, or exposure to the weather while working, Luna or Luna's agents would tell them to "then go to Mexico." Mr. Hidrogo understood these comments to mean that Luna would call Immigration and Customs Enforcement to revoke their immigration status if they continued to complain. | | | |
| 17. At the end of the 2016 season, Luna or Luna's agent told Mr. Hidrogo and other Workers that they needed to extend their visas and work another four days. Some of the Workers objected to this extension because they had already made plans to return to their home countries. Luna or Luna's agent told Mr. Hidrogo and the Workers that they would not be hired for future seasons if they did not comply and agree to extend their visas and work the extra days. | Samuel Hidrogo Ruiz | 2016 | 396 |
| 18. Luna or Luna's agents threatened to report the workers to Immigration and Customs Enforcement when the Workers did not want to work on the weekends. During the 2017 season, Mr. Aguilera witnessed supervisors send two co-workers to ML Farm's offices in Rockford | Dario Aguilera Rendon | 2017, 2018, 2019 | 418 |

| | | | |
|---|---|---|---|
| for refusing to work weekends. He understood Luna was sending these workers back to Mexico. Mr. Aguilera believed that if he failed to meet Luna's demands to work extra hours, Luna would send him to Mexico. | | | |
| 19. Each season, Mr. Aguilera witnessed Luna blacklisting workers to prevent future opportunities to work for ML Farm or other agricultural companies in the United States if the Workers refused to sign requests for their visa extensions and remain longer than originally agreed. | Dario Aguilera Rendon | 2017, 2018, 2019 | 420 |
| 20. During the 2019 season, Mr. Hernandez's supervisor and Luna's agent, Miguel Avila, threatened to withhold pay and to prevent future work opportunities for the Workers if they continued to complain. Mr. Avila also threatened to report Mr. Hernandez Aranda and other Workers to Immigration. | Jose Eliseo Hernandez Aranda | 2019 | 519 – 520 |
| 21. When Mr. Olivares arrived in Rockford, he attended a meeting at the ML Farm offices. Luna and other ML Farm permanent employees were present. A member of the human resources staff, Mirsa Benavides, told Workers that if they took any action against the company, they would be fired, and they would not earn any money. | Rogelio Olivares Rodarte | July – August 2017 | 552 |
| 22. While in the field, Luna's agent pressured Mr. Olivares to work harder and faster. He told Mr. Olivares and other Workers that if they could not sustain an intense pace of work, they would | Rogelio Olivares Rodarte | July – August 2017 | 564, 572 |

| | | | |
|---|---|---|---|
| be sent back to the motel in Rockford. Additionally, Raul Coria, ML Farm's comptroller, threatened Mr. Olivares by saying that he would call ICE to let them know if Mr. Olivares left ML Farm's employment. | | | |
| 23. In 2019, after three weeks without pay, Mr. Esquivel visited Luna at the Rockford office to demand his wages. Luna told Mr. Esquivel he did not have the money to pay him the missed wages from the 2018 season but said he would pay the 2019 wages in installments. When Mr. Esquivel expressed skepticism that ML Farm would ever pay his wages, Luna became angry and warned Mr. Esquivel that if Mr. Esquivel did not continue working, he would "make a report." Mr. Esquivel understood this to mean Luna would report him to ICE. | Omar Alonso Esquivel Beltran | 2019 | 628 |

<u>Racketeering Acts Nos. 24 through 48: Fraud in Foreign
Labor Contracting in Violation of 18 U.S.C. § 1351(a)</u>

939.   From 2012 to 2020, Defendants knowingly and with intent to defraud recruited, solicited and hired persons, namely, each of the Workers, outside the United States or caused another person to do so by means of materially false or fraudulent pretenses, representations and promises regarding that employment, in violation of 18 U.S.C. § 1351(a). (The racketeering acts correspond sequentially to the order in which the Workers are listed in this Complaint).

940.   The false pretenses, representations and promises included those identified in this Complaint relating to the false representations that they would be

paid full wages for their work, that they would be paid promptly, that no funds would

be unlawfully withheld from their wages, that they would work only 40 hours a week,

that they would have adequate housing, food, and water, that their place of

employment would correspond with their contract and the job order submitted to the

USDOL.

Racketeering Acts Nos. 49 – 59: Wire Fraud
against the Plaintiffs in Violation of 18 U.S.C. § 1343

941.   From 2016 to 2020, Defendants devised and intended to devise and

executed a scheme to defraud each of the Workers and to obtain money and property

from each Worker by means of false and fraudulent pretenses, representations and

promises, and in furtherance of the scheme transmitted or caused to be transmitted

by means of wire communication in interstate and foreign commerce, the signs,

pictures, emails or sounds detailed in the table following paragraph 943 below.

942.   The false pretenses representations and promises included those

identified in this Complaint relating to the false representations that they would be

paid full wages for their work, that they would be paid promptly, that no funds would

be with unlawfully withheld from their wages, that they would work only 40 hours a

week, that they would have adequate housing, food, and water, and that they would

not be transported among farms in different states.

943.   At least the following mailings and wire transmissions were made in

furtherance of the scheme:

| Date | Nature of communication | From | To |
|------|-------------------------|------|-----|

145

| 49. On or around October 15, 2019 | Wire transfer from ML Farm System to Alpha Agricultural for the sale of various vehicles in the amount of $26,800.00 | Mauricio Luna on behalf of ML Farm Systems | Luis Garcia on behalf of Alpha Agricultural |
|---|---|---|---|
| 50. On or around December 27, 2019 | Wire transfer from ML Farm System to Alpha Agricultural for Equipment in the amount of $35,000. Upon information and belief, invoice prepped by Melissa Garcia at ML Farm and received by the same at Alpha | ML Farm Systems | Alpha Agricultural |
| 51. On or around January 21, 2020 | Wire transfer from ML Farm System to Alpha Agricultural for Equipment in the amount of $28,350.00. Upon information and belief, invoice prepped by Melissa Garcia at ML Farm and received by the same at Alpha | ML Farm Systems | Alpha Agricultural |
| 52. February 20, 2020 | Check from Alpha Agricultural Builders, Blackhawk Bank in the amount of $150.00 for incorporation of Alpha | Alpha Agricultural Builders, Blackhawk Bank | Illinois Secretary of State |

| 53. March 12, 2020 | Email from Kim O'Rorke to Richard Randick about Maurcio's role in hiring her at Alpha | Kim O'Rourke, former CFO at Alpha, using an Alpha email address | Richard Randick |
| 54. May 5, 2020 | Deposit of $300,000 made at Stillman Bank and subsequent wire transfers made to GM Financial for vehicles and other expenses out of PPP loan money. | ML Farm Systems, Stillman Bank | GM Financial |
| 55. October 01, 2020 | Wire Transfer for $16,000 | Alpha | Spartans |
| 56. October 13, 2020 | Email from Lucia Ramirez directing Delta to send payroll information on Spartan | Lucia Ramirez, using an Alpha email address | Delta Financial Services |
| 57. December 14, 2020 | Email from Melissa Garcia to Delta instructing them to pay Lucia Ramirez a bonus check after starting Spartan | Melissa Garcia, using an Alpha email address | Delta Financial Services |
| 58. January 19, 2021 | Email from Lucia Ramirez sending Delta her hours for working on Spartan | Lucia Ramirez using an Alpha email address | Delta Financial Services |
| 59. April 21, 2021 | Email from Luis Garcia or Melissa Garcia to Delta requesting full payroll for Alpha and Spartan | Luis or Melissa Garcia using an Alpha email address | Delta Financial Services |

<u>Racketeering Acts No. 60 through 71: Mail Fraud against the United
States Department of Labor in violation of 18 U.S.C. §§ 1341 and 1346</u>

944.     From 2016 to present, Defendants devised and intended to devise and
executed a scheme to defraud the United States Department of Labor of its intangible
right to issue job orders and certifications under the H-2A Program only to firms that
adhered to the standards set forth in the program, by means of false and fraudulent
pretenses, representations and promises, and in furtherance of the scheme deposited
and sent through the United States Postal Service and commercial carriers the
mailings detailed in the table following paragraph 946 below.

945.     Luna submitted fraudulent applications to the USDOL, fraudulently
signed contracts with fixed-site employers knowing he would not pay the Workers for
work under these contracts, and purposefully and fraudulently misled the DOL into
authorizing the activities of the Luna Trafficking Operation.

946.     The false representations included that Defendants would pay Workers
the specified wage, that they would pay without deductions, that they would
reimburse Workers for travel expenses, that they would provide free housing that
complied with health and safety regulations, and others further detailed in this
Complaint. At least the following wire transmissions were made in furtherance of the
scheme:

| Date | Nature of communication | From | To |
|---|---|---|---|
| 60. May 8, 2018 | I-129 Form sent via UPS | Aaron Bernard, Esq., on behalf of ML Farm Systems | USDOL |

| 61. August 2, 2018 | I-129 Form sent via UPS | Aaron Bernard Esq., on behalf of ML Farm Systems | USDOL |
|---|---|---|---|
| 62. September 12, 2018 | I-129 Form sent via UPS | Aaron Bernard Esq., on behalf of ML Farm Systems | USDOL |
| 63. April 5, 2019 | H-2A Application for Temporary Employment Certification Form (ETA 9142A) via UPS | Aaron Bernard, Esq., on behalf of ML Farm Systems | USDOL |
| 64. April 17, 2019 | Clearance Form (Form ETA 790) sent via UPS | Aaron Bernard, Esq., on behalf of ML Farm Systems | Department of Labor Nebraska |
| 65. April 22, 2019 | H-2A Application for Temporary Employment Certification Form (ETA 9142A) via UPS | Aaron Bernard, Esq. on behalf of ML Farm Systems | USDOL |
| 66. April 26, 2019 | Labor Certification and H-2A Application sent via UPS | Aaron Bernard, Esq., on behalf of ML Farm Systems | USDOL |
| 67. May 8, 2019 | H-2A Application for Temporary Employment Certification Form (ETA 9142A) via UPS | Aaron Bernard, Esq., on behalf of ML Farm Systems | USDOL |
| 68. May 15, 2019 | Agricultural and Food Processing Clearance Order (ETA Form 790) sent via UPS | Aaron Bernard, Esq., on behalf of ML Farm Systems | USDOL |
| 69. May 21, 2019 | Agricultural and Food Processing Clearance Order (ETA Form 790) sent via UPS | Aaron Bernard, Esq., on behalf of ML Farm Systems | USDOL |

| 70. June 4, 2019 | Petition for Nonimmigrant Farmworker Form, I-129, sent via USPS | Aaron Bernard, Esq., on behalf of ML Farm Systems | USDOL |
|---|---|---|---|
| 71. June 10, 2019 | Agricultural and Food Processing Clearance Order (ETA Form 790) sent via UPS | Aaron Bernard, Esq., on behalf of ML Farm Systems | USDOL |

## COUNT 10:

### RACKETEERING CONSPIRACY IN VIOLATION OF 18 U.S.C. § 1962(D)

947.   The Workers incorporate by reference all preceding paragraphs of this Complaint.

948.   Luna conspired with the other Defendants together and with other persons known and unknown to violate 18 U.S.C. § 1962(c) in connection with the Luna Trafficking Operation, and agreed that in furtherance of that conspiracy, some person would commit at least two acts of racketeering.

949.   For these reasons, the Workers pray for compensatory damages, treble damages, costs, and attorneys' fees.

## COUNT 11:

### VIOLATIONS OF THE FLSA—UNPAID MINIMUM WAGES ON BEHALF OF ALL WORKERS

950.   The Workers incorporate by reference all preceding paragraphs of this Complaint.

951.   The FLSA requires employers to pay employees who engage in the production of goods for interstate commerce, or who are employed by an enterprise

engaged in commerce or in the production of goods for commerce, the federal minimum wage. 29 U.S.C. §§ 206(a), 215(a)(2).

952.  The Workers were engaged in the production of goods for commerce throughout their employment with ML Farm.

953.  Defendants is and was at all relevant times an enterprise engaged in commerce and the production of goods for commerce.

954.  Defendants repeatedly violated 29 U.S.C. §§ 206(a) and 215(a)(2) by failing to pay the Workers the applicable federal minimum wage during their employment at ML Farm during 2018, 2019, and 2020.

955.  Defendants violated the FLSA, as set forth herein, in part by failing to pay the Workers the federal minimum wage for each hour that the Workers worked. Instead, the Workers were frequently paid late or not paid at all.

956.  Defendants violated the FLSA, as set forth herein, in part by failing to reimburse the Workers for inbound transportation and visa-related costs.

957.  These costs, which were incurred primarily for the benefit of Defendants, resulted in FLSA minimum wage violations when Defendants failed to reimburse the Workers in their first pay period.

958.  Defendants violated the FLSA, as set forth herein, in part by failing to reimburse the Workers for their outbound transportation and visa costs.

959.  These costs, which were incurred primarily for the benefit of Defendants, resulted in FLSA minimum wage violations.

960.   Defendants repeated failures to pay the Workers federal minimum wage were willful violations of the FLSA under 29 U.S.C. § 255(a).

961.   As a consequence of Defendants' willful violations of the FLSA, the Workers are entitled to recover their unpaid minimum wages, plus an additional equal amount in liquidated damages, under 29 U.S.C. § 216(b).

WHEREFORE, the Workers, as defined above, pray that this Honorable Court enter judgment in their favor and against Defendants in an amount determined by this Honorable Court, along with an additional equal amount in liquidated damages, under 29 U.S.C. § 216(b), their costs, and grant such relief as this Honorable Court deems just.

## COUNT 12:

### TRAFFICKING VIOLATIONS UNDER 18 U.S.C. § 1589(A)(2)-(4) ON BEHALF OF THE WORKERS

962.   The Workers incorporate by reference all preceding paragraphs of this Complaint.

963.   Chapter 77 of Title 18 U.S.C. §§ 1581-1597 targets trafficking in persons. A victim of a violation of Chapter 77 may bring a civil action against the perpetrator, as well as against any person who knowingly benefits, financially or by receiving anything of value, from participation in a venture that the person knew or should have known violated the chapter. 18 U.S.C. § 1595(a).

964.   The Workers are victims of violations of the following provisions: 18 U.S.C. §§ 1589(a)(2)-(4), 1589(b), 1590, and 1594(a) and (b).

965.   Trafficking through forced labor occurs whenever one  knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means: (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint. *Id.* § 1589(a)(2)-(4).

966.   Defendants' actions violated 18 U.S.C. §1589(a)(2)-(4) individually and in combination.

967.   The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm. *Id.* § 1589(c)(2).

968.   "Abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action. *Id.* § 1589(c)(1).

969.   Defendants subjected the Workers to forced labor by means of serious harm by inflicting psychological, financial, and reputational harm on the Workers.

970.   Defendants caused substantial financial harm by causing the Workers to incur substantial debt before they began working and by committing substantial wage theft against the Workers.

971.   Defendants committed reputational harm by threatening to deport the Workers if they complained or did not continue working, and by threatening to provide them a visa in the future with ML Farm or any other company.

972.   Defendants caused untold psychological harm by continuous verbal abuse of the Workers, most often while they worked through criticism of their work and orders to work faster, and substantial psychological harm by subjecting Workers to unsafe work conditions resulting in Workers fearing physical harm while working, *Id.* § 1589(a)(2).

973.   The harm Defendants caused was sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances as the Workers, to perform or to continue performing labor or services in order to avoid incurring that harm.

974.   The Workers were impoverished foreign-born laborers who could not earn a comparable wage in their home county, and who had incurred debt that they owed back home in order to obtain work.

975.   Their families were depending on them to return home with these earnings.

976.    Leaving this work, with no or little earnings to show upon return, in addition to being prevented from getting future work, would compel a reasonable person in these circumstances to perform work or continue to perform work for Defendants, in order to avoid deportation or being blacklisted from future work. *Id.* § 1589(a)(2).

977.    Defendants abused the law the H2A visa process by forcing the Workers to become encumbered by debt in order to obtain their visas; failing to pay the Workers all of their earned wages according to their signed contracts; failing to provide proper housing, food, and medical care; threatening to abuse the law and legal process; threatening the Workers that Defendants would blacklist them from future work and report them to immigration for deportation; forcing them to sign visa extensions against their will so they would continue working for Defendants; coercing them by telling them that they would not receive all of their wages for one season unless they returned in subsequent seasons; and intimidating Workers by returning some workers unlawfully when they complained about work conditions. *Id.* § 1589(a)(3).

978.    Defendants' actions constituted a scheme, plan, or pattern intended to cause the Workers to believe that, if that person did not perform such labor or services, that they would suffer serious harm. For numerous years, Defendants carried out a system of recruiting hundreds of workers, forcing them to incur debt, and threatening them with the harm of deportation and blacklisting if they did not continue to work for Defendants. *Id.* §1589(a)(4).

155

979.   Defendants knew or should have known that their actions amounted to forced labor. *Id.* § 1595.

980.   Defendants' violations of 18 U.S.C. § 1589(a)(2)-(4) as described herein were willful and malicious, and they caused the Workers to suffer injuries.

981.   The Workers are entitled to recover compensatory and punitive damages and attorneys' fees and costs under 18 US.C. § 1595(a).

WHEREFORE, the Workers, as defined above, pray that this Honorable Court enter judgment in their favor and against Defendants in an amount determined by this Honorable Court, along with an additional amount in compensatory, liquidated damages, attorneys' fees and costs, under 18 U.S.C. § 1589(A)(2)-(4) and grant such relief as this Honorable Court deems just.

## COUNT 13:

### TRAFFICKING VIOLATIONS UNDER 18 U.S.C. § 1589(B) ON BEHALF OF THE WORKERS

982.   The Workers incorporate by reference all preceding paragraphs of this Complaint.

983.   18 U.S.C. §1589(b) creates liability for whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a), knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means.

984.    Defendants knowingly benefitted from the Workers' forced labor by obtaining the Workers, and Defendants knew or should have known that he was benefiting from their forced labor in violation of 18 U.S.C. § 1589(a). *See* 18 U.S.C. §§ 1589(b); 1595.

985.    Defendants provided or obtained forced labor from the Workers as set out above.

986.    Defendants financially benefited from this forced labor by receiving H-2A job orders from USDOL to bring hundreds of Workers to the United States to work; by receiving H-2A visas from USCIS to carry out that work; forcing workers to incur substantial debt in order to obtain their visa and travel to the U.S.; receiving payment for Workers' labor from multiple subcontractors;  cheating the Workers of their earned wages through chronic non-payment; requiring the Workers to work far more hours per week than stipulated by their contracts; coercing workers to return in subsequent seasons in order to receive their wages for prior seasons; coercing workers to extend their visas to continue working for Defendants; failing to  provide any of the legally required safeguards for the work, and failing to fulfilling the legally required housing, food, and transportation requirements as set out in the H-2A visa applications. All of these actions resulted in financial benefit to Defendants.

987.    Defendants knew or should have known that their actions violated 18 U.S.C. § 1589(b).

988.    Defendants' violations of 18 U.S.C. § 1589(b) were willful and malicious and caused the Workers to suffer injuries.

989.   The Workers are therefore entitled to recover compensatory and punitive damages and attorneys' fees and costs under 18 U.S.C. § 1595(a).

WHEREFORE, the Workers, as defined above, pray that this Honorable Court enter judgment in their favor and against Defendants in an amount determined by this Honorable Court, along with an additional amount in compensatory, liquidated damages, attorneys' fees and costs under 18 U.S.C. § 1589(B) and grant such relief as this Honorable Court deems just.

## COUNT 14:

### TRAFFICKING VIOLATIONS UNDER 18 U.S.C. § 1590 ON BEHALF OF THE WORKERS

990.   The Workers incorporate by reference all preceding paragraphs of this Complaint.

991.    Defendants knowingly recruited, harbored, transported, provided, and obtained the Workers for their labor and services in violation of 18 U.S.C. § 1589. *See* 18 U.S.C. § 1590.

992.   Defendants carried out recruitment of all the Workers in Mexico, arranged for their visas and other paperwork, transported them from the U.S./Mexico border to Rockford, Illinois and to all other work sites, and housed all the Workers, which resulted in their forced labor and involuntary servitude.

993.   Defendants knew or should have known that their actions violated 18 U.S.C. § 1590.

994.   Defendants' violations of 18 U.S.C. § 1590 were willful and malicious and caused the Workers to suffer injuries.

995.    The Workers are therefore entitled to recover compensatory and punitive damages and attorneys' fees and costs under 18 U.S.C. § 1595(a).

WHEREFORE, the Workers, as defined above, pray that this Honorable Court enter judgment in their favor and against Defendants in an amount determined by this Honorable Court, along with an additional amount in compensatory, liquidated damages, attorneys' fees and costs under 18 U.S.C. § 1590 and grant such relief as this Honorable Court deems just.

## COUNT 15:

### TRAFFICKING VIOLATIONS UNDER 18 U.S.C. § 1594(a) AND (b) ON BEHALF OF THE WORKERS

996.    The Workers incorporate by reference all preceding paragraphs of this Complaint.

997.    18 U.S.C. § 1594 punishes whoever attempts to violate or conspires with another to violate §§ 1589 or 1590. 18 U.S.C. § 1594(a), (b).

998.    Defendants attempted to violate 18 U.S.C. § 1594 when he used threats of serious harm against the Workers, used threats to abuse the law or legal process, and created a scheme and pattern intended to cause the Workers to believe that serious harm would result if they refused to continue working for ML Farm. *Id.* § 1594(a).

999.    Defendants conspired with others to violate 18 U.S.C. § 1594, in that he used his agents to make threats of serious harm and threats to abuse the law or legal process, and otherwise created a scheme and pattern intended to cause the Workers

to believe that serious harm would result if they did not continue working for Luna.
*Id.* § 1594(b).

1000. Defendants knew or should have known that their actions violated
§ 1594(a) and (b).

1001. Defendants' violations of 18 U.S.C. § 1594(a) and (b) were willful and
malicious and caused the Workers to suffer injuries.

1002. The Workers are entitled to recover compensatory and punitive
damages and attorneys' fees and costs under 18 U.S.C. § 1595(a).

WHEREFORE, the Workers, as defined above, pray that this Honorable Court
enter judgment in their favor and against Defendants in an amount determined by
this Honorable Court, along with an additional amount in compensatory, liquidated
damages, attorneys' fees and costs, under 18 U.S.C. § 1589(B) and grant such relief
as this Honorable Court deems just.

## COUNT 16:

### TRAFFICKING UNDER THE ILLINOIS VICTIMS PROTECTION ACT
### 740 ILCS 128/1 AND 720 ILCS 5/10-9 ON BEHALF OF THE WORKERS

1003. The Workers incorporate by reference all preceding paragraphs of this
Complaint.

1004. The Illinois Trafficking Victims Protection Act (ITVPA) provides for
civil damages "against any person or entity who knowingly subjects, attempts to
subject, or engages in a conspiracy to subject the victim to involuntary servitude or
human trafficking." 740 ILCS 128/15(a), (b-1).

160

1005.  Defendants knowingly subjected or attempted to subject the Workers to involuntary servitude and trafficking by abuse of the legal process, by using financial control over Workers, and by carrying out a scheme or plan intended to cause the Workers to believe that if they did not continue working, they would suffer serious harm. 720 ILCS 5/10-9.

1006.  Involuntary servitude occurs when one "knowingly subjects, attempts to subject, or engages in a conspiracy to subject another person to labor or services obtained or maintained through any of the following means: abuse or threatened abuse of law or legal process; intimidation, exertion of financial control; or, any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform the labor or services, that person or another person would suffer serious harm or physical restraint." 740 ILCS 128/10; *see also* 720 ILCS 5/10-9(b).

1007.  In relation to labor or services, to "obtain" is to secure performance thereof. 720 ILCS 5/10-9(a)(7).

1008.  In relation to labor or services, to "maintain" is to secure continued performance thereof, regardless of any initial agreement on the part of the victim to perform that type of service. 720 ILCS 5/10-9(a)(6).

1009.  "Any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm" amounts to "serious harm." 720 ILCS 5/10-9(a)(7.5).

1010. For purposes of the ITVPA, "financial harm" is defined to include "intimidation that brings about financial loss, criminal usury, or employment contracts that violate the Frauds Act." 720 ILCS 5/10-9(a)(3); *see also* 740 ILCS 128/10.

1011. "Intimidation" results when, "with intent to cause another to perform or to omit the performance of any act, an individual communicates to another, directly or indirectly by any means, a threat to perform, without lawful authority, any of the following acts: (1) inflict physical harm on the person threatened or any other person or on property; or (2) subject any person to physical confinement or restraint; or (3) commit a felony or Class A misdemeanor; or (4) accuse any person of an offense; or (5) expose any person to hatred, contempt or ridicule*;* or (6) take action as a public official against anyone or anything, or withhold official action, or cause such action or withholding; or (7) bring about or continue a strike, boycott or other collective action." 720 ILCS 5/12-6(a).

1012. Defendants abused the legal process by obtaining H-2A job orders from USDOL that contained misleading, false, and purposefully misleading information, including about the locations where Workers would be working, how many hours a week they would be working, and whether the Workers would be paid or paid timely for their hours worked.

1013. Defendants' contempt for and intimidation and ridicule of the Workers throughout their day-to-day work and when they complained about unpaid wages

was part of Luna's scheme to cause the Workers to believe that they would suffer serious harm should they fail to continue working.

1014.  Luna and Luna's agents told the Workers who complained about failure to pay wages or other work conditions that they would be returned to Rockford, Illinois and ICE would deport them. Luna also promised to pay the wages he owed them in the future if the Workers continued working.

1015.  The Workers believed that if they did not continue to work unpaid, under grueling conditions, and without complaint, they would not be paid for their hours already worked or/and Defendants would have them deported. Luna and Luna's agents also threatened to blacklist the Workers who caused trouble and threatened that, if deported, the Workers would be unable to obtain another H-2A visa.

1016.  Workers therefore believed that if they did not continue to work in these abusive work conditions, they would be unable to continue working in their chosen profession in the future. 720 ILCS 5/10-9(b)(3), (5).

1017.  Defendants used financial control over the Workers by failing to pay them their earned wages and making them believe that if they complained about non-payment of wages, they would be deported or blacklisted or both. Defendants' actions both threatened and actually brought about serious harm and financial loss to Workers.

1018.  The Workers were unpaid for numerous hours and went unreimbursed for substantial costs directly associated with their work, earning far less than their contract stated.

1019.  This caused real and actual harm to the Workers, who were unable to pay debts contracted to acquire the job with ML Farm or to sustain family members reliant on them for financial support.

1020.  Defendants' violations of 720 ILCS 5/10-9 were willful and malicious and caused the Workers to suffer injuries.

1021.  The Workers are therefore entitled to recover compensatory and punitive damages and attorneys' fees and costs under 740 ILCS 128/15.

WHEREFORE, the Workers, as defined above, pray that this Honorable Court enter judgment in their favor and against Defendants in an amount determined by this Honorable Court, along with an additional amount in compensatory, liquidated damages, attorneys' fees and costs, under 740 ILCS 128/1 AND 720 ILCS 5/10-9 grant such relief as this Honorable Court deems just.

## COUNT 17:

### FRAUDULENT MISREPRESENTATION ON behalf of THE WORKERS

1022.  The Workers incorporate by reference all preceding paragraphs of this Complaint.

1023.  Luna made false statements of material fact when he promised the Workers would receive wages, proper housing, food, and water, and enticed the Workers to leave their homes and travel to the United States to work for ML Farm.

1024. Luna knew that his statements were false, and that he would not be providing the Workers with all their wages, and proper housing, food, and water.

1025. Luna made these statements in order to induce the Workers to leave their homes in Mexico, travel to the United States, and work for him.

1026. Defendants were the sole holders of information about the Workers' wages and the monetary and non-monetary compensation owed to them.

1027. The Workers justifiably relied on Luna's promises that they would receive wages, proper housing, food, and water, when they worked for ML Farm.

1028. The Workers were severely damaged by Defendants false misrepresentation.

1029. The Workers are therefore entitled to recover compensatory and punitive damages.

WHEREFORE, the Workers, as defined above, pray that this Honorable Court enter judgment in their favor and against Defendants in an amount determined by this Honorable Court, along with punitive damages and costs, and grant such relief as this Honorable Court deems just.

## COUNT 18:

### BREACH OF CONTRACT UNDER ILLINOIS STATE LAW ON BEHALF OF THE WORKERS

1030. The Workers incorporate by reference all preceding paragraphs of this Complaint.

1031. The Workers entered into an employment contract to work for ML Farm in Illinois under the H-2A program.

1032. The Workers also signed contracts to work for ML Farm when they arrived in Rockford, IL.

1033. The Job Orders filed with the USDOL for these seasons contain the terms and conditions of the employment contract, the terms of which reflect the federal regulations at 20 C.F.R. §§ 655.121, 655.122, and 655.135.

1034. The Workers were employed in corresponding employment under 29 C.F.R. § §655.103(b), in that they were employed to perform work listed in the relevant job orders and/or performed by H-2A Workers.

1035. Defendants breached the employment contract with the Workers by:

a)     Providing terms and conditions that grossly deviated from the terms and conditions on their signed contracts and on the job orders submitted to the USDOL;

b)     Failing to pay the Workers the Adverse Effect Wage Rate salary per hour for every compensable hour that the Workers worked;

c)     Failing to pay the Workers at least the federal minimum wage for each compensable hour of work in a work week;

d)     Failing to pay the Workers their wages due on a weekly basis;

e)     Failing to reimburse the Workers for their full inbound and outbound travel between their hometowns in Mexico and Illinois;

f)     Failing to provide adequate housing, proper food, and water while on the jobsites.

1036. The Workers are entitled to recover their unpaid wages and reimbursable expenses under Illinois state law.

WHEREFORE, the Workers, as defined above, pray that this Honorable Court enter judgment in their favor and against Defendants in an amount determined by

this Honorable Court, their costs, and grant such relief as this Honorable Court

deems just.

## DEMAND FOR A JURY TRIAL

The Workers demand a jury trial on all issues properly triable to a jury.

Dated: August 9, 2021

Respectfully submitted,

**Rodrigo Martinez Torres, Dario Aguilera Rendon, Luis Alfredo Gamboa Marrero, Melquiades Barron Sandoval, Omar Alonso Esquivel Beltran, Brian Flores Gonzalez, Gerardo Martinez Hernandez, Angel Valentin Estrella Diaz, Gerardo Santillan Hernandez, Arturo Jasso Villalpando, Gerardo Garcia Roldan, Manuel de Jesus Sandoval Medina, Jose Luis Torres Salinas, Rogelio Olivares Rodarte, Martin Castañeda Aranda, Samuel Hidrogo Ruiz, J Remedios Mares Cordova, Guillermo Guevara Mora, Jose Eliseo Hernandez Aranda, Francisco Palos Soto, Edgar Castillo Torres, Manuel Mora Garcia, Marco Cuevas Leal, and Felipe Flores Garcia,**

By:   /s/    Mariyam Hussain
One of Their Attorneys

Mariyam Hussain (ARDC No.6304816)
Miriam Hallbauer (ARDC No. 6229392)
Legal Aid Chicago
120 S. La Salle, Ste. 900
Chicago, IL 60603
(312) 229-6360
mhussain@legalaidchicago.org
mhallbauer@legalaidchicago.org

Gregory J. Jordan (ARDC No. 6205510)
Mark Zito (ARDC No. 6276231)
Jordan & Zito LLC
55 West Monroe St., Suite 3600
Chicago Illinois 60603
(312) 854-7181
gjordan@jz-llc.com
mzito@jz-llc.com

Chris Gair (ARDC No. 61900781)
Gair Eberhard Nelson Dedinas Ltd.
One East Wacker Drive, Suite 2600
Chicago, IL 60601
312-600-4900
cgair@gairlawgroup.com